David UNGAR et al.

v.

DUNKIN' DONUTS OF AMERICA, INC. and Quincy Adams Donuts, Inc.

John RADER et al.

v.

DUNKIN' DONUTS, INC. and Dunkin' Donuts of America, Inc.

Civ. A. Nos. 72-88, 72-1526.

United States District Court, E. D. Pennsylvania.

March 12, 1975.

74

David Berger, Warren D. Mulloy, Warren Rubin, Bruce K. Cohen, Edward C. German, Joseph G. Manta, Philadelphia, Pa., Harold Brown, Boston, Mass., for plaintiffs.

Alfred H. Wilcox, Charles J. Bloom, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### INDEX

I. Preliminary Statement 77

II. The Plaintiffs' Class Action Claims 80
 A. The Equipment Tie-In Claim 80
 B. The Supplier Tie-In Claim 81
 C. The Sign Tie-In Claim 82
 D. The Real Estate Tie-In Claim 82
 E. The Advertising Claims 82
 F. The Real Estate Tax Escrow Claim 83
 G. The Restrictive Covenant Claims 83
 H. Common Law Fraud Allegations 84

III. The Law of Tying—Economic Policy & Basic Principles 84
 A. The Economic Policy of the Law; The *Per Se* Rule 84
 B. Formal Requisites of a Tie 89
 1. The Tying and the Tied Products 89
 2. Sufficient Economic Power to Appreciably Restrain Competition in the Tied Product 90
 a. Quantum of the Power 90
 b. Proof of Existence of Economic Power 91
 3. The Requisite That a "Not Insubstantial" Amount of Commerce be Affected 94
 C. Does the Traditional Law of Tying Apply Where There is Split Ownership of the Tying and the Tied Products(?): The "TBA" Cases and the Franchise Cases 95

IV. The Law of Tying Continued: The Requirement of Proof of Use of Economic Power; The Individual Coercion Doctrine and the "Use-Coercion Dialogue" 97
 A. The Requirement That Economic Power be Used: A Statement of the "Use-Coercion Dialogue" 97
 B. A Statement of the Individual Coercion Doctrine; Incipient Flaws in the Doctrine 98
 C. The Cases Positing the Individual Coercion Doctrine: Comment on Their Viability 99

**76**

D. *Texaco* and *Perma Life Mufflers*; Their Adverse Impact Upon the Individual Coercion Doctrine 107
 1. *Texaco* 107
 2. *Perma Life Mufflers* 110
E. Can There be a "Voluntary" Tie(?); Further Defects in the Individual Coercion Doctrine 111
F. The Role of Company Policy in Proving Use of Economic Power 113
G. The Use-Coercion Dialogue Synthesized 114

V. Defenses to a Claim of Tying 116
A. The Marketing Identity or Quality Control Defense 116
B. Other Defenses 117

VI. Antitrust Law and Restrictive Covenants 118

VII. A Survey of the Class Action Discovery 122
A. Introduction; Overview of Defendant's Position 122
B. The Equipment Tie-In Claim 123
C. The Supplier Tie-In Claim 127
D. The Sign Tie-In Claim 130
E. The Real Estate Tie-In Claim 132

VIII. The Class Action Discussion 135
A. Formal Requisites of Rule 23; The Applicability of Rule 23(b)(3) Rather than Rule 23(b)(2) 135
B. Numerosity 136
C. Typicality of Claims 136
D. Adequacy of Representation 136
E. Predominance of Common Questions of Fact and Law over Individual Questions 139
 1. Introduction; The Matters of Damages and the Statute of Limitations 139
 2. The Antitrust Tying Claims 140
 a. The Formal Requisites of a Tie 141
 b. Proof of Use of Economic Power 141
 (1) General Conclusions 141
 (2) The Equipment and Sign Ties 142
 (3) The Real Estate Tie 142
 (4) The Supplier Tie-In Claim—The Quality Control Defense 143
 3. The Advertising Claims 143
 4. The Real Estate Tax Escrow Claim 143
 5. The Common Law Fraud Claims 144
 6. The Restrictive Covenant Claims 145
F. Superiority 147

IX. Conclusion 150

## I. *Preliminary Statement*

Before us are motions for class action determination under F.R.Civ.P 23(b)(2) and (3) in consolidated franchise antitrust suits brought against Dunkin' Donuts, Inc. and its wholly owned subsidiary, Dunkin' Donuts of America, Inc. (hereinafter collectively Dunkin' Donuts), by 14 of its present and former franchisees. Dunkin Donuts is the nation's largest coffee and doughnut franchise system. The plaintiffs, by virtue of their motions, seek to represent over 400 present Dunkin Donuts franchisees and approximately 200 former franchisees in claims for damages as well as declaratory and injunctive relief.[1] Plaintiffs' claims are bottomed principally upon alleged violations of § 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (1958), although they have also asserted counts based upon breaches of contract and fiduciary duty.

The claims presented by the plaintiffs in their complaints and class action papers are voluminous. In sum, they are a chronicle of the contemporary franchisee's recriminations against the franchise system in which he is enmeshed; indeed, they constitute a veritable jeremiad. These accusations and lamentations, couched of course in legal terms, span much of the range of the antitrust laws and consume 18 pages in the *Rader* complaint. Not all of the allegations are pressed, and for purposes of the present motions we are concerned principally with the allegations of anticompetitive ties of real estate, equipment and supplies, "oppressive" restrictive covenants, and misappropriation of the franchisees' advertising and real estate tax escrow funds.

As the reader will note from the caption, there are two actions before us. While their allegations are for the most part woven into a common skein, there is an important distinction between them. The *Ungar* case, unlike the *Rader* case, stems from a franchise agreement signed before November 1, 1970. On that date Dunkin Donuts altered its basic form franchise agreement in response to the decision of the United States Court of Appeals for the Ninth Circuit in Siegel v. Chicken Delight, Inc., reported at 271 F.Supp. 722 (N.D. Cal.1967), modified sub nom. Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969) [hereinafter *Siegel I*]. The fantastic growth of the franchising industry over the past decade has spawned a multitude of franchise antitrust actions, so that the matter before us is but another on a burgeoning roll. However, the *Siegel* litigation, which culminated in *Siegel II*, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), is a benchmark and a point of demarcation as well. Therefore, a brief discussion of its import is necessary at the outset of this opinion.

In *Siegel,* which also involved a fast food franchise operation, franchisees of Chicken Delight sought treble damages for injuries allegedly resulting from illegal restraints imposed by Chicken Delight's standard form franchise agreement. That agreement required that franchisees purchase certain essential cooking equipment, dry mix food items and trademark-bearing packaging exclusively from Chicken Delight as a condition of obtaining its trademark license to operate home delivery and food pickup stores.. In *Siegel I* the court certified a class consisting of all Chicken Delight franchisees. In *Siegel II* the holding of the district court that the contractual requirements constituted a tying arrangement in violation of the

---

1. According to the information supplied to us by the parties, there are presently 780 Dunkin Donuts shops in the United States, Canada and Puerto Rico. There are approximately 563 present franchisees, of whom 95 are multiple owners (with 2 to 10 shops) accounting for some 263 shops. The number of former franchisees is not precisely known, but the best information received to date indicates that they number over 200.

Sherman Act was affirmed by the court of appeals. *Siegel II* also held: (1) that the Chicken Delight trademark, logo and method of operations constituted a tying item separate and distinct from the packaging, mixes and equipment; (2) that the unique registered trademark, in combination with its demonstrated power to impose a tie-in, established as a matter of law the existence of sufficient market power to bring the case within the Sherman Act; and (3) that the tie could not be justified as a reasonable device for measuring and collecting revenue, as a device to protect a new business in accordance with the doctrine of United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), or as a means of preserving market identity or quality of the franchisor's product.

A tie is classically defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted). In the wake of *Siegel II*, many (and probably most) firms engaged in the franchising business eliminated overt tying provisions from agreements with their franchisees. Dunkin Donuts' November 1, 1970 modification of its standard form contract, for instance, was made to eliminate a provision which required a franchisee to purchase from Dunkin Donuts the equipment package necessary to operate the franchised business. In plaintiffs' view, however, *Siegel* did not mark the end of unlawful tying practices in the franchise industry, but rather signalled the beginning of a new era in which unlawful ties and other anticompetitive practices would be effected by more subtle and sophisticated means. Plaintiffs include Dunkin Donuts' practices in their opprobrium.

■ Almost all of the post-*Siegel* franchise antitrust cases are founded upon claims of unlawful ties. In each of those cases in which class certification was sought, the defendant has, as here, interposed the contention that in the absence of an overt contractual tie an unlawful tying arrangement cannot be established without proof of what is usually described as "individual coercion." Although the individual coercion doctrine has nowhere been explicated in detail, it appears to require proof by the plaintiff of such events and circumstances surrounding the relationship between the franchisor and *each* franchisee as will demonstrate that the franchisee was *coerced* into agreeing to an anticompetitive tie, usually of equipment or supplies. In suits of this type, the franchisor generally asserts that the alleged tie was either sought or voluntarily acquiesced in by the franchisee. Proof of individual coercion by each proposed class member is then said by the franchisor to be the only way to counter the doctrine. The result of the individual coercion doctrine, as it affects a class certification motion, is to escalate the predominance of individual questions over common questions of fact and law, and hence to militate against class action determination under F.R. Civ.P. 23(b)(3).

Plaintiffs concede that they must establish not only that the franchisor possesses the economic power requisite to a tie, but also that the economic power was in fact used. However, they vigorously assert that there is no individual coercion requirement in the law of tying and, alternatively, that even if such requirement exists in either pure or hybrid form, common questions still predominate for purposes of the class certification motion because of the pervasive effect of company policies in franchise dealings. These alternative assertions frame the initial undertakings of this

opinion: (1) an in-depth analysis of the law of tying, with attention to whether the individual coercion doctrine is a part of the law; and (2) a discussion of how the required use of economic power may be proved.[2]

These are initial or threshold undertakings because we cannot determine whether individual or common questions of fact or law predominate for purposes of Rule 23(b)(3) class certification unless we first survey the law of tying arrangements and determine the nature of proof required to establish an antitrust violation. This type of analysis has often been made at class action determination stages of franchise antitrust cases. *See, e. g.*, Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973); Abercrombie v. Lum's, Inc., 345 F.Supp. 387, 390 (S.D.Fla.1972). While such an analysis is not appropriate as a preliminary determination of the merits, *see* Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), it is proper and necessary in order to determine whether the requisites of Rule 23(b)(3) are satisfied.

An analysis of the law of tying arrangements, as it affects the franchising industry, is not a simple undertaking; in the lower federal courts (see discussion *infra*) the individual coercion doctrine is plainly in the ascendency. Since most tying cases that have reached the United States Supreme Court were brought by the government, that Court has not yet addressed the question of the necessity of proving individual coercion in a private injunctive or treble damage class suit where unlawful ties in the franchise industry are at issue. Nevertheless, it is necessary that we survey the Supreme Court's pronouncements in the tying area, and together

with an analysis of the lower court cases, do our best to arrive at a synthesis in this enigmatic area of the law.

The issue of predominance of common questions in the tying area is not, however, the sole question of substance before us. Difficult problems are also posed by the plaintiffs' allegations that the various restrictive covenant provisions of the Dunkin Donuts franchise agreement constitute an unreasonable restraint in violation of the antitrust laws. In terms of federal antitrust scrutiny, such allegations force us to enter a relatively nascent area of the law. Moreover, in view of the disparity between present and former franchisees in terms of the relief sought, we must face the problem of whether the representative parties will adequately represent the interests of the class. Finally, in view of the gargantuan nature of the litigation which will confront us if we make a class certification, there is also a difficult question of superiority of the class action form.

In view of the length of the opinion that follows, it is appropriate that we summarize its principal elements here. They are: (1) a discussion of the nature of plaintiffs' class action claims as presented in the complaints and class action papers; (2) an exegesis of the law of tying; (3) an explication of the duality between use of economic power and coercion and a resolution of the tension between the use and coercion concepts; (4) a brief look at some potential defenses to allegedly unlawful ties; (5) an analysis of the antitrust principles relating to restrictive covenants; (6) a survey of the voluminous discovery record taken in connection with the class action motions, which makes reference to Dunkin Donuts' defenses as well as plain-

---

**2.** During our discourse we will also confront the question of the extent to which the conventional law of tying applies to the alleged supplier tie-in involved in this case. Here, as in most contemporary fast food franchise cases, the franchisor is not the actual seller of the supplies with which the product is made, but instead requires that supplies be purchased from "approved" sources. This is not unlike the situation of the so-called TBA cases, and we will discuss their impact as well.

tiffs' claims and which attempts to expose the individual versus common issues; (7) a review of the requisites of Rule 23(b)(3); and (8) a discussion of whether the requirements of that rule have been met. For the reasons which will at some length appear, and with certain qualifications and limitations, a class action determination under Rule 23(b)(3) will be made.

## II. *The Plaintiffs' Class Action Claims*

Plaintiffs' complaints assert myriad claims for relief both under the antitrust laws and the common law. A number of these claims have been abandoned and some are not asserted as class action claims.[3] We will now summarize the principal allegations with respect to which class certification is sought. In this summary we will draw upon the allegations of both the *Ungar* and *Rader* complaints and the class action papers and briefs. We refrain, at this juncture, from surveying the class action discovery record, and from reviewing the defendant's forceful rejoinder to the plaintiffs' claims, preferring to defer these matters to a succeeding section of the opinion. We recite plaintiffs' claims at this early stage so that the discussion of the law of tying and of restrictive covenants which follows will be referable to the facts at bar.

### A. *The Equipment Tie-In Claim*

Plaintiffs claim that Dunkin Donuts has made it a condition of purchasing a Dunkin Donuts franchise that the franchisee buy from or through Dunkin Donuts the extensive equipment package necessary to operate the franchisee's store.

From 1967 until November 1, 1970, Dunkin Donuts' standard contract made it a "prerequisite" to the franchise agreement that the franchisee enter into an arrangement to buy his equipment package from Dunkin Donuts. This package cost the franchisee a total of approximately $32,000 to $42,000, depending upon the time the equipment was purchased, whereas the actual cost of the equipment was allegedly only $20,000.[4]

On November 1, 1970, Dunkin Donuts amended the Equipment Agreement to provide that the franchisee had a 30 day option to purchase the equipment from a source other than Dunkin Donuts.

3. Originally, plaintiffs also asserted: (1) allegations of price-fixing under Section 1 of the Sherman Act; (2) claims of monopolization and attempt to monopolize under Section 2 of the Sherman Act; (3) violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) promulgated thereunder; (4) allegations of conspiracy to restrain trade in violation of Section 1 of the Sherman Act; (5) charges of price and service discrimination under section 2 of the Clayton Act, as amended by section 1 of the Robinson-Patman Act; (6) claims of breach of contract in that, *inter alia*, defendant allegedly failed to cure defects in the buildings leased from it to plaintiffs and did not use its business expertise and economic power for the *mutual* benefit of the parties as contractually promised; (7) allegations of violations of Sections 38 and 43(a) of the Lanham Act by defendant's false and fraudulent claims to and use of the sole right to the Dunkin Donuts trademark and logo; (8) charges of tortious interference by defendant with the reasonable business expectancies of plaintiffs; and (9) claims of illegal tying under § 3 of the Clayton Act. These claims have either been abandoned or are not asserted as class action claims.

4. The equipment sold by Dunkin Donuts in the equipment package is manufactured by various concerns. Thereafter, such concerns sell the separate pieces of equipment to Paramount Fountain and Restaurant Supply Company, Dunkin Donuts' sole authorized supplier for equipment, which coordinates the equipment package from items that meet Dunkin Donuts' specifications. When this is done, Paramount sells the entire package to Dunkin Donuts for resale by Dunkin Donuts to its franchisees. Some of the items comprising the equipment package are mixers, friers, proofers, cutting benches, refrigerators, finishing tables, doughnut machines, bins and racks and pans, doughnut cutters, knives, tea and coffee dispensers, and even ashtrays, bulletin boards, clipboards, stepladders and mop handles.

Plaintiffs assert, however, that the thirty day period still resulted in the imposition of an illegal tying arrangement upon the franchisees for two reasons. First, they contend that the revised clause provides insufficient time for the uneducated franchisee to go out into the market and purchase and finance the required items.[5] Second, they submit that, in any event, those individuals who inquired about the thirty-day option were pressured by Dunkin Donuts not to purchase the equipment on their own, a pressure which allegedly was successful because of the dominant role of Dunkin Donuts over the franchisee.

Plaintiffs contend that the pre-November 1, 1970 equipment tie provision of the franchise agreement was resolutely enforced and that the policy which it reflected was nonetheless effectively continued after November 1, 1970, with the result that both before and after November 1, 1970, virtually every franchise operator has purchased the entire equipment package from Dunkin Donuts. It is asserted that over $1 million worth of equipment sales has thereby been foreclosed to competing firms in the restaurant equipment business.

B. *The Supplier Tie-In Claim*

Prior to 1966, Dunkin Donuts' franchise agreement required the franchisees to purchase materials from Dunkin Donuts or from sources approved by it. In 1966, defendant altered the Franchise Agreement whereby the franchisee could purchase materials from "non-approved vendors" so long as the "non-approved vendors" could meet Dunkin Donuts' specifications and then become approved suppliers. The five major categories of

supplies involved are flour, shortening, fillings, paper products and coffee. According to the complaints,[6] the defendant receives kickbacks and a grand opening contribution from these approved suppliers. Plaintiffs assert that in order to secure the first order in the franchisee's store, which is placed by Dunkin Donuts, the vendor must contribute anywhere between $50 and $750 to the defendant. In order to reimburse the vendor for this cost, through subsequent dealings with the franchisee, the plaintiffs assert that there is substantial pressure on the franchisee to retain the original Dunkin Donuts selected vendors and not to purchase supplies from vendors of his own choosing. This pressure, they contend, takes two basic forms: (1) the designation of a particular approved supplier for a new store and threats of disenfranchisement if the franchisee should object and prefer a different approved supplier; and/or (2) dilatory and obfuscatory methods set up by the defendant specifically to deal with problems such as the approval of new suppliers which thereby render the franchisee's freedom of choice a nullity.

It is plaintiffs' claim that Dunkin Donuts' specifications are nothing more than "a vehicle for defendants to receive kick-backs from suppliers, to completely control the operation of the franchisee, to limit the ability of the franchisees to purchase quality supplies from other vendors and to divide or geographically allocate territories to vendors."[7] Plaintiffs assert that Dunkin Donuts' specifications are "useless" and that their primary purpose is as a tool to prevent the utilization by the franchisees of sup-

5. Plaintiffs contend that had Dunkin Donuts provided the franchisees more time—at least ninety days—to obtain the equipment, they would have been able to purchase the equipment from sources other than Dunkin Donuts and at a considerably lower cost. Thus, although subsequent to November 1970, the defendant added a franchise fee and reduced the cost of the equipment package to the franchisee to $27,000, the plain-

tiffs contend that the $27,000 price exceeded the actual cost of $20,000 at which the franchisees could have obtained the items from other sources.

6. See *Rader* complaint ¶¶ 53(p) to (t); *Ungar* complaint ¶ 31(E).

7. Plaintiffs' Memorandum of Law in Support of Motion for Class Action Determination at 35.

pliers from whom Dunkin Donuts would not receive "contributions." In sum, plaintiffs allege that Dunkin Donuts' company policy, resolutely enforced, is tantamount to tying to the grant and maintenance of the franchise the obligation to purchase the wares of a limited group of vendors. This policy, according to plaintiffs, has resulted in increased cost to the franchisee since the supplier must pass on the cost of his contributions to Dunkin Donuts by means of higher prices to the franchisee.

## C. The Sign Tie-In Claim

Dunkin Donuts has always maintained the policy (through the equipment agreements) that each franchisee must have certain signs located at his store. To effectuate this policy, Dunkin Donuts says that it assists the franchisee in acquiring the signs to be sure they meet its specifications, or alternatively, that it permits the franchisee to purchase the signs directly from Dunkin Donuts. Plaintiffs contend that, in reality, the events which occur when a franchisee wants to purchase a sign or signs on his own track those recited previously; i. e., the franchisee is persuaded to purchase the signs either from Dunkin Donuts or from a company from which the defendant is receiving substantial secret kickbacks. The legal effect of this arrangement, plaintiffs assert, is the imposition of an illegal tying scheme upon the franchisee who, if he were free to choose his sign vendor, would be able to save a considerable sum of money.[8]

## D. The Real Estate Tie-In Claim

Plaintiffs contend that the defendant has conditioned the grant of the franchise upon the franchisees' agreement to lease or sublease from Dunkin Donuts, under onerous terms, the premises on which the donut shop is to be operated, and that defendant has prevented plaintiffs from acquiring or using their own land and/or buildings for their Dunkin Donuts franchises.[9] The defendant's alleged practice is to sublease the property to a franchisee at a substantial mark-up over the rent that Dunkin Donuts pays the prime lessor. According to plaintiffs, in most instances where a franchisee is permitted to use his own property, he is required to lease the property to Dunkin Donuts which, in turn, sublets it to the franchisee-owner. The foregoing is alleged to constitute an unlawful tying arrangement.

Related to the tying claims are two further contentions. Plaintiffs contend that all of the franchise lease agreements contain a provision for an extra mark-up in the franchisees' rental payments in the event the construction costs of the building exceed Dunkin Donuts estimates thereof. They also aver that since 1966 Dunkin Donuts has charged a 7% override on the gross income of the franchisees when the gross income reaches a certain figure, normally $150,000 to $165,000. While the excess construction cost markup and the lease override do not fit within the traditional framework of tying law, in plaintiffs' view they represent additional rental income to the defendant and hence are part of the tied package deal. The common denominator, they allege, is increased income to Dunkin Donuts, in the name of rent, at the expense of the franchisee.

## E. The Advertising Claims

Plaintiffs assert various antitrust and common law claims with respect to the arrangements for advertising between Dunkin Donuts and the franchisees. The Dunkin Donuts franchise agreement specifically states that each franchisee must pay to Dunkin Donuts, as administrator of an "Advertising and Sales Pro-

---

8. Plaintiffs allege that the signs usually cost the franchisee approximately $6,000, with Dunkin Donuts receiving a kickback of approximately $1800.

9. *Rader* complaint ¶¶ 53(aa) to (hh).

motion Fund," 2% of the franchisee's gross sales.[10] The franchise agreement provides that one half of the money collected will be used by defendant "for advertising, including production expenses, in the advertising area in which the Dunkin Donuts shop is located." The other half of the fund is to be used, at the discretion of the defendant, to provide for administration, merchandising materials and distribution costs. Dunkin Donuts is required to furnish franchisees a statement of receipts and disbursements of the fund, prepared by an independent certified public accountant, for each fiscal year of the fund. As in the case of equipment, supplies and signs, plaintiffs assert that the required advertising contributions are the subject matter of an illegal tying arrangement whereby defendant has tied its advertising program to the franchise name and license.

Plaintiffs' common law claims regarding defendant's handling of the advertising funds are grounded upon alleged breaches of contract and/or fiduciary duty. More specifically, plaintiffs allege that defendant has: (1) used the fund to advertise for new franchisees, for the benefit of the company and not the franchisees; (2) used the monies to make movie films for indoctrination of new and prospective franchisees, and upon discontinuing the practice after franchisee complaints, made no effort, despite requests, to replace the bulk of the monies spent upon expensive cameras and photographic equipment which continued in company use; (3) used the fund as a "catchall" for other charges and to publish the Company Newsletter and to pay for "seminars" for operators of franchised outlets, which were more properly company incurred expenses; (4) refused to render an accurate and/or proper accounting, or any ac-

counting at all, of said Advertising Fund; and (5) compelled franchisees to expend still more monies to receive any benefits.

### F. The Real Estate Tax Escrow Claim

Plaintiffs aver that each sublease requires each sublessee (i. e., each franchisee) to pay to defendant, on a monthly basis, $\frac{1}{12}$th of the estimated yearly real estate taxes.[11] Plaintiffs allege that Dunkin Donuts has a concomitant fiduciary obligation to each franchisee which requires it to maintain the funds in an interest-bearing account for the benefit of the franchisee. Moreover, according to plaintiffs, defendant has breached its fiduciary duty to the franchisees: (1) by commingling the tax escrow funds with its own funds; (2) by failing in many instances to pay the taxes when they became due; (3) by failing to account for monies in the fund; and (4) by refusing to return monies not needed to cover real estate taxes.

### G. The Restrictive Covenant Claims

Plaintiffs seek certification of their prayer for a declaratory judgment invalidating the restrictive covenant clauses in the Dunkin Donuts form franchise agreements. It is plaintiffs' position that these covenants are invalid under common law principles and under the antitrust laws as constituting unreasonable restraints of trade.

Plaintiffs note that each Standard Franchise Agreement contains an in-term and post-term covenant restricting the franchisee from engaging in businesses similar to that of Dunkin Donuts, other than another Dunkin Donuts franchised store. For example, provision 8(A)(2) of the present Standard Franchise Agreement restricts the franchisee in-term, without geographic limit, from owning, engaging in or having any in-

---

10. The franchise agreement also requires each franchisee to pay $1,000 to defendant for a grand opening promotional advertising program.

11. *Rader* complaint ¶ 53 (ii).

terest in the operation of any enterprise substantially similar to that of Dunkin Donuts. Provision 8(B)(3) of the same Standard Franchise Agreement states that, during the term of the franchise and for 18 months after the franchise is terminated, licensees may not have interests in similar businesses within 10 miles from an existing Dunkin Donuts shop, "or such other area as arbitrators may decide." [12]

Plaintiffs concede that there are several variants of the restrictive covenant provisions, differing as to geographic and time limits, depending upon the year that the contract was entered into.[13] However, they contend that the restrictive covenant provisions in all of the recent franchise agreements have an overbroad common denominator and that even the most minimal restrictions imposed by Dunkin Donuts are not reasonably necessary to protect it. Moreover, plaintiffs contend that the determination of their illegality under the common law or Sherman I tests is ripe for adjudication.

### H. *Common Law Fraud Allegations*

Plaintiffs also seek class certification of their allegations that defendant is liable at common law for material misrepresentations in its pro formas, its literature and in oral statements made to induce prospective franchisees to enter into franchise agreements. Plaintiffs recite a litany of suspect practices which they contend fulfill the requisites of a common law fraud claim. *Inter alia,* they aver that defendant has: (1) misrepresented the amount of gross sales reasonably to be expected in connection with the opening of a Dunkin Donuts store in a given location or area; (2) misrepresented the net profit and cash flow which can be derived from the operation of a Dunkin Donuts franchise at given levels of gross sales; (3) failed to reveal the alleged cost advantage to the franchisee of mass purchasing by Dunkin Donuts; (4) misstated the markup on food supplies or paper goods by defendant; and (5) failed to reveal to plaintiffs that mass purchasing would increase the cost of such products to plaintiffs because of rebates, discounts, commissions, fees and kickbacks, either expressly or as contributions to advertising funds which defendant received from its approved suppliers.

### III. *The Law of Tying—Economic Policy & Basic Principles*

#### A. The Economic Policy of the Law; *The Per Se Rule*

■■■ As we have noted above, a tying arrangement under the antitrust

12. In all of the Standard Franchise Agreements, the in-term and post-term covenants appear to overlap. That is, although the in-term covenants would seem to apply only during the period in which a franchisee is operating a Dunkin Donuts store, the post-term covenants, as written, likewise cover the in-term period plus further specified periods after the termination of the franchisor-franchisee relationship.

13. For example, the Standard Franchise Agreement that was in use during 1957–63 had an in-term restriction upon entering into similar businesses anywhere in the world. It also dictated that during the term and for 5 years after the term, no licensee could have an interest in a similar business in an area competitive to Dunkin Donuts. The minimum area which was deemed to be competitive was stated as 25 miles from any existing or prospective shop. In 1963 the Standard Franchise Agreement was modified to read that during the term no licensee could enter into a similar business at that location. (This was probably an error in drafting on the part of Dunkin Donuts as it would have been almost physically impossible for any franchisee to operate two distinct doughnut businesses at the same location at the same time.) The post-term restriction provision of the 1963 Agreement, much like that of the 1957 contract, proscribed licensees, during the term and for 5 years after termination, from engaging in businesses similar to Dunkin Donuts in areas within 25 miles of existing shops or such other areas as arbitrators would decide. In 1967 the Standard Franchise Agreement was again amended. The in-term restriction remained the same as that of the 1963 contract. However, the post-term restriction was reduced to two years. The present form (described in the text) was adopted in 1971.

law is an agreement by a party to sell one product but only on condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from another supplier.[14] In describing the general policy of the law against tying arrangements, Mr. Justice Black has said in Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L. Ed.2d 545 (1958):

> Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 305–06, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products.

*Id.* at 6, 78 S.Ct. at 518 (footnote omitted).

---

14. Tying arrangements may be declared illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1958), or under Section 3 of the Clayton Act, 15 U.S.C. § 14 (1958), or under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1958). Section 3 of the Clayton Act provides in pertinent part:

> It shall be unlawful for any person engaged in commerce . . . to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Courts and commentators have noted several potential distinctions between the Sherman Act § 1 and Clayton Act § 3. First, the Clayton Act provision is confined to ties involving "goods, wares, merchandise, machinery, supplies, or other commodities," while section 1 of the Sherman Act prohibits every contract, combination or conspiracy in restraint of trade. In this sense, the Sherman Act may be viewed as more encompassing than the Clayton Act. On the other hand, the Clayton Act provision has been interpreted as more prohibitive since it outlaws ties whose effect "may be to substantially lessen competition, or tend to create a monopoly." This language allows the courts to strike down the ties and anticompetitive practices in their incipiency, while the Sherman Act requires proof of actual restraint of trade. Most commentators, however, believe that section 3 of the Clayton Act and Section 1 of the Sherman Act should be interpreted similarly in regard to their prohibitions concerning tying. *See, e. g.,* Pearson, Tying Arrangements and Antitrust Policy, 60 Nw.U.L.Rev. 626, 653 n. 96 (1965); Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50, 58 (1958).

The weight of authority is to the effect that § 3 applies only if *both* the tying and tied items are "goods, wares, merchandise, machinery, supplies, or other commodities." *See, e. g.,* Advance Business Systems and Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969) (repair services not a "commodity" within § 3 of the Clayton Act); Columbia Broadcasting System v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961) (advertising not a "commodity" within § 3 of the Clayton Act). The parties agree that the asserted tying items in this case, the trademark or license for the use of the proprietary mark "Dunkin' Donuts" and its logo, are not "commodities" under § 3 of the Clayton Act, and that the case must be viewed against the background of § 1 of the Sherman Act. The plaintiffs have thus abandoned the Clayton § 3 claim pleaded in their complaint. However, for the reasons indicated above, the Clayton Act cases are nonetheless helpful in construing the law. The cases arising under Section 5 of the Federal Trade Commission Act proscribing certain unfair methods of competition, *e. g.,* F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S. Ct. 429, 21 L.Ed.2d 394 (1968); Atlantic Refining Company v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), will be discussed in a separate section of this opinion.

The commentators and the courts are in general agreement as to the underlying economic policy basis of the law's disfavor of tying arrangements. Such arrangements can force a buyer to take a product which he does not want, or at least restrict his choice of supply for the tied product. Tie-ins also foreclose competitors of the seller from the market in the tied product and act as a means of extending a monopoly in the tying product to the tied product. They thus have adverse impacts upon the buyer, the seller's competitors and the public because of the effect on the market for the tied product.[15]

In his opinion in the important case of Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), discussed at length *infra*, Mr. Justice White expounded upon the underlying economic policy basis of the law of tying as follows:

> There is general agreement in the cases and among commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line.

*Id.* at 512–514, 89 S.Ct. at 1264 (footnotes omitted). That the foregoing statement appears in a dissent does not affect the viability of what is perhaps the most comprehensive judicial statement extant of the policy of tying law.[16]

15. *See generally* Austin, The Tying Arrangement: A Critique and Some New Thoughts, 1967 Wisc.L.Rev. 88 (1967) [hereinafter cited as Austin]; McCarthy, Trademark Franchising and Antitrust: The Trouble with Tie-Ins, 58 Calif.L.Rev. 1085 (1970) [hereinafter cited as McCarthy]; Pearson, Tying Arrangements and Antitrust Policy, 60 Nw. U.L.Rev. 626 (1965) [hereinafter cited as Pearson]; Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50 (1958) [hereinafter cited as Turner]; Comment, Franchises, Requirements Contracts and Tie-Ins: One Test for a Tangled Two, 74 Yale L.J. 691 (1965).

16. Mr. Justice White also notes that tie-ins may at times be beneficial to the market. He states that they may facilitate new entry into fields where established sellers have

As the foregoing discussion suggests, the economic policy underlying the law of tying has several nuclei. One object of the Supreme Court's concern is the buyer who may be forced to take a product he does not want or whose choice of supply for the tied product is restricted. However, the Court's principal concern seems to be the foreclosure of competition in the tied product and the adverse impact of tying upon the marketplace. In the words of Professor Turner:

> . . . [T]he interest of buyers is not the only legitimate interest at stake. The [Supreme] Court has shown at least equal concern, and in later cases perhaps primary concern, with the interest of competing suppliers of a tied product in free access to the consuming market—a strong desire that competition in the sale of each product should be "on the merits." [17]

Turner, *supra* note 15, at 60. The Court emphasized this point in the *Fortner* case where it said:

> In any event, a narrow focus on the volume of commerce foreclosed by the particular contract or contracts in suit would not be appropriate in this context. *As the special provision awarding treble damages to successful plaintiffs illustrates, Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.*

394 U.S. at 502, 89 S.Ct. at 1258 (emphasis added). The acme of the Court's policy views in this area may be found,

however, in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

*Perma Life* was a treble damage suit by dealers who operated Midas Muffler shops under franchises granted by Midas, Inc. The Midas dealers challenged as illegal restraints of trade numerous provisions of the franchise agreement, such as the terms barring them from puchasing from other sources of supply, preventing them from selling outside a designated territory, tying the sale of mufflers to the sale of other products in the Midas line and requiring them to sell at fixed retail prices. The court of appeals held the suit barred because the franchisees were *in pari delicto*, 376 F.2d 692 (7th Cir. 1967), noting that each of the franchisees had enthusiastically sought to acquire a Midas franchise with full knowledge of these provisions and had "solemnly subscribed" to the agreement containing the restrictive terms. The court of appeals also noted that the franchisees had all made enormous profits as Midas dealers, had eagerly sought to acquire additional franchises and had voluntarily entered into additional franchise agreements, all while fully aware of the restrictions they now challenged. The Supreme Court reversed, adverting to "the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." 392 U.S. at 138, 88 S.Ct. at 1984. Speaking for the Court, Justice Black noted:

> The plaintiff who reaps the reward of treble damages may be no less morally

---

long predominated. They may make possible price cutting in otherwise non-competitively priced products because of the removal of fear of retaliation by the few other producers dealing in the market. They may protect the reputation of the tying product if failure to use the tied product in conjunction with it may cause it to function less effectively. Finally, if the tied and tying products are functionally related, tying arrangements may reduce costs through the savings realized in joint distribution and production.

17. *Accord*, Pearson, *supra* note 15, at 635: "There is no doubt that a strong strain of competitor protection runs through the current anti-trust law." To buttress this contention, Pearson cites Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), where virtually the only anticompetitive effect discovered by the Court was that the questioned merger might enable Brown to sell shoes at a lower price, thus making it more difficult for Brown's competitors to compete.

reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement.

392 U.S. at 139, 88 S.Ct. at 1984.

■ The prime lesson to be garnered from these policy statements is that our analysis of the validity of the arrangements alleged to have been imposed by Dunkin Donuts cannot be limited to a focus upon whether the individual plaintiffs have been injured. Our attention must also be heavily concentrated on the economic injury wrought upon competitors in the tied product and, hence, upon the market place and the economy as a whole.

■ Under the doctrine of *Northern Pacific,* tying agreements are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market and a "not insubstantial" amount of interstate commerce is affected. This *per se* doctrine was itself explicated by Mr. Justice Black as follows:

> Although [Sherman Act § 1] is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition. . . . However, there are certain agreements or practices which because

of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, *affirmed* 175 U.S. 211, 20 S. Ct. 96, 44 L.Ed. 136; group boycotts, Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

356 U.S. at 5, 78 S.Ct. at 518. The *per se* doctrine is not without its critics. *See* Turner, *supra* note 15; Austin, *supra* note 15; Pearson, *supra* note 15. However, it remains the law.[18]

---

18. The position of the plaintiffs in this lawsuit is that the tying arrangements which they attack constitute *per se* violations. If the practices asserted should not be so construed, the plaintiffs could still proceed upon the theory that the restraints are unreasonable. Section 1 of the Sherman Act literally proscribes "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." However, the "rule of reason" announced in Standard Oil Co. v. United States, 221 U.S.

1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), limits the prohibitions of Section 1 to unreasonable restraints of trade. Inquiry pursuant to the rule of reason has traditionally proceeded according to guidelines formulated by Justice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ;

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may sup-

### B. *Formal Requisites of a Tie*

Under the Supreme Court cases there are three basic requisites to the establishment of an illegal tie: (1) there must be separate tying and tied products; (2) the seller (here the franchisor) must possess sufficient economic power to appreciably restrain competition in the tied product; and (3) the tying arrangement must affect a "not insubstantial" amount of commerce. We will discuss these requisites *seriatim*.

### 1. *The Tying and the Tied Products*

In order for there to be an unlawful tie, there must be two separate products: a *tying product* which cannot be obtained without the purchase of a *tied product*. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The alleged tying product in this case is the Dunkin' Donuts trademark, franchise system and logo. The alleged tied products are principally equipment, supplies and real estate.[19] *Siegel II*, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), is sound authority for the proposition that the franchisor's trademark, system and logo may constitute a separate tying product. The *Siegel II* court's approach was as follows:

> The historical conception of a trademark as a strict emblem of source of the product to which it attaches has largely been abandoned. The bur-

geoning business of franchising has made trade-mark licensing a widespread commercial practice and has resulted in the development of a new rationale for trade-marks as representations of product quality. This is particularly true in the case of a franchise system set up not to distribute the trade-marked goods of the franchisor, but, as here, to conduct a certain business under a common trademark or trade name. Under such a type of franchise, the trade-mark simply reflects the goodwill and quality standards of the enterprise which it identifies. As long as the system of operation of the franchisees lives up to those quality standards and remains as represented by the mark so that the public is not misled, neither the protection afforded the trademark by law nor the value of the trade-mark to the licensee depends upon the source of the components.

> This being so, it is apparent that the goodwill of the Chicken Delight trade-mark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trade-mark protection. It is to the system and the end product that the public looks with the confi-

---

press or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

Proving that the alleged ties are an unreasonable restraint within the meaning of the "rule of reason" would require a complex determination of their effect upon competition and of the possible justifications for any adverse effect. Such an inquiry would necessitate a complicated and prolonged economic investigation into the franchising industry. At least with respect to the question of anticompetitive ties, plaintiffs have indicated their reliance upon the *per se* rule; they are apparently unwilling to undertake a "rule of reason" burden at trial.

19. Advertising was also alleged to be a tied product, but we reject this theory for the reasons discussed below.

dence that established goodwill has created.

448 F.2d at 48–49 (footnotes omitted). The *Siegel II* court thus concluded that the sale of a franchise license, with the attendant rights to operate a business in the prescribed manner and to benefit from the goodwill of the trade name, in no way requires the forced sale by the franchisor of some or all of the component articles. Therefore, attempts by tie-ins to extend the trade-mark protection to common articles (which the public does not and has no reason to connect with the trade-mark), simply because they are said to be essential to production of that which is the subject of the trade-mark, cannot escape antitrust scrutiny.

▇ We add here only our disagreement with the contention of the plaintiffs that advertising can be a separable, tied product. Relevant advertising is inextricable from the trademark, franchise system and logo as it is the major vehicle for promoting them. Kugler v. AAMCO Automatic Transmissions, Inc., 460 F.2d 1214 (8th Cir. 1972). Our holding on this point, however, is confined to advertising that arguably promotes the interests of the entire franchise system and not merely the interests of the franchisor alone. On the other hand, the equipment, supplies and real estate may be considered separate (and therefore potentially tied) products since the public does not have any reason to connect them with the trademark itself. *But cf.* In re 7–Eleven Franchise Antitrust Litigation, 1974–2 Trade Cas. ¶ 75,429 (N.D.Cal.1974).

2. *Sufficient Economic Power to Appreciably Restrain Competition in the Tied Product*

a. *Quantum of the Power*

▇ In order for an illegal tie to exist, the tying product must have sufficient economic power or advantage to appreciably restrain competition in the

tied product. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The standard of "sufficient economic power" does not require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Indeed, Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), made it clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. 394 U.S. at 502–03, 89 S.Ct. 1252. Mr. Justice Black explained:

These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally served no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market. . . . [D]espite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. Accordingly, the *proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with re-*

*spect to any appreciable number of buyers within the market.*[20]

394 U.S. at 503–04, 89 S.Ct. at 1258 (emphasis added).

### b. *Proof of Existence of Economic Power*

It was established in *Northern Pacific* that distinctiveness and the existence of the tying arrangement were themselves sufficient proof of economic power in the tying product to find an illegal tie. In *Northern Pacific* the tying product was a unique leasehold or ownership of uniquely placed land. The Northern Pacific Railroad had initially been granted large acreages. This land was strategically located in checkered fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense made it evident to the Court that this particular land was often prized by those who purchased or leased it from Northern Pacific and was frequently essential to their business activities. The defendant entered into contracts of sale or lease covering at least several million acres of land which included "preferential routing" clauses. These clauses compelled the lessee or land purchaser to ship over Northern Pacific's lines all commodities produced or manufactured on the leased or purchased land (provided that North-

ern Pacific's rates were equal to those of competing carriers). Mr. Justice Black thereupon observed: "The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power at least where, as here, no other explanation has been offered for the existence of these restraints." [21]

*Northern Pacific* was followed four years later by United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). *Loew's* was a civil suit brought by the Justice Department against six major distributors of pre-1948 copyrighted motion picture films for television exhibition, claiming that each defendant had engaged in "block booking" in violation of § 1 of the Sherman Act. Defendants allegedly had, in selling to television stations, conditioned the license or sale of one or more feature films upon the acceptance by the station of a package or block containing one or more unwanted or inferior films. According to Mr. Justice Goldberg, the "successful pressure" applied to television station customers to accept inferior films along with desirable pictures was the gravamen of the complaint. He ultimately concluded on the proof of economic power issue:

> Even absent a showing of market dominance, the *crucial economic power*

20. *Fortner* represents an extension of *Northern Pacific* in this area. It is noteworthy, however, that in *Northern Pacific* the Court rejected the use by the Court in Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), of the term "monopolistic position" which had suggested a return to the "dominance" test implied by the early Clayton Act cases. *Northern Pacific* undercut the language of *Times-Picayune* and reaffirmed the broader *per se* principles enunciated earlier in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947):

> While there is some language in the Times-Picayune opinion which speaks of "monopoly power" or "dominance" over the tying product as a necessary precondi-

tion for application of the rule of *per se* unreasonableness to tying arrangements, we do not construe this general language as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a "not insubstantial" amount of interstate commerce is affected).

356 U.S. at 11, 78 S.Ct. at 521. *See also* Turner, *supra* note 15.

21. In so holding, the majority rejected the contention of Mr. Justice Harlan that testimony should have been taken on: (1) the relative strength of Northern Pacific's land holding in the appropriate market; (2) the issue of "uniqueness"; and (3) the extent to which the location of the lands, in fact, put Northern Pacific in a strategic position.

*may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.*

The requisite economic power is presumed when the tying product is patented or copyrighted . . . . This principle grew out of a long line of patent cases which had eventuated in the doctrine that a patentee who utilized tying arrangements would be denied all relief against infringements of his patent.

371 U.S. at 45–46, 83 S.Ct. at 102 (emphasis added) (footnote omitted).[22] This quoted language from *Loew's* represents a further liberalization of the proof of economic power requirement. In *Northern Pacific* the requirement evolved from dominance to distinctiveness; the Court in *Loew's* permits the drawing of an inference of economic power merely from the tying product's desirability to the consumer.

 Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Court's latest pronouncement, does not retrench. The *Fortner* case allows a jury to infer sufficient economic power over the tying product from varied kinds of evidence. Proof that an appreciable number of buyers may have accepted a burdensome term such as a tie-in may raise an inference of sufficient economic power. Alternatively, a jury may draw such an inference from the fact that buyers were willing to pay a higher than competitive price for the tied product.[23] Refining the language of *Loew's, Fortner* explains that uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive products themselves. Such barriers may be legal, as in the case of patented and copyrighted products (*e. g.,* International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947)), or physical, as where the product is land (*e. g.,* Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2

---

22. *See also* Motion Picture Patents Co. v. Universal Films Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931); Leitch Mfg. Co. v. Barber Co., 302 U.S. 458 (1938); Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 S.Ct. 363 (1942). The extension from the patent into the copyright area occurred in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), where the Court proscribed block booking of copyrighted films under § 1 of the Sherman Act. The *Paramount* Court presaged *Loew's* by implying that dominance in the tying product would be presumed on a mere showing that the tying product had some element of distinctiveness.

23. In *Fortner* the alleged tie lay in an arrangement pursuant to which the purchaser was required to take a tied product—prefabricated homes—as a condition of being allowed to purchase the tying product—credit—from U. S. Steel Homes Credit Corp., a subsidiary of United States Steel. The affidavit of Fortner's president stated that competitors of U. S. Steel sold prefabricated houses and built conventional homes for at least $400 less than U. S. Steel's price for comparable models. Since in a freely competitive situation buyers would not accept a tying arrangement obligating them to buy a tied product at a price higher than the going market rate, this substantial price differential with respect to the tied product (prefabricated houses) in itself suggested to the court that U. S. Steel had some special economic power in the credit market. In addition, Fortner's president stated that he accepted the tying condition on respondents' loan solely because the offer to provide 100% financing, lending an amount equal to the full purchase price of the land to be acquired, was unusually and uniquely advantageous to him; he found that no similar financing was available to his corporation on such inexpensive terms from any other source during the 1959–1962 period. Although the Court noted that market power cannot be inferred simply because the kind of financing terms offered by a lending company are unique and "unusual," it observed that uniquely and unusually advantageous terms can reflect a creditor's distinctive economic advantage over his competitors. The grant of summary judgment for the defendant was reversed.

L.Ed.2d 545 (1958)). As the foregoing discussion indicates, the Court's decisions in this area reflect a clear trend: that of a steady diminution in the strictness of proof required to establish the economic power requisite of an unlawful tie. In the words of a leading commentator:

> There is no doubt that the Supreme Court's attitude towards the use of the tying arrangement has become increasingly harsh. The character of the market control that must be exerted by the producer of the tying product so as to furnish a basis for successful prosecution has shifted dramatically from *United Shoe's* almost complete (ninety-five percent) dominance to the minimal "sufficient economic power" of the *Northern Pacific* decision. Thus, one could argue that there has been a discernible and persistent move towards making the tie-in a per se violation in the accepted sense of the term. *Loew's* seems to confirm this trend with express mention that consumer desirability or uniqueness of the tying product satisfies both the marked dominance and "economic power" criteria.

Austin, *supra* note 15, at 109–10.

The Supreme Court has not yet been called upon to decide whether economic power may be presumed from the uniqueness or distinctiveness or legal exclusivity of a trademark, franchise system or logo. However, the Ninth Circuit Court of Appeals in *Siegel II* has done so:

> Just as the patent or copyright forecloses competitors from offering the distinctive product on the market, so the registered trade-mark presents a legal barrier against competition. It is not the nature of the public interest that has caused the legal barrier to be erected that is the basis for the presumption, but the fact that such a barrier does exist. Accordingly we see no reason why the presumption that exists in the case of the patent and copyright does not equally apply to the trade-mark.

448 F.2d at 50 (footnote omitted). *Accord*, Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); Redd v. Shell Oil Co., 1974–2 Trade Cas. ¶ 75,390 (D.Utah 1974); Falls Church Bratwursthaus v. Bratwursthaus Management Corp., 354 F.Supp. 1237 (E.D. Va.1973). We agree.[24]

---

24. In so holding, we are not unmindful of the recent decision in Capital Temporaries, Inc. v. The Olsten Corp., 365 F.Supp. 888 (D. Conn.1973), aff'd, 506 F.2d 658 (2d Cir. 1974). That case dealt with a trademarked franchise system engaged in the business of supplying temporary personnel to customers for "white collar" jobs. Plaintiff, after operating an Olsten's franchise for several years, repudiated the franchise agreement and in an antitrust suit asserted, *inter alia*, that in order to obtain an Olsten white collar franchise, he was also required to establish and operate a blue collar operation under the "Handy Andy Labor" trademark. He alleged in his complaint that this constituted an illegal tie, the tying product being "Olsten," and the tied product being "Handy Andy Labor." For reasons discussed in the text, *infra*, the district court granted summary judgment for the defendant on the tie-in claim and the court of appeals affirmed.

We address here only that portion of the opinion of Judge Mulligan for the court of appeals rejecting the contention that, since the service franchised to the plaintiff was trademarked, the economic power of the defendant must be presumed.

Judge Mulligan first noted that no Supreme Court decision has gone any further than to presume economic power in those cases where the tying product is patented or copyrighted. He then observed that the trademark or name "merely identifies the franchisor," and pointed out that there was no suggestion in the record of any uniqueness in the techniques of Olsten that could not be offered by others. Indeed, in Judge Mulligan's view, "since almost everything sold today is trademarked," the consequence of adopting the franchisee's position would be "troublesome." Recognizing that *Siegel II* and Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th

### 3. The Requisite That a "Not Insubstantial" Amount of Commerce be Affected

▮ To find an illegal tying agreement one must also determine that the alleged tie affects a "not insubstantial" amount of commerce. International Salt Co. v. United States, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20 (1947). In *International Salt* the defendant leased dispensing machines—Lixators and Saltomats—only on the condition that the lessees purchase from defendant all their requirements of salt for use in the machines. The Lixator contracts imposed the purchase requirement only if defendant's price was competitive; the Saltomat contracts guaranteed to the purchasers that they would get International's own lowest price. The Court unanimously affirmed a summary judgment holding the contracts unlawful not only under Section 3 of the Clayton Act, but also under Section 1 of the Sherman Act. In the Court's view, it was:

> unreasonable, *per se*, to foreclose competitors from any substantial market. . . . The volume of business affected by these contracts [$500,000 worth annually] cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious.

332 U.S. at 396, 68 S.Ct. at 15. *International Salt* thus made clauses tying unpatented materials to a patented product

or process illegal *per se*, provided that they foreclose a dollar amount of commerce that "cannot be said to be insignificant . . . ." *Id.*

▮ In Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Court also had occasion to address this subject and, in effect, liberalized the *International Salt* criteria. The *Fortner* Court not only made it clear that the "not insubstantial" requirement makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie, but also added that:

> . . . normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimus*, is foreclosed to competitors by the tie . . . .

394 U.S. at 501, 89 S.Ct. at 1258. The Court held that the relevant figure is the total volume of sales tied by the policy under challenge, not the portion of this total amount applicable to the particular plaintiff who brings suit. 394 U.S. at 502, 89 S.Ct. 1252. It does not appear, in view of the substantial dollar volume involved in the present case with respect to purchases or leases of the alleged tied items, that Dunkin Donuts will refute plaintiffs' contentions that a "not insubstantial" amount of commerce is involved.

Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972) hold *contra*, Judge Mulligan also cited to the decision in Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), which held that a 'trademark *qua* trademark is not a sufficient indication of dominance over the tying product to qualify for *per se* treatment under *Northern Pacific*.

We do not believe that *Capital Temporaries* is apposite here, for it appears unquestionable that, at a trial on the merits, the trademark, franchise system and logo of

Dunkin Donuts will emerge as far more distinctive than that of Olsten's. In any event, we prefer to follow the *Siegel* view on the impact of a trademark as proof of requisite economic power. *See also* Redd v. Shell Oil Co., 1974–2 Trade Cas. ¶ 75,390 (D.Utah 1974); Falls Church Bratwursthaus v. Bratwursthaus Management Corp., 354 F.Supp. 1237 (E.D.Va.1973). We note too that the *Susser* dominance test to which Judge Mulligan adverts was completely undercut by the Supreme Court's decision in the *Fortner* case.

C. *Does the Traditional Law of Tying Apply Where There is Split Ownership of the Tying and the Tied Products: The "TBA" Cases and the Franchise Cases*

In outlining the nature of the plaintiffs' supply tie-in claims, we noted that under the terms of the franchise agreement the franchisee is obligated to purchase supplies not from Dunkin Donuts, but from certain approved suppliers, thus rendering Dunkin Donuts the seller of the tying product (the franchise) but not of the tied product.[25] We have also noted that the conventional case law definition of the tying arrangement assumes a single seller using the market power of one product as a means of inducing the purchaser to buy a second product. The question thus arises as to whether the traditional law of tying, which we have already analyzed in part, applies where there is split ownership between the tying and the tied products.[26]

Professor Austin has observed that it is inappropriate to focus solely upon the seller's position, for the relevant factor is the overall impact of the arrangement on the purchaser and the manner in which it affects his decision-making:

If a business must purchase a second "tied" product in order to obtain the use of an item that is necessary to continued market survival, it makes little difference whether there is a single or dual source for the tying and tied products. In either case the decisional range is the same—do without the desired item or purchase both the principal and ancillary products.

In view of the above analysis it is suggested that a tie-in exists whenever a vendee is persuaded to purchase one item or avail himself of a service as a condition for obtaining a second item—*regardless of the source of either product* (or service, as the case may be). This definition would engender a uniformity of treatment—at least as to section 1 of the Sherman Act and section 5 of the Federal Trade Commission Act. Courts would no longer apply tie-in precedent on an "as if" basis, as was done in the *Atlantic Refining* case. Thus the development of hybrid and quasi-tie-in principles would be precluded.

. . .

Austin, *supra* note 15, at 95. Professor Austin's analysis is also consistent with the underlying policy of the law of tying upon which we have already discoursed and its emphasis upon purchaser and

---

25. Dunkin Donuts is not a manufacturer of the equipment package required to operate a Dunkin Donuts shop. However, Dunkin Donuts sells to its franchisees the equipment assembled by Paramount Equipment Company of Providence, Rhode Island, and sold by Paramount to Dunkin Donuts. Hence, there is no split ownership with respect to equipment.

26. The practice followed by Dunkin Donuts with respect to requiring that its franchisees purchase supplies only through approved suppliers is not uncommon in the franchising industry. See McCarthy, *supra* note 15. However, in the franchise cases the courts have not to date focused upon the question of whether traditional tying law applies where there is split ownership of the tying and the tied products. In *Siegel II* the problem did not arise because the Chicken Delight franchisees apparently purchased the supplies directly from the franchisor, a practice difficult for a national franchisor to duplicate today in view of distribution problems. Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972), and Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970) were Sherman Act § 1 cases dealing with claims that oil companies had tied to their franchise the requirement that the service station owners purchase TBA (*Belliston*) or certain unwanted trading stamps and games (*Lah*). Neither court applied a *Northern Pacific* or *Fortner* type analysis to the facts, utilizing instead the analysis from the Supreme Court TBA cases. *See generally* 9 Von Kalinowski, Antitrust Laws and Trade Regulation § 65.-05[2][b] (1972). However, neither did the *Belliston* and *Lah* courts focus on the split ownership question, and their facts are notably different from those at bar.

consumer protection.[27] We find ourselves in accord with it, and also believe it to be consistent with the caselaw.

The most significant of the split ownership cases reported to date are the so-called "TBA" cases in which the courts have dealt with the efforts of various major oil companies to promote the sales of tires, batteries and accessories through their franchised retail service station dealers in return for a commission on the sale. In Atlantic Refining Company v. Federal Trade Commission, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), Atlantic had turned over its TBA business to Goodyear and Firestone which became completely responsible for all TBA sales to Atlantic dealers (and handled warehousing and distribution to them as well). Atlantic sales personnel were instructed to take TBA orders and to actively encourage dealers to buy Goodyear and Firestone products. In return, Atlantic was to receive a 10% commission on the net sales of products by Atlantic dealers. According to the record before the FTC, the Atlantic salesmen were zealous and made it clear to dealers that lease and renewal contracts were dependent upon the acceptance of Goodyear and Firestone TBA.

The Federal Trade Commission held this arrangement to be an "unfair method of competition" prohibited by § 5 of the Federal Trade Commission Act and ordered Atlantic to cease and desist from (1) intimidating or coercing dealers to purchase any particular brand of TBA and (2) making any commission arrangement for sponsoring or promoting TBA sales to its dealers. The Commission's opinion, 58 F.T.C. 309 (1961), is couched in tie-in language and draws heavily from tie-in precedent, including the rationale of *Northern Pacific*. The Supreme Court affirmed, noting that while the Goodyear-Atlantic contract was not a tying arrangement, its central competitive characteristic was the same—the utilization of economic power in one market to curtail competition in another. The Court described the effect of this TBA plan as being "similar to that of a tie-in." 381 U.S. at 371, 85 S.Ct. at 1507.

In F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), the Supreme Court held that it was an unfair method of competition in violation of the F.T.C. Act for Texaco to induce its service station dealers to purchase B. F. Goodrich TBA in return for a commission, where Texaco possessed and exercised dominant economic power over its dealers and where anti-competitive results flowed therefrom.[28] The Court again noted that the essential anti-competitive vice of the arrangement was the utilization of economic power in one market to curtail competition in another. It held that in order to establish a § 5 violation the Commission is not required to show that a practice it condemns has totally eliminated competition in the relevant market, but only that the practice in question has unfairly burdened competition for a not insignificant volume of commerce. In so holding, the Court cited *International Salt* and *Loew's*, which are, of course, tying cases.

Plaintiffs have claimed that the Dunkin Donuts' approved supplier system is a sham; that it is a vehicle for the payment of kickbacks and that Dunkin Donuts is unwilling to approve new suppliers, despite ability to meet proper specifications, so as to maintain an anti-competitive (and profitable) tie. Plaintiffs may or may not be able to prove this at trial.[29] In any event, nothing in defendant's brief dissuades us

---

27. *But cf.* Comment, Franchises, Requirements Contracts and Tie-Ins: One Test for a Tangled Two, 74 Yale L.J. 691, 699 (1965).

28. In the *Texaco* opinion the Court diluted the *Atlantic Refining* coercion standard.

This is an important point and will be discussed *infra*.

29. The approved supplier system is generally justified as a vehicle for the franchisor to retain sufficient quality control to protect the integrity of his trademark and franchise

from holding that plaintiffs are not foreclosed from applying traditional tying law analysis to their claim because of split ownership of the tying and tied products in the supply area. For, if plaintiffs are correct, the split ownership cannot erase the fact that the supply sales owe their origin and existence to Dunkin Donuts' willingness to use its leverage.[30]

### IV. The Law of Tying Continued: The Requirement of Proof of Use of Economic Power; The Individual Coercion Doctrine and the "Use-Coercion Dialogue"

#### A. The Requirement That Economic Power to Used: A Statement of the "Use-Coercion Dialogue"

Although *Northern Pacific* and *Fortner* make the possession by the seller (or franchisor) of sufficient economic power to appreciably restrain competition in the tied product the second requisite of an illegal tie, those cases themselves make clear that the plaintiff must prove more than mere possession. For, as Judge Blumenfeld aptly noted in the district court opinion in Capital Temporaries, Inc. v. The Olsten Corp., 365 F. Supp. 888, 892 (D.Conn.1973), aff'd 506

F.2d 658 (2d Cir. 1974): "[t]he economic power must not simply exist; it must be used." Indeed, the Court's statement of the facts in *Northern Pacific* subsumes such a formulation: "the defendant possessed substantial economic power by virtue of its extensive landholdings which it *used* as leverage . . . .." 356 U.S. at 7, 78 S.Ct. at 519 (emphasis added). The use notion is, of course, related to the fact that a tie cannot exist unless the availability of the tying product is conditioned on the purchase of the tied product.[31]

As will be seen, the ultimate disposition of the class action motions will turn on the determination of whether it is sufficient under the law of tying that the plaintiffs show the *use* of (the requisite) economic power, or whether the plaintiffs must, as defendant contends, show that the power was *used coercively* as to each individual in the putative class. We describe the issue framed by these contending positions as the "use-coercion dialogue." We believe that the dialogue may be illustrated by the following queries. Is it necessary merely that the franchisor use his economic power to achieve the tie, or is it necessary that the franchisor coerce the fran-

---

system, and the defendant has sought to justify it on that basis here. Thus, it contends, there is no illegality in a system of quality control based on approved suppliers, especially where franchisees are provided a means for securing approval of additional suppliers. Although in the particulars already noted the plaintiffs have contended that the Dunkin Donuts quality control system is a sham, the quality control defense may well prove formidable at trial and, in any event, will be discussed in greater detail below.

30. A franchisor's requirement that a franchisee purchase his supplies only from designated third parties has sometimes been characterized as an exclusive dealing arrangement. *See* Von Kalinowski, *supra* note 26, at § 65.05[B][2]; Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Barby's Frosted Foods, Inc. v. McDonald's Corp., 1973–2 Trade Cas. ¶

74,622 (D.N.J.1973). Exclusive dealing contracts are not judged by a *per se* rule. *See* Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). *Susser* has, however, been undercut by *Fortner* and by *Siegel*. We believe that the exclusive dealing analogy is inappropriate, and that the plaintiffs' approved supplier claim is most appropriately dealt with in tie-in terms. *Accord*, Comment, Franchisees, Requirements Contracts and Tie-Ins: One Test for a Tangled Two, 74 Yale L.J. 691, 697–98 (1965).

31. To succeed in a claim of unlawful tying, the plaintiff must prove that the tying product was unavailable without the tied product. What is at issue here is the question of proof. In this respect, the issues are similar to those discussed in the portions of this opinion dealing with proof of the use of economic power. Hence, they will not be separately addressed.

chisee, *i. e.*, compel him, after negotiation, to act against his will? Does a tie exist if the franchisee voluntarily seeks the franchisor out and solicits the purchase of the franchisor's package "lock, stock and barrel"? Does a tie exist if, notwithstanding mental reservations, the franchisee nonetheless voluntarily accepts the tie? Does it matter that the alleged tie is not reduced to boilerplate contractual form? Is it necessary that the franchisee understand the uneconomic nature of the tie? If there is an individual coercion requirement, is it relevant at the liability stage or only on the issue of damages? At either stage, is it the plaintiffs' burden to rule it out or the defendant's burden to prove it?

As we pose these queries, we remain conscious of the fact that the Supreme Court has not set forth a coercion requirement in the tying cases. Indeed, we note that the law comprehends tying suits by foreclosed competitors in which a question of coercion of franchisees seems peripheral at best. *See, e. g.*, Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir.), cert. denied, 409 U.S. 1086, 93 S. Ct. 688, 34 L.Ed.2d 673 (1972); Kelly v. General Motors Corp., C.A. No. 73–51 (E.D.Pa., Huyett, J., Aug. 1, 1974); N. W. Controls, Inc. v. Outboard Marine Corp., 333 F.Supp. 493 (D.Del.1971); Record Club of America, Inc. v. Capitol Records, Inc., 1971 Trade Cas. ¶ 73,694 (S.D.N.Y.1971).

We turn now to a development of the use-coercion dialogue thus framed.

### B. *A Statement of the Individual Coercion Doctrine; Incipient Flaws in the Doctrine*

The individual coercion doctrine as it is pressed by Dunkin Donuts in this case

postulates that a tie cannot be established in the absence of proof by the plaintiffs of such events and circumstances surrounding the relationship between Dunkin Donuts and each proposed franchisee class member as will demonstrate that the franchisee, after negotiating on the point, was coerced into agreeing to the equipment, supply or real estate tie. This formulation is consistent with the dictionary definition of coercion, which is compulsion to act against one's free will. As will be seen when we survey the class action discovery, Dunkin Donuts asserts that the alleged tie was either sought or voluntarily acquiesced in by the named plaintiff-franchisees. Proof of individual coercion by each of the class members is said to be the only way to counter this defense.

At the outset of this opinion, we took note of Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) [*Siegel II*], wherein there was an express contractual provision requiring that the franchisee purchase all the equipment necessary to operate a Chicken Delight franchise directly from the franchisor. The *Siegel II* court held that the requisite economic power to bring the case within § 1 of the Sherman Act was established as a matter of law by the unique registered trademark in combination with its demonstrated power to impose a tie-in; indeed, a directed verdict for the plaintiff class was affirmed.[32] The *Siegel II* court did not discuss the individual coercion doctrine, and neither the defendant here, nor any of the courts upon whose decisions the defendant relies, have suggested that *Siegel II* was decided erroneously because there was no evidence that each of the 650 franchisees involved were

---

32. Similar in import to *Siegel II* were Redd v. Shell Oil Co., 1974–2 Trade Cas. ¶ 75,390 (D.Utah 1974); Falls Church Bratwursthaus v. Bratwursthaus Management Corp., 354 F.Supp. 1237 (E.D.Va.1973); Butkus v. Chicken Unlimited Enterprises, Inc., 1971 Trade Cas. ¶ 73,780 (N.D.Ill.1971).

coerced to purchase the equipment.[33] Indeed, the leading cases espousing the individual coercion doctrine concede that a class was properly certified in *Siegel I*. *See, e. g.,* Abercrombie v. Lum's, Inc., 345 F.Supp. 387 (S.D.Fla.1972); Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974).

Given this background, two questions immediately arise. First, might there not have been Chicken Delight franchisees who, like Dunkin Donuts franchisees, either sought or gladly acquiesced in the equipment tie because, as novices in the field, they were happy not to be bothered with having to secure the various items of equipment? Under Dunkin Donuts' individual coercion theory, was not *Siegel II* wrongly decided as to such franchisees? Plainly, the answer is yes. On the other hand, if *Siegel II* was correctly decided, as the leading cases upon which the defendant relies assume, what difference does it make whether the tie is articulated in the contract or can be proved at trial as having been imposed *sub silentio* through a pervasive and resolutely enforced company policy as is alleged here? Palpably, the answer is none. In this latter regard, Professor Pearson has observed:

> Once the product problem has been hurdled, the court must determine whether a tie-in exists, that is, whether a buyer can buy the tying product only on condition that he take the tied product. Of course, where the condition is express, there is no problem. *But the substance of the condition may exist even if the form doesn't,* and the problem is to determine if, as a practical matter, the buyer must take both products to get one.

Pearson, *supra* note 15, at 630 (emphasis added).

The foregoing analysis reveals incipient flaws in the defendant's position and suggests that the dispute between the parties may well resolve into a dispute not over the requisites of a tie, but over the appropriate means of *proving* use of economic power. Thus, it may be that evidence indicating (individual) coercion is but one way of proving use of economic power. However, before determining whether there is a requirement of (individual) coercion in the law, we have several threshold tasks. *First,* we must analyze the individual coercion doctrine in more detail and discuss its etiology. *Second,* we must review the decisions in F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), and Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), to assess their impact upon the question of proof of use of economic power. *Third,* we must address the notion of the "voluntary" tie. *Fourth,* we must consider the role of company policy. And, in the course of our discussion, we must consider the semantic overtones of the problem, for coercion and use of economic power may be but part of the same syndrome and it is possible that by means of linguistic phenomena alone, "coercion" may have assumed an independent viability in the law.

### C. The Cases Positing the Individual Coercion Doctrine: Comment on Their Viability

The individual coercion doctrine appears to have sprung mainly from the opinion of the United States District Court for the Southern District of Florida in Abercrombie v. Lum's Inc., 345 F. Supp. 387 (S.D.Fla.1972). It is *Abercrombie* that is cited in each of the succeeding cases in the line of decisions relied upon by defendant (see p. 105 *infra*).

*Abercrombie* was a franchise antitrust suit brought by a franchisee against a

---

33. One court has, however, rendered the interpretation that "a contractual provision is necessarily coercive." In re 7-Eleven Franchise Antitrust Litigation, 1972 Trade Cas. ¶ 74,156 (N.D.Cal.1972).

franchisor engaged in the fast food business. The plaintiff sought to represent approximately 400 past and present Lum's franchisees in a class action. The plaintiff claimed that the franchisees were unlawfully required: (a) to purchase signs and equipment from defendants and to purchase furniture, fixtures, supplies, foods, and beverages from defendants or their approved suppliers; (b) to lease their restaurant sites to defendants who would then sublease the sites back to plaintiffs at the same rental paid by defendants plus 5% of their gross sales and, in some cases, other charges; (c) in some cases to secure their sites from persons designated by Lum's and to deal with building contractors designated by Lum's; and (d) to permit Lum's, upon termination of the franchise agreement, to repurchase equipment and fixtures from them. The claims thus asserted are strikingly similar to those in the case at bar.

While Lum's entered into a franchise agreement for the operation of a Lum's Restaurant with each franchisee, there were some twelve different types of agreements executed from time to time, none of which contained overt tying arrangements. The large variety of forms might have motivated the court to conclude that proof of the tie-ins would have to come from an examination of each franchisee's (or a group of franchisees') dealings with Lum's. However, the opinion denying class certification sweeps far more broadly. Judge King wrote:

> Plaintiffs also urge that the existence of an illegal tying arrangement may be shown not only by evidence of an express agreement but also through conduct extrinsic to an agreement, Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). *In order to establish an illegal tying arrangement arising from business conduct, franchisees must prove that they were coerced, not merely persuaded, into purchasing the products at issue here.* See Ford Motor Co. v. United States, 335 U.S. 303, 316–320, 69 S.Ct. 93, 93 L.Ed. 24 (1948). As the Court stated in American Mfrs. Mutual Ins. Co. v. ABC-Paramount Threatres, 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).
>
> *"[T]here can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice."*
>
> Such proof will necessarily vary from franchisee to franchisee. If the Abercrombies were to establish that they made forced purchases it would not necessarily follow that other franchisees were similarly coerced. Thus, while the Abercrombies may have purchased equipment from Lum's, it appears that other Lum's franchisees purchased none. Franchisees may have purchased items from defendants for a variety of reasons ranging from convenience, to attractiveness of the product, to, as the Abercrombies claim, coercion. Determination of the issue requires separate, distinct and individual, not common, proof.
>
> Plaintiffs' claims concerning leasing arrangements similarly give rise to individual issues. Any claim that lease provisions which permit cancellation for breach of the franchise agreement could be applied so as to coerce franchisees in the operation of their restaurants would necessitate a review of how the provision was administered as to each franchisee who claimed he was coerced thereby. Any claim of a tie-in arising from lease guarantees, which are not mentioned in plaintiffs' franchise agreements, would also require examination of the particular dealings of each franchisee with the defendants.

345 F.Supp. at 391–92 (emphasis added) (footnotes omitted).

*Abercrombie* was a forceful as well as influential opinion, which is entitled to much respect. However, the context of the present case and matters apparently not called to the attention of Judge King cause us to disagree with his articulation of the individual coercion doctrine. (We do not suggest that *Abercrombie* was incorrectly decided on its facts, which differ markedly from those at bar.) Because of the enormous import of *Abercrombie* on the individual coercion doctrine, it is necessary that we analyze the bases for the opinion in detail and explicate the basis for our disagreement with its salient principles.

As appears from the foregoing text, the first case upon which the individual coercion doctrine of *Abercrombie* is grounded is Ford Motor Co. v. United States, 335 U.S. 303, 69 S.Ct. 93, 93 L. Ed. 24 (1948). But *Ford Motor* is not a tying case and, in our view, has no relevance to the issue before the *Abercrombie* court. *Ford* emanated from a consent decree entered into in a previous antitrust suit between Ford and the Government which provided that Ford would be precluded from arranging with specified finance companies that Ford's and their agents would be present with Ford dealers for the purpose of influencing the dealer to patronize that finance company. The decree further prohibited Ford from recommending, endorsing or advertising those finance companies to its dealers or the public and also from establishing any practice for the financing of autos for the purpose of enabling any finance agency to enjoy a competitive advantage in obtaining a dealer's patronage. Such prohibitions as were contained in the decree were to be sus-

pended unless by a specified date substantially similar prohibitions were placed upon Ford's competitor, General Motors Corporation (GMC). Negotiations for a consent decree between GMC and the Government failed and criminal charges were thereupon brought against it. In the criminal trial, GMC was found guilty of conduct in violation of Section 1 of the Sherman Act for practices that substantially mirrored those of Ford prior to the entering of the consent decree. Ford appealed and contended that, despite such determination of guilt, the judge's charge in the prosecution of the case involving GMC fell short of holding illegal the conduct proscribed in its consent decree. If such were the case, according to the terms of the consent decree, Ford contended it would be entitled to a suspension of those restrictions not in *pari materia* with those imposed by the criminal adjudication upon GMC.

Accepting the viability of Ford's contention, Mr. Justice Frankfurter, writing for the majority, noted that the trial judge used the word "coercion" to summarize practices which would justify a verdict against GMC. On the other hand, the trial judge used the words "persuasion," "exposition" and "argument" to describe conduct which would be permissible and not supportive of a guilty verdict.[34] Since the consent decree entered into by Ford Motor had made no such distinction and had proscribed all the above kinds of practices, the Court simply held that Ford was entitled to a modification of its consent decree to accord with the terms imposed upon GMC by the criminal trial.[35]

34. The effect of the trial judge's instructions in GMC's criminal case was to "draw a line between such practices as cancellation of a dealer's contract, or refusal to renew it, or discrimination in the shipment of automobiles, as a means of influencing dealers to use GMAC [a finance company], all of which fall within the common understanding of 'coercion,' and other practices for which

'persuasion,' 'exposition' or 'argument' are fair characterizations." 335 U.S. at 316–17, 69 S.Ct. at 100.

35. Thus, Mr. Justice Frankfurter found:
The restraints imposed by the paragraphs appellants seek to have suspended are properly described by the terms "exposition," "persuasion" and "argument." So

It is relevant in determining the extent to which *Ford Motor* supports the individual coercion doctrine to note that the Government in that case urged that the Court should refuse to suspend or modify the relevant provisions of Ford's consent decree on the grounds that they were, in any event, illegal under the Sherman Act. The Court found this argument unappealing not because practices such as "persuasion" and "exposition" were permissible within the framework of the antitrust laws, but rather on the narrower ground that such position had neither been admitted nor proven. Thus, Justice Frankfurter stated:

> . . . since ascertainment of illegality under the Sherman Law normally depends on the circumstances of a particular situation and the inferences they yield, the appellants have a right to insist that, so long as interdiction of these practices has not been decreed against General Motors, the Government be put to its proof. The lifting of the restraints imposed by the consent decree does not, of course, affect the liability of Ford for any violations of the Sherman Law that the Government may establish in court.

335 U.S. at 320, 69 S.Ct. at 101. The foregoing analysis brings to light the weakness of the *Abercrombie* court's reliance upon *Ford Motor* to stand for the proposition that "[i]n order to establish an illegal tying arrangement . . . franchisees must prove that they were coerced, not merely persuaded, into purchasing the [tied] products . . . ." 345 F.Supp. at 391. The Court in *Ford Motor* was concerned purely with a "contract" between the Government and the appellant. The Court's emphasis upon distinctions between "persuasion" and "coercion" was merely a tool of interpretation rather than a substantive explication of the requirements of the antitrust laws.

The second case upon which *Abercrombie* relies is American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L. Ed.2d 752 (1972). That case is likewise inapposite. In *American Manufacturers*, plaintiff, Kemper Insurance Companies (Kemper), claimed that the American Broadcasting Company (ABC) exerted unlawful economic pressure by requiring plaintiff to sponsor an evening news program over several local television broadcasting stations affiliated with the ABC network as a condition to being permitted to sponsor programs over other local ABC affiliates whose sponsorship Kemper desired. The district court dismissed the complaint because of its finding that Kemper did not seriously bargain for the elinination of the alleged unwanted sponsorships; indeed, the court found that Kemper had abandoned its initial attempt to exclude the "unwanted" stations merely due to bargaining strategy. Plaintiff appealed and the decision of the district court was affirmed by the court of appeals. In the opinion of the court of appeals affirming the dismissal, Judge Kaufman noted:

> Here, ABC exerted no pressure on Kemper, successful or not. We agree that it is not decisive, as Kemper correctly asserts, that Kemper found the August 15 contract economically advantageous given the available alternatives, since that is a necessary characteristic of most contracts, including illegal ones. But *there can be no ille-*

---

long as these paragraphs remain in effect and so long as there is no comparable decree enjoining their substance against General Motors and GMAC, Ford and CIT cannot do without risk of violating the consent decree that which General Motors and GMAC are free to do. . . . Thus the conditions have been fulfilled which entitled Ford and CIT to suspension of the restraints imposed by those terms of the decree.

335 U.S. at 319–20, 69 S.Ct. at 101.

*gal tie unless unlawful coercion by the seller influences the buyer's choice.* 446 F.2d at 1137 (emphasis added).

The *Abercrombie* court focused upon Judge Kaufman's reference to "coercion." However, as we read the *American Manufacturers* opinions, the *ratio decidendi* of both the district and circuit courts stemmed from their concern that an antitrust action could be grounded upon what was in actuality a strategic bargaining ploy. While the circuit court used the word "coercion," its real concern was whether there had in fact been any *use of economic* power by the seller. Judge Kaufman continued:

> ABC's initial response was indeed, as might well have been expected, decidedly adverse, but there is no evidence that this reaction ever crystallized into any identifiable or reasonably definitive policy within ABC. . . . Foreclosure implies actual exertion of economic muscle, not a mere statement of bargaining terms which, if they should be enforced by market power, would then incorporate an illegal tie. . . . It is not apparent, to turn the metaphor, that Kemper ever discovered whether it faced a windmill or a bona fide giant. ABC's preliminary bargaining position may have influenced Kemper, but Kemper did not persevere long enough with its ideal lineup to feel any economic pressure from ABC, and we cannot know whether ABC would ever have tried to bring any such pressure to bear.

446 F.2d at 1135, 1137.

That the use of the word "coercion" in Judge Kaufman's opinion was meant only to refer to utilization of economic power in the tying product is further buttressed by his reliance upon the decision in United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Mr. Justice Goldberg did state in *Loew's* that the "gravamen" of the complaint was the "successful pressure applied to television station customers to accept inferior films." 371 U.S. at 40, 83 S.Ct.

at 99. However, this aspect of *Loew's*, as we read it, is authority only for the proposition that utilization of economic power is essential to the maintenance of an illegal tie. *Loew's* does not appear to us to suggest that there is an additional requirement of overcoming the will of a buyer faced by the policy decision of a seller not to deal except on terms imposing an illegal tie under the Sherman Act. Nor does *Loew's* seem to imply that where economic pressure is applied, the antitrust result would be any different because the buyer voluntarily accepted the result.

*American Manufacturers* was also distinguished by Judge McLaren in Mc-Mackin v. Schwinn Bicycle Co., 354 F. Supp. 1154 (N.D.Ill.1972), vacated on other grounds, 1974 Trade Cas. ¶ 75,047 (N.D.Ill.1974), a recent franchise antitrust suit:

> This Court is persuaded that acceptance of a burdensome tie-in by an appreciable number of buyers within the market permits an inference of coercion and that the decisions in *Fortner* on remand and in American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F. 2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972) are distinguishable since there was no consideration of acceptance by an *appreciable* number of buyers in those cases.

1972 Trade Cas. at 93,020.

The other main decision upon which *Abercrombie* relies is Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970). *Lah* was a Sherman Act § 1 treble damage action by a Shell Oil dealer against the oil company in which class certification was sought. The plaintiff claimed that Shell conditioned the sale of its gasoline upon the entry by dealers into short term (one year) leases of real estate, *i. e.*, a service station owned by Shell. The plaintiff also claimed that Shell dealers were committed to purchasing further unwanted products such as trad-

ing stamps and games. Judge Hogan refused to certify a class in an opinion which does not articulate, but has strong overtones of, the individual coercion doctrine. Because *Lah* is the remaining prop upon which *Abercrombie* rests (other than its own inherent logic with which we will in due course deal), it is important that we analyze *Lah* carefully. When we do, it too appears distinguishable and, with respect to its advancement of the individual coercion doctrine, also unpersuasive precedent.[36]

Judge Hogan's rationale for refusing to certify a class consisting of 140 Shell dealers in southwest Ohio was that the predominating fact of whether Shell refused to sell the plaintiff and other dealers Shell gasoline for sale in stations which they or others owned (or compelled each individual to sign a one-year lease) was "not one question, but 140 separate questions of fact" requiring individual inquiries. 50 F.R.D. at 200. Moreover, the court stated, class actions in the antitrust field are ("with the possible exception of *Chicken Delight*") maintainable where only a single question of fact, such as a conspiracy to fix prices, furnishes the foundation upon which the individual damage claims rest as a matter of course. In terms of the coercion requirement, Judge Hogan also drew upon Ford Motor Co. v. United States, 335 U.S. 303, 69 S.Ct. 93, 93 L. Ed. 24 (1948), and F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L. Ed.2d 394 (1968). He concluded from those cases that while one in a dominant position may not coerce without running afoul of the antitrust laws, nonetheless the dominant may still persuade or argue. The potential role of company policy was not advanced, and Judge Hogan thus concluded that proof of individual coercion was necessary to establish a Sherman Act claim. The court in *Lah* also found that problems of class action management inherent in the necessity of trying the damage issues individually militated against class certification.

We believe that *Lah* lacked precedential effect in *Abercrombie* and that it lacks it here for several reasons. First, *Ford* is inapposite for reasons noted above. Second, as explained below, *Texaco* does *not* hold that a dominant may persuade; rather, it holds that a dominant may *not* persuade without running afoul of the antitrust laws. While *Texaco* was a § 5 F.T.C. Act case, its holding is buttressed in the Sherman Act § 1 situation by Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), in which the Court held that franchisees who had voluntarily, if not eagerly, participated in a tying scheme to their ultimate financial benefit were not barred from seeking treble damages by virtue of the *in pari delicto* doctrine. Furthermore, in terms of the law of class actions, for reasons explained at n. 104 *infra*, we do not agree with the narrow view of their utility in antitrust cases, or that the necessity of individual trial of damage issues inveighs against class action determination.

*Abercrombie* is not, of course, without its own raison d' être aside from its reliance upon *Ford, American Manufacturers Mutual* and *Lah*. Judge King found that Lum's had a number of franchise agreements in effect from time to time, materially varying in important respects, and noted that this fact itself led to a proliferation of issues. He also observed that there were serious individual problems of interpretation of 127 general releases given over the course of the operations of Lum's when Lum's bought back franchised stores. Finally, Judge King found that the plaintiffs' personal claims were dissimilar to those of the class. With these conclusions we cannot disagree. But *Abercrombie's* enunciation of the individual coercion doctrine

---

**36.** As with *Abercrombie*, we do not suggest that *Lah* was wrongly decided on its own facts.

emanates not from these factual phenomena, but rather from reliance upon the cases we believe are inapposite. Furthermore, *Abercrombie* did not focus on the Supreme Court cases, or upon the above-discussed policies underlying the law of tying which we believe are pivotal. Above all, *Abercrombie* did not consider the effect of *Perma Life Mufflers*, which devastates the individual coercion doctrine and which we shall discuss at length below. Hence, we do not elect to follow *Abercrombie*.

It would unduly prolong this extensive opinion to review each of the franchise antitrust cases which have posited the individual coercion doctrine in the wake of *Abercrombie*, and upon which the defendant has relied. We believe it sufficient, with three exceptions, simply to enumerate them, for they all draw their sustenance from *Abercrombie*. The cases include Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal. 1974); Halverson v. Convenient Food Mart, Inc., No. 70–C–499 (N.D.Ill., Oct. 31, 1974); Thompson v. T.F.I. Companies, Inc., 1974 Trade Cas. ¶ 72,215 (N.D.Ill.1974); E.B.E., Inc .v. Dunkin' Donuts of America, Inc., 64 F.R.D. 140 (E.D.Mich.1974); Capital Temporaries, Inc. v. The Olsten Corp., 365 F.Supp. 888 (D.Conn.1973), aff'd, 506 F.2d 658 (2d Cir. 1974); Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973); and In re 7–Eleven Franchise Antitrust Litigation, 1972 Trade Cas. ¶ 74,156 (N.D.Cal.1972).

In *Bogosian* a class certification was sought on behalf of a nationwide class consisting of all present and former retail gasoline service station dealers who leased or had leased their respective stations from any of the 15 defendants, the major nationwide oil companies. The plaintiffs complained that the defendants as landowner-lessors had imposed illegal tie-in agreements in the leasing of their respective service stations by requiring the lessees to buy and sell only the gasoline supplied by their respective lessors, thus preventing them from purchasing their wholesale requirements of gasoline (which they claimed to be a fungible product) on a free and open market. In a well-reasoned opinion, our colleague, Judge VanArtsdalen, (properly, we think) denied class certification. While Judge VanArtsdalen cited *Abercrombie* and the individual coercion doctrine with approval, we believe that *Bogosian* is plainly distinguishable from this case on its facts. In *Bogosian*, Judge VanArtsdalen was faced with over 400 contractual forms used by the fifteen oil companies; these facts were sufficient to create a predominance of individual issues. Thus, the individual coercion doctrine is not necessary to the *Bogosian* decision. Moreover, a problem existed in determining whether all oil company leased service stations throughout the nation were so strategically located as to be able to create leverage. Additionally, the magnitude of the case created enormous potential problems of management and cast grave doubts upon the superiority of a class action. But equally important to the distinction between *Bogosian* and the present case is the separability of products problem. As Professor McCarthy notes:

> the crucial test is to determine the primary product or products of the franchisor being distributed through francised outlets. If this is automobiles for car dealers and gasoline for gas stations, then requiring *other* products or services to be bought only from designated sources is correctly characterized as tying. Thus, it was held that General Motors could not force its dealers to use only the services of G.M.'s financing company. However, if General Motors required only that its franchised dealerships sell exclusively G.M. autos, this could not be called a tying of autos to the G.M. trademark, but rather an exclusive dealing arrangement. Similarly, a gasoline refiner might properly require its own brand of gas to be

pumped from leased pumps and tanks bearing its trademark, but cannot require a dealer to sell only a designated brand of tires, batteries, and accessories without violating the prohibition against tying.[37]

McCarthy, *supra* note 15, at 1108 (footnotes omitted).

In the district court opinion in *Capital Temporaries,* Judge Blumenfeld adopted the individual coercion doctrine, relying on *American Manufacturers, Abercrombie* and Belliston v. Texaco, Inc., 455 F. 2d 175 (10th Cir. 1972). However, *Capital Temporaries* is also completely distinguishable on its facts since the practices complained of did not even amount to a tying arrangement. It will be recalled from our earlier discussion (see n. 24) that the *Capital Temporaries* plaintiff complained that the blue collar Handy Andy franchise was tied to the purchase of the white collar Olsten's franchise. The evidence showed, however, that neither the contract nor the communications between the parties in any way obligated the franchisee to enter the blue collar business to obtain the white collar franchise; it was purely up to him if he wished to do so. Thus, the court of appeals, in affirming Judge Blumenfeld's grant of summary judgment for the defendant, referred to the plaintiff's allegations as, at best, an "ersatz tie."

Finally, in E. B. E., Inc. v. Dunkin' Donuts, the court granted summary judgment for Dunkin Donuts, the franchisor involved in the present litigation, because the plaintiff franchisee could not show (individual) coercion. E. B. E., Inc. alleged that an illegal tie-in existed because, as an express condition to obtaining a Dunkin Donuts franchise, E. B. E. was required to purchase all necessary operating equipment from Dunkin Donuts and to rent the building and land from defendant at excessive rates. In surveying the evidence, the court found that the plaintiff was perfectly willing to rely on defendant's services in assembling the business package, and that it had never occurred to him to do otherwise. The court further noted that the plaintiff, instead of claiming that it was forced to accept the equipment, the property lease and signs as a condition of obtaining the franchise, merely argued that it was never affirmatively told that it could buy from other sources. Relying upon *Abercrombie,* the court granted summary judgment for the franchisor because it felt that a plaintiff was required to prove some element of coercion in order to establish an illegal tying agreement. As noted above, we do not follow *Abercrombie.* The court also relied upon *Loew's,* which is inapposite for reasons enumerated above, and upon that portion of *Belliston* dealing with the TBA claim. We believe the *E. B. E.* court's reliance upon *Belliston* to be misplaced.

The *Belliston* court rejected the plaintiff's claim due to the absence from the record of sufficient evidence of coercion. In so doing, the *Belliston* court relied upon the decision in Atlantic Refining Co. v. F. T. C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), without mentioning that the *Atlantic* coercion test was virtually abandoned in the case of F. T. C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), which followed it. *Belliston* is thus undermined. In sum, we do not find *E. B. E.* distinguishable on its facts since it deals with the same franchisor as the case at bar and with similar allegations. However, for the myriad reasons which form the basis of this opinion, we do not agree with its legal rationale and, therefore, elect not to follow it.

We believe that the foregoing discussion exposes the roots of the individual coercion doctrine and shows them to be frail, if not infirm. But if we have cast doubts upon the viability of the individ-

37. *But cf.* Redd v. Shell Oil Co., 1974–2 Trade Cas. ¶ 75,390 (D.Utah 1974).

ual coercion doctrine, we have not yet resolved the use-coercion dialogue. Before doing so, it is necessary that we harvest the teachings of *Texaco* and *Perma Life Mufflers.*

### D. *Texaco and Perma Life Mufflers; Their Adverse Impact Upon the Individual Coercion Doctrine*

#### 1. *Texaco*

Federal Trade Commission v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L. Ed.2d 394 (1968), was a TBA case addressing the question of whether Texaco had engaged in an "unfair method of competition" under § 5 of the Federal Trade Commission Act when it undertook to induce its service station dealers to purchase the tires, batteries and accessories of B. F. Goodrich. After extensive hearings, the F.T.C. concluded that there was a § 5 violation, but the court of appeals reversed and held that the Commission had failed to establish that Texaco had exercised its dominant economic power over its dealers or that the Texaco-Goodrich arrangement had an adverse effect on competition, 127 U.S. App.D.C. 349, 383 F.2d 942 (1967). The result achieved by the court of appeals was factually inconsistent with that reached by the Supreme Court in Atlantic Refining Co. v. F. T. C., discussed above, and by the court in Shell Oil Company v. F. T. C., 360 F.2d 470 (5th Cir. 1966). Accordingly, the Supreme Court granted certiorari.

It was agreed before the Supreme Court that the TBA arrangement would fall under the *Atlantic* quasi-tying rationale if the Commission was correct in its three ultimate conclusions: (1) that Texaco had dominant economic power over its dealers; (2) that Texaco exercised that power over its dealers in fulfilling its agreement to promote and sponsor Goodrich products; and (3) that anticompetitive effects resulted from the exercise of that power. The Supreme Court had no difficulty in concluding that the record showed Texaco's dominant economic power over its deal-

ers, and that such power was "inherent in the structure and economics of the petroleum distribution system." 393 U. S. at 226, 89 S.Ct. at 431. Mr. Justice Black, speaking for the Court, observed:

> The average dealer is a man of limited means who has what is for him a sizable investment in his station. He stands to lose much if he incurs the ill will of Texaco. As Judge Wisdom wrote in *Shell*, "A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord."

393 U.S. at 227, 89 S.Ct. at 432. Turning to the manner of the exercise of Texaco's power, Justice Black noted that the evidence before the F.T.C. showed that: (1) Texaco carried out its agreement to promote Goodrich products through constantly reminding its dealers of Texaco's desire that they stock and sell the sponsored Goodrich TBA; (2) Texaco emphasized the importance of TBA and the recommended brands as early as its initial interview with a prospective dealer and repeated its recommendation through a steady flow of campaign materials utilizing Goodrich products; (3) Texaco salesmen, the primary link between Texaco and the dealers, promoted Goodrich products in their day-to-day contact with the Texaco dealers; (4) the evaluation of a dealer's station by the Texaco salesman was often an important factor in determining whether a dealer's contract or lease with Texaco would be renewed; and (5) Texaco received regular reporting on the amount of sponsored TBA purchased by each dealer. In this regard, the record was palpably weaker than that in *Atlantic Refining* because of the presence there, and the absence in *Texaco,* of overt coercive practices designed to force dealers to purchase the sponsored brand of TBA. The Court nonetheless found a § 5 violation:

> While the evidence in the present case fails to establish the kind of overt coercive acts shown in *Atlantic*, we

think it clear nonetheless that Texaco's dominant economic power was used in a manner which tended to foreclose competition in the marketing of TBA. *The sales-commission system for marketing TBA is inherently coercive.* A service station dealer whose very livelihood depends upon the continuing good favor of a major oil company is constantly aware of the oil company's desire that he stock and sell the recommended brand of TBA. Through the constant reminder of the Texaco salesman, through demonstration projects and promotional materials, through all of the dealer's contacts with Texaco, he learns the lesson that Texaco wants him to purchase for his station the brand of TBA which pays Texaco 10% on every retail item the dealer buys. With the dealer's supply of gasoline, his lease on his station, and his Texaco identification subject to continuing review, we think it flies in the face of common sense to say, as Texaco asserts, that the dealer is "perfectly free" to reject Texaco's chosen brand of TBA. Equally applicable here is this Court's judgment in *Atlantic* that "[i]t is difficult to escape the conclusion that there would have been little point in paying substantial commissions to oil companies were it not for their ability to exert power over their wholesalers and dealers." 381 U.S., at 376, 85 S.Ct., at 1509 [14 L.Ed.2d 443].

393 U.S. at 228–29, 89 S.Ct. at 433 (emphasis added).

Turning to the effect on competition, and drawing upon the principles familiar in the field of tying law, the Court held that the government did not have to show that a practice which the Commission condemned had totally eliminated competition in the relevant market, but only that the Commission found that the practice in question unfairly burdened competition for a not insubstantial volume of commerce:

Ideally, each service station dealer would stock the brands of TBA that in his judgment were most favored by customers for price and quality. To the extent that dealers are induced to select the sponsored brand in order to maintain the good favor of the oil company upon which they are dependent, the operation of the competitive market is adversely affected. As we noted in *Atlantic*, the essential anticompetitive vice of such an arrangement is "the utilization of economic power in one market to curtail competition in another."

393 U.S. at 229–30, 89 S.Ct. at 433. Accordingly, the Court reversed the decision of the court of appeals and reinstated the Commission's order.

While Texaco is an F.T.C. Act case and thereby requires a lesser standard than under Sherman Act § 1, we believe that its teaching that dominance in bargaining power may give rise to inherent coercion is applicable here. *Texaco* does not announce a *per se* doctrine as such; it came to the Court on a voluminous commission record. However, its quasi-tying analysis tracks the traditional tying cases. Much of what had to be proved in *Texaco* must be proved under Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958), and Fortner Enterprises, Inc. v. United States Steel Corp., 394 U. S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), *e. g.*, the existence of economic power in the tying product, use of that power and foreclosure of a not insubstantial amount of commerce in the tied product. In terms applicable here, *Texaco* holds that proof of use of economic power in the TBA situation does not require evidence of coercion, but rather that evidence of persuasion or influence will suffice where there is dominance in bargaining power of a franchisor over a franchisee, or, what is essentially the same, where there is evidence of an inherently coercive marketing system.

We are satisfied that the same principle applies in the traditional tying situation which is involved here. The importance of this conclusion is that it is a further indication of the unsoundness of the individual coercion doctrine. Moreover, the conclusion may also be relevant here because there appears *prima facie* to be a unique bargaining relationship between the contemporary fast food franchisor and his average franchisee which is similar throughout the typical franchise system; as in the case of *Texaco* and its dealers, "inherent coercion," if it exists, is thus a system-wide, not an individual, matter.[38]

---

**38.** In the wake of *Texaco* and the views expressed by Mr. Justice White in *Perma Life Mufflers* with respect to equality of bargaining power, see pp. 110–111), it is helpful to keep in mind the fact that the present case *does not arise in a vacuum, but rather* against the backdrop of a staggering increase in the franchising business in the United States in recent years. According to the *Franchise Opportunities Handbook* published by the United States Department of Commerce in 1972, franchised businesses in the United States accounted for over $131 billion in annual sales in 1971, representing 35% of retail sales and 13% of the Gross National Product. Published figures show that 1972 sales in the fast-food franchising industry alone were $5.8 billion dollars. McDonald's led the way with 1.03 billion dollars; Kentucky Fried Chicken's sales were approximately $1 billion and Dunkin Donuts' sales for that year were $120 million. At least 400,000 businessmen are franchisees. Federal Trade Commission, Staff Report on Legal Problems in Connection with Franchise Agreements 6 (1969) [hereinafter cited as FTC Staff Report]. For franchising statistics, see Hearings on S. 2507 and S. 2321 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 90th Cong., 1st Sess., ser. 1, pt. 1 (1967) [hereinafter cited as Hearings]. More recent statistics would doubtless reflect significant volume increases.

Franchising has been described as the latest frontier for the independent businessman, a vehicle which enables the "little guy" to enter business despite the trend towards oligopoly which casts a shadow upon the free enterprise system. For an excellent discussion of modern franchising see McCarthy, *supra* note 15, at 1086–1093. Instead of going it alone, a person of modest means desiring to go into business can associate himself with a large concern and market something that is proven, standardized and well advertised. The fact that each franchisee is investing his own money leads to a high degree of motivation for him to work hard to be successful. According to E. Lewis and R. Hancock, The Franchise Method of Distribution 71, n. 2 (1975), most franchisees work long hard hours, often as many as 60 to 80 hours per week. Franchising is also of benefit to the franchisor, who is able to maintain a large number of consumer outlets to distribute his products *without having to invest his own money in a* retail operation.

Notwithstanding its supposed benefits to the franchisee, it is plain that abuses have appeared which have prompted United States Senate hearings (*see* Hearings, *supra*) and the enactment of at least one state law to protect franchisees. *See* Cal.Corp. Code § 31005 (West Supp.1971). McCarthy describes some of the "inequities of franchising" as follows:

The franchisee, by definition not wise in the ways of business, is presented with a form contract prepared for the franchisor by a battery of highly skilled attorneys. This contract is usually presented on a take-it-or-leave-it basis, and few of them are negotiated in the legal sense. Relying on the glowing representations of the franchisor's agent, the franchisee readily signs without much perusal of the contract terms. What the terms really mean becomes apparent only after the franchisee launches into the daily operation of his new business.

Most franchise contracts can be legally characterized as a skeleton of a trademark license fleshed out with the many duties and restrictions imposed upon the franchisee. The failure to comply with any of these terms generally gives the franchisor the power to terminate, often with disastrous results for the franchisee's personal investment. . . .

McCarthy, *supra* note 15, at 1090 (footnotes omitted).

Focusing on the present case and the named plaintiffs involved, we believe that it is fair to conclude that few if any of them, whether represented by counsel or not, had sophistication or resources to match that of Dunkin Donuts in negotiating a new franchise. As the class action discovery in this case demonstrates, today's franchisees come from all walks of life. For instance, before becoming Dunkin Donuts franchisees, the following named plaintiffs pursued the fol-

## 2. Perma Life Mufflers

The claims of the plaintiffs in Perma Live Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), have been detailed at page 109 above. It will be recalled that the plaintiffs complained, *inter alia*, of a supplier tying arrangement, and that the court of appeals held their claims barred by the *in pari delicto* doctrine. It will also be recalled that the franchisor there (just as the franchisor here) contended that its Midas Muffler franchisees had voluntarily, if not eagerly, participated in the tying scheme to their ultimate financial benefit. To that contention Mr. Justice Black, speaking for the Court, replied:

> Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. They sought the franchises enthusiastically but they did not actively seek each and every clause of the agreement. Rather, many of the clauses were quite clearly detrimental to their interests, and they alleged that they had continually objected to them. Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity. . . .
>
> \* \* \* \* \* \*
>
> Moreover, even if petitioners actually favored and supported some of the other restrictions, they cannot be blamed for seeking to minimize the disadvantages of the agreement once they had been forced to accept its more onerous terms as a condition of doing business. The possible beneficial byproducts of a restriction from a plaintiff's point of view can of course be taken into consideration in computing damages, but once it is shown that the plaintiff did not aggressively support and further the monopolistic scheme as a necessary part and parcel of it, his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover which the antitrust acts give him. We therefore hold that the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action.

392 U.S. at 139, 140, 88 S.Ct. at 1984. The lessons of the foregoing passage for the present case are obvious; *Perma Life Mufflers* emasculates the individual coercion doctrine.

Also instructive is the concurring opinion of Mr. Justice White, who posed

---

lowing occupations: Mr. Ungar was an accountant; Mr. Giannuzzi was a butcher; Mr. Cerajewski was a teacher; Mr. Pallantios was a luncheonette operator; Mr. Burwell was a railroad conductor; Mr. Daratony was an automotive designer; Mr. Hudock was a dockman and part-time baker; Mr. Wainrober was a salesman; the Olivieris were beauticians; Mr. Thomae was a barber; and Mr. Rader worked for an electronics company and in a doughnut shop part-time. An affidavit filed by defendant reveals that the franchisee roster also includes individuals who have pursued such diverse occupations as insurance agent, Antarctic scientist, self-employed plasterer, gasoline station operator and ophthalmologist.

Several of the named plaintiffs are multiple franchisees. Pallantios, for instance, op-

erates 9 Dunkin Donuts shops and Rader operates 5. Information supplied to us by counsel for plaintiffs indicates that there may be as many as 95 multi-unit franchisees operating from 2 to 10 stores each. Although it might conceivably create an issue for trial, we suspect preliminarily (and tentatively) that none of the franchisees has as yet reached a position of bargaining equality with Dunkin Donuts. Accordingly, we need not be concerned in this opinion with the import of Justice White's remarks in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134 [88 S.Ct. 1981, 20 L. Ed.2d 982] (1968), respecting equality of bargaining power.

three interesting hypothetical situations. Under the first, a manufacturer (A) sells to a retailer (B) and, over B's objection, insists on adherence to specified retail prices to which B agrees because A's product is important to him and he cannot get it elsewhere. When business declines because of inability to compete, B sues A. Under the second hypothetical, when B maintains the suggested prices on A's product, he simply sells more of C's competing product which he also handles and A sues B. Under the third hypothetical, D and E, competitors, combine to fix higher prices. D's best customer thereupon sets up his own source of supply to D's great damage and D then sues E. Addressing the hypotheticals, Mr. Justice White observed:

> It is arguable that in each supposed situation recovery should be denied because the plaintiff was a party to the illegality and wrongdoers should be left where they are found. In terms of the deterrent aims of the statute permitting injured plaintiffs to recover treble damages, however, this undiscriminating approach makes little sense. *When those with market power and leverage persuade, coerce, or influence others to cooperate in an illegal combination to their damage, allowing recovery to the latter is wholly consistent with the purpose of § 4, since it will deter those most likely to*

*be responsible for organizing forbidden schemes.*[39]

392 U.S. at 145, 88 S.Ct. at 1987 (emphasis added). It will be noted that Mr. Justice White used the words "persuade," "coerce" and "influence" in the disjunctive, thereby implying that one may violate the antitrust laws by using persuasion or influence without coercion.

 *Perma Life Mufflers* thus goes far beyond *Texaco*, for it makes clear that anticompetitive conduct may exist (and hence be enjoined) in the absence of coercion, even where the franchisees voluntarily acquiesce in the practices which constitute antitrust violations. Even if we read *Perma Life Mufflers* too broadly and conclude that Mr. Justice White's expression more accurately reflects the views of the Court, *Perma Life Mufflers* nonetheless expands upon *Texaco*. This is so because it demonstrates that the use of economic power is inferable in a situation where there is a dominant relationship of franchisor over franchisee,[40] and where the franchisor's conduct rises not to the level of coercion, but only to the level of persuasion or influence.

E. *Can There be a "Voluntary" Tie(?); Further Defects in the Individual Coercion Doctrine*

The thrust of the individual coercion doctrine is that the plaintiffs must prove that each of them did not take the

---

**39.** Mr. Justice White reasoned that in the first hypothetical case, B should recover from A; that in the second case A should not recover from B; and that in the third case, where D and E were competitors, if judge or jury found the parties equally responsible for the conduct which caused injury, D's recovery under § 4 should be denied for failure of proof that E was the more substantial cause of the injury. Justice White concluded with the observation that:

> No simple formula can encompass the infinite variety of possible situations. Generally speaking, however, I would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of them but permit recovery in favor of the one less responsible where one is more responsible than the

other. This rule would simply pose the issue of causation in particularized form. There will be little mystery as to what evidence would be relevant proof: facts as to the relative responsibility for originating, negotiating, and implementing the scheme; evidence as to who might reasonably have been expected to benefit from the provision or conduct making the scheme illegal under § 1; proof of whether one party attempted to terminate the arrangement and encountered resistance or counter-measures from the other; facts showing who ultimately profited or suffered from the arrangement.

392 U.S. at 146–47, 88 S.Ct. at 1988.

**40.** See n. 38 *supra.*

tied product willingly. The advocates of the doctrine do not explain whether the willingness standard is a subjective one, depending upon the state of mind of each franchisee. Is individual coercion proved if the franchisee took the tied product "willingly" but with strong mental reservations? Or is individual coercion proved only where there were active negotiations over the subject of the tie and the franchisee took it "or else?" Put conversely, is individual coercion negated only if the franchisee truly desired the package of the tied product along with the tying product? And must the buyer have had conscious knowledge of the uneconomic nature of the package before there can be proof that he took the package without being coerced? Dunkin Donuts opts for a construction in the harshest light to plaintiffs, i. e., to bar each plaintiff from a cause of action unless each can show that he bargained to reject each specific tied product and capitulated by taking each tied product due to improper economic pressure.

We reiterate these queries because they help to frame the critical issue of whether there can be a "voluntary" tie. We conclude that there can be an antitrust violation where the franchisee takes voluntarily and with knowledge of the uneconomic nature of the tie.[41] Moreover, we believe this to be the case whether or not the franchisee possessed mental reservations (although the case for a tie is stronger if he did have reservations). Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) and Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), with their emphasis on the free market and the non-foreclosure of competition, point to this conclusion; Perma Life Mufflers, with its rejection of the in pari delicto

defense, compels it. An additional basis for rejection of the individual coercion doctrine is the almost metaphysical analysis which would be required if we were to adopt it; courts would be obliged to parse the human personality in the most sophisticated terms in an effort to determine the franchisee's state of mind vis-a-vis the putative (and ill-defined) coercion standard.

Finally, it should be noted that the Court in Northern Pacific defined a tie as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." 356 U.S. at 5–6, 78 S. Ct. at 518 (footnote omitted)(emphasis added). The use of the word "agreement," moreover, has been prevalent in other tying cases decided by the Supreme Court. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U. S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Thus, a further argument against the individual coercion doctrine can be constructed on a linguistic basis.

The dictionary definition of the word "agreement" is "harmony of opinion, action, or character; concord." Such language, although far from determinative, would seem itself to point to a less strenuous requirement than that of coercion in order to make out a violation of the antitrust laws. Thus, although one could conclude that the use of the word "agreement" is either loose language on the part of the Court or only an indication of the final "forced deal" which is entered into between buyer and seller, one could just as easily conclude that such is not the case. In light of the policy behind the proscription of ties—that they harm both the buyers who

---

41. The willing but ignorant buyer must be deemed indirectly and subjectively coerced since, in the defendant's parlance, a rational man would presumably not take an uneconomic tie unless he was coerced or deceived.

may be unwilling to take the tied product as well as competitors of the sellers of the tied product from entering a new market—plus the inadvisability of attributing "loose language" to the Supreme Court, it would seem preferable to take the word "agreement" at face value and dispense with any notions of individual coercion.

### F. The Role of Company Policy in Proving Use of Economic Power

 The individual coercion cases have generally held that where there is no *Siegel*-type standard form franchise agreement that can be the focal point of allegedly illegal acts, proof of tie-ins has to come from an examination of each individual franchisee's dealings with the franchisor which becomes a matter of individual proof militating against class certification. The analysis in the preceding sections of this opinion explains our disagreement with this view. Moreover, for the reasons outlined in § IV B above (commenting upon incipient flaws in the individual coercion doctrine evident from an analysis of *Siegel II*), we conclude that proof of a resolutely enforced company policy to dissuade the franchisee from purchasing other than from or through the franchisor is the equivalent of an express contractual tie. It should indeed make no difference whether a tie is articulated in the contract or can be proved at trial as having been imposed *sub silentio* through a pervasive and resolutely enforced company policy. To hold to the contrary would be to exalt form over substance.

The efficacy of this proposition was recognized by Judge Reynolds in his decision in In re Clark Oil & Refining Corp., 1974–1 Trade Cas. ¶ 74,880 (E.

D.Wis.1974). *Clark* comprised two consolidated actions brought on behalf of 1800 Clark Oil dealers and 1000 former dealers against their branded supplier asserting price fixing, price discrimination and tying claims. While Judge Reynolds' short opinion does not recite the underlying facts, we have reviewed the briefs from which it appears that the tying complaints were a combination of the claims asserted in *Bogosian* and in the TBA cases; that is, the Clark dealers objected to dealing exclusively in Clark products and to being required to purchase unwanted products. Clark's brief in opposition to plaintiffs' motion for determination of a class cited Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973); Abercrombie v. Lum's Inc., 345 F.Supp. 387 (S.D.Fla.1972); Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970); and In re 7-Eleven Franchise Antitrust Litigation, 1972 Trade Cas. ¶ 74,156 (N.D.Cal.1972), in support of Clark's allegation that the individual coercion doctrine insulated it against class certification. Judge Reynolds nonetheless made a (conditional) class certification. Confirming, and to some extent placing a synergistic gloss upon, the point at hand, he stated:

> Individual acts of coercion may be just that—isolated incidents with no implications beyond the specific individuals being coerced—or they may be part of an overall pattern which has a coercive impact beyond the particular parties involved. Coercive activities aimed at one dealer for engaging in some specific behavior can, under some circumstances, have the obvious effect of coercing all dealers from engaging in similar behavior.

We agree.[42]

---

42. Company policy may be reflected in similar representations or misrepresentations to all purchasers. It is thus appropriate to note here the words of Judge Harris in making the original class certification in *Siegel I*:

> To acknowledge defendants' position at this point would be, in effect, an emascu-

lation of the vitality and pliability of the amended rule, as recognized by Judge Edmund Palmieri when he stated that "While there may be different kinds of misrepresentations alleged with respect to different plaintiffs, including some oral misrepresentations, and while such factors might have led to dismissal of a class ac-

### G. The Use-Coercion Dialogue Synthesized

■ The lengthy analysis of the individual coercion doctrine in the preceding pages makes it plain that that doctrine lies within the conceptual framework of the segment of the law of tying which requires proof of the nexus between economic power in the tying product and the restraint of competition in the tied product, or, put differently, the requirement that economic power be used in the tying transaction. We resolve the duality between use and coercion as follows.

■ Our first conclusion has already been drawn. It is that the individual coercion doctrine is not properly a part of tying law. It is not necessary to prove coercion in order to establish an illegal tie; concomitantly, there can indeed be a "voluntary," yet illegal, tie. When a franchisee with or without knowledge of the uneconomic nature of the tie, and with or without bargaining or even arguing on the point, takes a tied package voluntarily, he can still seek relief so long as it is shown that the franchisor possessed the requisite economic power or leverage and, in fact, used or exercised it to induce the franchisee to take the tied product. The franchisee has not been coerced in this circumstance; his will has not been overcome. Yet, *Perma Life Mufflers* compels the conclusions that: (1) the plaintiffs are not barred because they cannot prove coercion; and (2) it does not matter if the franchisee truly desired the package of the tied product along with the tying product because he was new to the fast food business and was willing to pay more for a total deal. This is particularly so in view of the emphasis of *Fortner* and *Perma Life Mufflers* on the non-foreclosure of competition. Moreover, even if we read *Perma Life Mufflers* too broadly, it is plain under *Texaco* and Mr. Justice White's views in *Perma Life Mufflers* that where there is unequal bargaining power, it is not necessary to prove coercion; mere persuasion or influence will suffice.

A contrary result is not compelled by *Siegel II*. As we have seen, *Siegel* did not require proof of individual coercion. When the post-*Siegel* cases arose, the courts often stated that where there was an express contractual tie, coercion was "presumed." [43] But it was not coercion that was *sub silentio* presumed in *Siegel II*; it was the *use of economic power.*

■ The second conclusion that we draw is that the principal significance of the coercion notion in this area is as one mode of proving use of economic power. If a franchisor who possesses the requisite economic power coerces the franchisee in such a manner as to restrain competition in the tied product, *a fortiori* he has used his economic power. This, then, establishes the necessary nexus between economic power in the tying product and the restraint of competition in the tied product. Since *Siegel II*, however, there has been a subtle process by which coercion, as a mode of proving use of economic power, has itself been construed to be the required

---

tion under the old rule, e. g., Speed v. Transamerica Corp., 5 F.R.D. 56 (D.Del. 1945); Gilbert v. Clark, 13 F.R.D. 498 (D.Mass.1952), the new Rule 23 provides the flexibility to permit this action to proceed. *It may very well develop that the misrepresentations made to the purchasers were in fact very similar, if not identical. If, on the other hand, the facts should reveal in the course of the pre-trial development of the case that the alleged misrepresentations were so varied as to render* the action unmanageable (Fed.R.Civ.P. 23(c)(1)), the Court can order that the class allegations be stricken and that the action proceed on behalf of the named plaintiffs alone. Fed.R.Civ.P. 23(c)(1) and 23(d)(4)." Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42, 45 (S. D.N.Y.1966).

271 F.Supp. at 727 (emphasis added).

43. *See, e. g.,* Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974).

nexus between the economic power and restraint of competition requirements. The metamorphosis has been aided by what we have submitted is a misuse of the *Ford Motor, Texaco* and *Lah* precedents, and by what we believe to be an imprecise use of language. The term "coercion" has been used differently in different cases, sometimes in the strict sense posited by defendant, and sometimes to connote mere use of economic power or mere persuasion or influence. In his famous article, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16 (1913), Professor W. N. Hohfeld observed: "in any closely reasoned problem, whether legal or non-legal, chameleon hued words are a peril both to clear thought and lucid expression." That observation is in order here.

 The second conclusion just recited leads readily to a third, which is that proof of individual coercion is but one of several means of establishing the use of economic power or leverage. We agree with defendant that the individual coercion mode of proof of use is inapplicable in a class context. For purposes of this opinion, we will address only those modes which lend themselves to class treatment. This observation brings us to our final conclusion, relating to how use of economic power may be proved in a class context.

First we find that use of economic power may be established by evidence of a firm and resolutely enforced company policy to influence the franchisees to purchase from the franchisor or its designated sources. As will be seen in our survey of the class action discovery, plaintiffs contend that there is at least prima facie evidence of such a company policy in the areas of the equipment, sign, real estate and supply tie-ins.[44] If such a policy is established, individual exceptions make no difference. It is not necessary, in the wake of *Perma Life Mufflers,* that the company policy be administered coercively. If, however, we read that case too broadly, *Texaco* at least establishes that persuasion or influence may be the virtual equivalent of coercion where there is an unequal relationship between the parties, as there is here. *Cf.* White, J., concurring in *Perma Life Mufflers.*

 We also believe that use of economic power is inferable from the acceptance by large numbers of buyers of a burdensome or uneconomic tie. In any event, such evidence would be probative. In this respect we note that, in McMackin v. Schwinn Bicycle Co., 354 F. Supp. 1154 (N.D.Ill.1972), vacated on other grounds, 1974 Trade Cas. ¶ 75,047 (N.D.Ill.1974), Judge McLaren was persuaded that acceptance of a burdensome tie-in by an appreciable number of buyers permits an inference of coercion.[45] It is also instructive to recall Professor Turner's observation:

> Since a tying arrangement in the vast majority of cases performs no useful

44. Although the parties have not addressed the issue, we perceive in the facts as developed during class action discovery possible instances· where the necessity of taking the tied product did not appear until after the franchise sale was completed. In our view, this does not inveigh against a tying claim with respect to such instances if the situation resulted from company policy or where a threat of franchise termination existed for failure to comply. We note that the plaintiffs allege that Dunkin Donuts possesses broad termination leverage under the franchise agreement. There is at least one case holding that temporal notions must give way to reality. *See* MDC Data Centers, Inc. v.

International Business Machines Corp., 342 F.Supp. 502 (E.D.Pa.1972), where Judge Masterson rejected the argument that no tie-in claim could be asserted because there was no mention of any service requirement (the alleged tied product) until after the IBM computers had been delivered and installed. Judge Masterson held that supplying an inoperable product which becomes useful only upon acceptance of another product or service can constitute an unlawful tie-in.

45. Judge McLaren also· states therein that coercion is not a necessary element of a Sherman Act § 1 action.

function that cannot be performed by less restrictive courses of action, it is quite reasonable to presume an illegal purpose . . . from the mere fact that the tie-ins were used.

Turner, *supra* note 15, at 64. In positing this mode, we are not unaware that, in an ultimate sense, acceptance by large numbers of buyers of a burdensome or uneconomic tie may be nothing more than the mirror image of a company policy to effect illegal ties.

 We thus resolve the use-coercion dialogue by rejecting the doctrine that individual coercion must be proved in order to establish an unlawful tie. We conclude that the required use of economic power may also be established by proof of a resolutely enforced company policy to persuade or influence franchisees to buy only from the franchisor or its designated sources, particularly (but in any event) where there is an unequal bargaining relationship between the parties, or by proof that large numbers of franchisees have accepted a burdensome or uneconomic tie.

As is evident from the foregoing discussion, we have not presented a formulation with the precision of a jury charge. Nor have we attempted to posit the quantum of evidence required before the case can go to the jury. What we have done is to state our general conclusions as to the law in this area, for only in that way can we assess the nature of the issues to be tried. That assessment is, we believe, a precondition to addressing the question of certification of a class.

## V. *Defenses to a Claim of Tying*

The record in this case reflects the interposition by Dunkin Donuts of certain defenses to plaintiffs' claims of tying. Because these defenses present bona fide issues for trial, we must review the applicable law so as to be able to determine whether trial of those defenses presents issues in which common or individual questions predominate. The principal defense at issue is the marketing identity or quality control defense, but for the sake of completeness we shall also mention other possible defenses.

### A. *The Marketing Identity or Quality Control Defense*

 The most frequently asserted defense in franchise tying cases is the marketing identity or quality control defense.[46] In essence, the defense asserts that a form of tying clause is necessary for the franchisor to preserve the value of his trademark by ensuring that uniform appearance and quality are maintained at all franchised outlets. Plainly it is uniformity of product which causes the public to patronize given franchised stores. Indeed, trademark law imposes an affirmative duty upon a trademark owner to the public to maintain control over the quality of the products sold by his licensees under his trademark at the peril of abandonment of the mark. *See* 15 U.S.C. § 1055, 1127 (1958). The history of the defense has been ably traced by Professor McCarthy in his article Trademark Franchising and Antitrust: The Trouble with Tie-ins, 58 Calif.L.Rev. 1085, 1110–1116 (1970). *See also* Comment, Quality Control and the Antitrust Laws in Trademark Licensing, 72 Yale L.J. 1171 (1963); and *Siegel II*, 448 F.2d 43, 51–52 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). The Supreme Court has approved the defense but has restricted its availability. *See* Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

---

46. In *Siegel II* this defense was labelled the "marketing identity" justification.

The general principle which has emerged, representing the courts' efforts to reconcile the conflicting pulls of the law of trademarks and the law of antitrust, is that a restraint of trade can be justified only in the absence of less restrictive alternatives such as meaningful specifications for the tied product. In Standard Oil Co. v. United States, it was held:

> The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied.

337 U.S. at 306, 69 S.Ct. at 1058. The franchisor has the burden of proving that it would be impractical to draft quality specifications and allow franchisees to buy their needed supplies anywhere in the market.

The quality control defense is a hotly contested issue in this litigation and more will be said of it later. We have noted already the plaintiffs' contention that the approved supplier clause in the Dunkin Donuts franchise agreement is a subterfuge for a kickback scheme. The defendant emphatically denies this contention and presses forcefully the necessity for quality control.[47] The defense may well prove to be a successful one. However, in terms of the settled principles of the law of tying, it is plain that one cannot immunize a tie-in from antitrust scrutiny merely by stamping a trademark symbol on the tied product—at least where the tied product is not itself the product represented by the mark.[48]

### B. *Other Defenses*

The remaining defenses to tying are principally the collection of royalty defense[49] and the new business justification.[50] Professor Austin has also referred to the "defense of lenient enforcement," Austin, *supra* note 15, at

---

47. Indeed, defendant points to the Consent Order in In re AAMCO Automatic Transmission, Inc., F.T.C. File No. 681 0141, reported at 1972 CCH FTC Complaints ¶ 20,094, where the Federal Trade Commission entered a Consent Order *instituting* an approved supplier system for AAMCO franchisees' purchases of automotive parts, equipment and merchandise.

48. Professor McCarthy takes a strong stand in the issue:

> But when does quality control justify tying supply sources to the licensed trademark? The answer is: hardly ever. Effective quality control in no way requires trademark owners to designate their franchisees' suppliers. Both antitrust law and trademark law are satisfied by the simple alternative of quality specifications that allow the franchisee to buy from whomever he chooses, so long as he meets the quality standards. The only possible exception is the rare case where it is impossible to draft meaningful specifications for quality.
>
> The quality specification alternative will, of course, put a greater burden on the franchisor than if he could simply designate sources and supervise quality at the supply source. But mere convenience has never been a defense to charges of restraint of trade. Congress and the courts have decided that the benefits of competition are worth the price of inconvenience and extra expense. The social and economic benefits of allowing the franchisee freedom of choice are worth the price of greater burdens on the franchisor in achieving quality control: "[The] central policy of both § 1 of the Sherman Act and § 3 of the Clayton Act [is] against contracts which take away freedom of purchasers to buy in an open market."
>
> The franchisor who ties franchisees into designated supply sources merely to get a kick-back on sales to his franchisees is deserving of little sympathy: he is merely trying to deceive them as to the true extent of their royalty payments.

McCarthy, *supra* note 15, at 1117–1118 (footnotes omitted).

49. In *Siegel II,* the court held that a tie-in cannot be justified as an accounting device for compensation for a trademark license.

50. The new business justification stems from the decision of Judge Van Dusen in United States v. Jerrold Electronics Corp., 187 F. Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). Jerrold was a pioneer in the business of selling systems of electronic equipment to relay television to rural areas where

121, the core of which is that competition is not restrained or lessened where there is lax enforcement of the tying clause. Professor Austin observes, however, that this is the "least successful defense," and that the courts have looked to the omnipresence of the power to foreclose and not to the degree of actual enforcement. It does not appear that any defense other than the quality control defense will be important in the case at bar.

## VI. *Antitrust Law and Restrictive Covenants*

As mentioned earlier in the section delineating plaintiffs' claims, the franchisees seek class certification of their prayer for a declaratory judgment that the defendant's franchise agreements contain restrictive covenant clauses which are invalid under the common law and § 1 of the Sherman Act.

We have already described the in-term and post-term restrictive covenants imposed by Dunkin Donuts in its franchise agreement. In broad general terms, the Dunkin Donuts restraints are similar to those customarily imposed in this country upon employees or sellers of businesses, proscribing them from working for a competitor or setting up a competitive business within a designated geographical limit and period of time. Indeed, the antecedents of such typical restraints are so hoary that the commentators report judicial scrutiny under the "restraint of trade" rubric for more than five hundred years.[51] Today, although many diverse formulations and applications may be found to exist from state to state (see discussion, *infra*), it can be said generally that a restrictive covenant is, unreasonable and therefore illegal under state law if it "(a) is greater than is required for the

TV signals could not be effectively received with conventional apparatus. It sold its equipment only on the condition that the buyers agreed to accept an installation and servicing contract. The court noted that the company, which was the pioneer in the industry, had sold approximately 75% of the CATV systems in the country. The court also noted that the community television system industry in the country might have been retarded or destroyed by consumer reaction to a rash of early system failures, and that Jerrold lacked the resources to survive initial setbacks. It found that the tie-ins were necessary to prevent system failures in light of the intricacy of the new system and the training necessary for proper servicing, which made it impossible for Jerrold to prevent failures by supplying purchasers with instructions alone.

Judge Van Dusen evaluated the tying agreements dealing with maintenance and repair services under § 1 of the Sherman Act and the agreements covering purchases of replacement parts and full systems under Section 3 of the Clayton Act. He held that even though the tied service agreements constituted a *per se* violation under *Northern Pacific*, under the unique facts of the case an injustice would be done by blindly accepting the *per se* rule. He thereupon fashioned a limited exception where the tie was necessary to preserve and enhance the goodwill of a new and small industry. Moreover, Judge

Van Dusen held that the defendant had the burden of proof as to the exception. While *Jerrold* has frequently been cited as an exception to the *per se* rule and interpreted as an effort to establish a "rule of reason" in tying cases, which would in turn necessitate exhaustive economic inquiry in every tying case, it is in actuality a very discrete exception applying only to new and small industries. *See generally* Comment, The Use of Tie-Ins in New Industries, 70 Yale L.J. 804 (1961).

51. The first case involving a restrictive covenant that has come to our attention is Dyer's Case, Y.B.Mich. 2 Hen. 5, f. 5, pl. 26 (C.P.1414). However, the most celebrated decision on the legality of common-law restraints came almost three hundred years later in Mitchel v. Reynolds, 1 P.Wms. 181, 24 Eng.Rep. 347 (Q.B. 1711). There the court balanced the social utility of certain types of restraints against their possible deleterious effects upon the promisor and the public, formulating a test of "reasonableness" under which such undertakings were to be examined. This approach has carried forward to the present day, albeit somewhat modified in form. For an excellent discussion of the common law antecedents of the principles governing the legality of restrictive covenants, see Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. 625 (1960).

protection of the person for whose benefit the restraint is imposed, or (b) imposes undue hardship upon the person restricted, or (c) tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artificially." Restatement of Contracts § 515 (1932).[52] Courts look to the geographical scope, length of time of the restriction, and breadth of its prohibitions in applying the Restatement's formulation in a given factual situation.

■■■ The federal antitrust laws, with rare exceptions, have not been applied to restrictive covenants. *See* Goldschmid, Antitrust's Neglected Stepchild: A Proposal for Dealing with Restrictive Covenants under Federal Law, 73 Colum.L. Rev. 1193 (1973). *See also* Blake, Employee Agreements Not to Compete, 73 Harv.L.Rev. 625, 628 (1960). Thus, although section 1 of the Sherman Act makes illegal "every contract, combination . . . or conspiracy, in restraint of trade or commerce . . ..", and although in the first decades

after the act's passage the common law "restraint of trade" doctrine was considered the major guide to determining the meaning of the statutory phrase, the modern day treatment of these "ancillary" restraints has been overwhelmingly a function of state and not federal law.[53]

■■■ According to Professor Goldschmid, there is little legal basis for this state of affairs since certainly "[t]here is no doubt that the Sherman Act was intended to apply to those restraints that were unenforceable at common law." [54] 73 Colum.L.Rev. at 1204. Moreover, since restrictive covenants can well be construed as "contracts" within the meaning of the Sherman Act, apart from any "combination" or "conspiracy" theories that may apply in any given case, antitrust application is seemingly well warranted. Precedent for such application has emerged in this circuit in the case of American Motor Inns, Inc. v. Holiday Inns, Inc., 365 F.Supp. 1073 (D.N.J.1973) [hereinafter "AMI"].[55]

52. This is an abbreviation of the Restatement's more detailed formulation which lists some additional factors not mentioned herein. However, the above test is the one most often utilized by the courts who have reduced the standards to just three.

53. *See, e. g.*, Capital Temporaries, Inc. v. The Olsten Corp., 506 F.2d 658 (2d Cir. 1974) ; Bradford v. New York Times Co., 501 F.2d 51 (2d Cir. 1974) ; Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163, 167 n. 4 (5th Cir. 1969). The position expressed by the courts in these decisions is that restrictive covenants do not rise to the status of Sherman Act violations and that they are generally treated under state law.

54. To support this conclusion, Professor Goldschmid quotes the famous opinion of Judge Taft (later Chief Justice) in United States v. Addyston Pipe and Steel Co., 85 F. 271, 279 (6th Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), to the effect that the design of the Sherman Act was only to alter the legal consequences of improper contracts :

The effect of the act of 1890 is to render such contracts unlawful in an affirmative or positive sense, and punishable as a misdemeanor, and to create a right of civil

action for damages in favor of those injured thereby, and a civil remedy by injunction in favor of both private persons and the public against the execution of such contracts and the maintenance of such trade restraints.

Moreover, the author points to Chief Justice White's summation of the common law from Mitchel v. Reynolds in Standard Oil Co. v. United States, 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911) :

Let us consider the language of the first and second sections [of the Sherman Act], guided by the principle that where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense

. . . .

. . . [T]he context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade . . . ..

73 Colum.L.Rev. at 1205.

55. *AMI* is the only decision which, to our knowledge, has determined the legality of a restrictive covenant under the antitrust laws, although there are other cases which

AMI was a "multiple franchisee," owning or operating 48 Holiday Inns in Tennessee, North Carolina, Virginia, Maryland, Pennsylvania, Connecticut, Maine, Massachusetts and Puerto Rico. The case, dealing with violations of the Sherman Act, stemmed from AMI's unsuccessful efforts to obtain a Holiday Inn franchise for land which it owned near the Newark airport at Elizabeth, New Jersey, and its consequent desire to construct an inn on that property in affiliation with the Sheraton chain. In granting the plaintiffs relief, Judge Garth held that: (1) Holiday Inns' "radius letter" policy, whereby existing franchisees in the vicinity of locations for which new franchise applications were made were given the opportunity to object to the proposed granting of the new application and a "veto of sorts," constituted a conspiracy to allocate territories horizontally which was a *per se* violation of the Sherman Act;[56] (2) Holiday Inns' unilateral policy of not granting franchises in cities where it operated inns itself was not, by itself,

violative of the Sherman Act because it was not the result of a "contract," "combination" or "conspiracy;" and (3) (the holding relevant here), the clause of the franchise agreement prohibiting a franchisee from owning or being involved in the operation of any inn, hotel or motel other than one franchised by Holiday Inns (the non-Holiday Inn clause) constituted an unreasonable restraint of trade violative of Section 1 of the Sherman Act.[57]

The non-Holiday Inn clause was nationwide (or perhaps worldwide) in scope.[58] In determining that the clause violated the rule of reason under Section 1 of the Sherman Act, Judge Garth examined the business justifications for the restraint, the practices generally obtaining in the industry and the harm flowing from the restrictive covenant. Finding the practices of others in the industry to be less restrictive while still protective of their legitimate interests, and the business justifications advanced by Holiday Inns insufficient to warrant judicial approval of such a drastic and

approach the analysis utilized in *AMI* tangentially. *See* Hecht v. Pro-Football, Inc., 144 U.S.App.D.C. 56, 444 F.2d 931 (1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); United States v. Chicago Tribune—New York News Syndicate, Inc., 309 F.Supp. 1301 (S.D.N.Y.1970).

56. In its market effects and manner of operation, Judge Garth determined that Holiday Inns' radius letter policy was closely analogous to the horizontal allocation of territories condemned in United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In *Topco*, 25 small supermarket chains formed a wholly-owned cooperative association ("Topco Associates") to serve as a purchasing agent for its members and to distribute Topco-brand products. Applications for membership in the cooperative went through approval procedures of the Board of Directors and of 75% of the existing members. If the closest existing member, or any member within 100 miles of the applicant, voted against approval, however, then an 80% vote was required. The Supreme Court held the Topco system illegal *per se* because these practices operated as "a veto of sorts" over actual and potential

intra-brand competition. Although the individual Holiday Inns did not combine to create and own Holiday Inns, Inc., as the Topco franchisees created and owned Topco Associates, Judge Garth found that through the radius letter technique Holiday Inns franchisees had utilized the parent Holiday Inns, Inc. as the Topco franchisees utilized the "parent" Topco Associates—to allocate territories horizontally.

57. Judge Garth also held that regardless of the market effect of the above practices standing alone, their combined effect resulted in a horizontal allocation of territories violative of the antitrust laws because such practices cumulatively insulated any given Holiday Inn from unwanted competition from any other Holiday Inn or from any non-Holiday Inn owned by a Holiday Inns franchisee.

58. The non-Holiday Inn clause provided:
. . . that licensee will not, directly or indirectly, own any interest in, operate, or be in any manner connected with or associated with, any inn, hotel or motel, during the period of this license, except Holiday Inns.
365 F.Supp. at 1081.

unnecessary restraint of trade, Judge Garth concluded:

> The harm flowing from the non-Holiday Inn clause is the foreclosure of all hostelers competing with HI from doing business with all HI franchisees . . .. By the same token, the non-Holiday Inn clause precludes AMI from owning, for example, a Sheraton Inn in competition with a franchised or company-owned Holiday Inn, even at a site distant from those sites at which AMI has Holiday Inns . . . .

365 F.Supp. at 1094.

The defendant in *AMI* argued, much as it does in the instant action, that the restrictive covenant creates an exclusive dealing type arrangement which is justified prima facie unless it results in anti-competitive effects more substantial than those discussed above. Assuming, *arguendo,* that the non-Holiday Inn clause did create an exclusive dealing situation, Judge Garth held that it would still violate Section 1 of the Sherman Act. Setting forth the guidelines to be followed in exclusive dealing cases as: (1) defining the line of commerce; (2) charting the area of effective competition in the known line of commerce; and (3) finding foreclosure of a substantial share of the relevant market, Judge Garth held that the line of commerce therein involved was hotel-motel chains utilizing national referral systems, and that the area of effective competition among national hostelers for hotel-motel outlets was the United States.[59] Finding that the independent Holiday Inns franchises comprised 14.7% of the hotel-motel chains utilizing national referral systems in the United States and

that those same franchisees were the ones prevented from affiliating with the national hotel-motel chains that competed with Holiday Inns, Judge Garth concluded that the percentage of the relevant market foreclosed was 14.7%. He then held that this foreclosure was substantial enough to satisfy the Supreme Court's pronouncements in Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), and Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). The restrictive covenant which prevented franchisees from owning non-Holiday Inns was, thus, for this additional reason, an illegal "restraint of trade" violative of the antitrust laws.

The foregoing discussion makes it plain that Judge Garth did not apply a *per se* test to the restrictive covenant at issue. Under the antitrust laws, this restraint must be evaluated on a factual basis under the rule of reason test. In our class action discussion *infra,* we will address the certifiability of the plaintiffs' assertion that the nationwide (or worldwide) in-term restraint in the Dunkin Donuts standard form franchise agreement is violative of § 1 of the Sherman Act under the rule of reason analysis or under an alternative exclusive dealing analysis. In the latter connection, we will perforce consider the process by which the relevant market (nationwide or less (?)—for donut shops or all fast food franchises (?)) may be proved. Suffice it to say here that, following the lead of the *AMI* case rather than the cases cited at n. 53 *supra,* we believe that the matter of Dunkin Donuts' nationwide (or worldwide) in-term restraint is a bona fide antitrust issue.

59. One reason for selecting this market definition of the line of commerce was that it took into account the national referral system, a device which is important to Holiday Inns' success and whose protection was the alleged justification for the restrictive covenant. Moreover, in selecting the geographic market, Judge Garth found that AMI owned or had applied for franchises in the entire United States except for the Far West, and had been unable to deal with other hotel chains operating nationally. Also, he cited evidence that another Holiday Inns franchisee, Albert Pick, had been precluded by Holiday Inns from maintaining his own independent chain of non-Holiday Inns.

## VII. *A Survey of the Class Action Discovery*

### A. *Introduction; Overview of Defendant's Position*

When class action motions were filed we ordered that discovery be taken, limited to the class action issues, so that we would have a sufficient factual record to survey before making findings regarding determination of the class. Extensive discovery was, indeed, undertaken. Voluminous corporate records were produced by Dunkin Donuts and records of the plaintiffs were also produced. The parties deposed included all the named plaintiffs and the main corporate officers, franchise salesmen and zone managers of defendant.

At an earlier stage of this opinion we described the plaintiffs' antitrust and common law claims. Hence, our review of the class action discovery will first be from defendant's eye-view, making reference in addition to Dunkin Donuts' various defenses. The plaintiffs' rejoinders, predicated upon their view of the discovery, will then follow.

While there are variations depending upon the issue, the essence which defendant distills from the discovery, as reflected by its memoranda in opposition to class certification, is that no franchisee was ever coerced into buying equipment or signs or taking the real estate lease from or through Dunkin Donuts. In this respect, defendant submits that the class action discovery supports the general proposition that individuals often turn to franchising precisely because they are attracted to a "turnkey" or "package" deal. This, says the defendant, is what the franchisor offers. Defendant contends that its site selection expertise, production and merchandising expertise, advertising expenditures and other services have enabled it to attract its franchisees. Defendant also contends that to the extent those franchisees acquired from or through it the premises in which they conduct their businesses, the equipment by which they make and sell their products and the signs by which they announce their presence in their communities, they did so because it was the very availability of such products and services through defendant that attracted them to Dunkin Donuts in the first place.

Although the franchisees were limited by contract to buying supplies from approved vendors, defendant maintains that such contractual provision was a valid quality control device to protect the Dunkin Donuts trademark for the benefit of all the franchisees and that approval of new vendors was not unreasonably withheld. Moreover, defendant claims that it is the burden of each putative class member asserting a supplier tie-in claim to prove that he attempted to secure qualification of a new supplier and, because of defendant's contrariness, failed.

As a defense to the alleged breaches of fiduciary duty and claims of common law fraud, defendant denies that there was any mishandling or misrepresentation on its part such as would give rise to a cause of action. Finally, plaintiffs' assertion that the restrictive covenants are illegal is disputed by defendant's allegations that the covenants are reasonably related to protecting a legitimate interest of the franchisor and the other franchisees.

Whether or not the above defenses will be effective in shielding Dunkin Donuts from liability on the merits, defendant contends that, in any event, trial of the issues raised by its refutation of plaintiffs' claims and its substantive defenses will require individual proof varying from franchisee to franchisee and that the case is not suitable for class treatment. It is defendant's assertion that, given the variations in and general manner of the conduct of defendant's business, it is to be expected that any one franchisee's tying claims against the defendant will be based, however firmly or weakly, on his own

individual and distinct dealings with defendant. The defendant relies on portions of the class action discovery, including depositions of some of the named plaintiffs, to buttress its conclusions that even if some of the plaintiffs were coerced into buying items from Dunkin Donuts, forced purchases of unwanted items were not widespread or even a policy of Dunkin Donuts. With regard to the fiduciary duty and common law fraud claims asserted by plaintiffs, defendant takes primarily the same position, but not only with respect to proof of facts. Defendant also contends that liability under the non-antitrust theories would be governed by state law concepts which would vary in the case of each franchisee, rendering class certification inappropriate for that additional reason.

The foregoing overview of Dunkin Donuts' defenses highlights an important point: the core of defendant's opposition to class certification lies in its advancement of the individual coercion doctrine. Our rejection of that doctrine as an accurate rendering of tying law undercuts much, though not all, of defendant's submission of class action discovery facts. Our own synthesis of the law will require a review of the extent to which Dunkin Donuts' company policy is prima facie demonstrable in the alleged tying areas as a substitute for the *Siegel II* express contractual tie to prove use of economic power. In the ensuing survey we will omit reference to the restrictive covenant claims, the real estate tax escrow claims, the advertising claims and the common law fraud claims, mainly because their resolution depends more upon a discussion of legal issues than upon a factual review. Accordingly, we will take those issues up in the class action discussion which follows the class action discovery survey.

## B. *The Equipment Tie-In Claim*

The defendant's first approach to the equipment tie claim is to suggest that the pre-November 1970. contractual provisions expressly requiring franchisees to purchase their equipment packages from Dunkin Donuts were not rigidly enforced and that the franchisees were allowed to delete any item of equipment for which they wished to make their own arrangements.[60] Defendant points to ten pre-November 1970 franchisees identified as making deletions from the equipment package purchased from Dunkin Donuts and notes that five of these franchisees were so-called "virgin" operators. Why these franchisees did make deletions and other franchisees did not, states defendant, cannot be answered by any inference of coercion but requires individual examination of each franchisee's dealings with Dunkin Donuts.

---

60. As evidence of this fact, defendant quotes the deposition testimony of David P. Segal, Dunkin Donuts' Senior Vice President:

Q. When the franchisee purchases an equipment package—let's go back to pre-November 1, 1970—does he have to take the whole package?
A. I think that the package of equipment was part of the franchise, was often varied, especially when we were dealing with a multi-unit operator who already had certain items of equipment and it was not necessary for him to repurchase equipment.
And also, there were occasions where, for some reason, a franchisee would want or have preference for some other equipment that might have been acceptable to the company. And I am thinking specifically about—I know the proof box, which is a pretty substantial part of the package. A number of operators preferred certain other equipment which was approved by us, and we were certainly—we certainly cooperated with them when they wanted to buy that other equipment.
Q. Are you talking about another make proof box or something besides a proof box?
A. A different make, different manufacturer of the equipment.
There were alternative items of equipment that could do the same job, in our opinion. They were always allowed to replace equipment of that kind.
(Segal dep. at 180–81).

Moreover, defendant contends that, assuming for the sake of argument that individual proof of coercion is not essential as to the pre-November 1970 franchisees, there is still not a certifiable class claim. In support of this contention, it points to the various general categories of exceptions which could be excluded from the class. Thus, defendant maintains that franchisees purchasing a "used" store even prior to November 1, 1970, and franchisees of new stores which were already equipped when purchased have no tie-in claim.[61] To these general categories of exceptions, defendant would add two more: franchisees who purchased more than four years before commencement of the action and whose claims are therefore barred by the antitrust statute of limitations, and franchisees whose shops opened after November 1, 1970, and who therefore were extended the option of converting to the post-November 1970 form agreement.

Turning to the post-November 1, 1970 contract, it will be recalled that plaintiffs have argued that the practical economic effect of the thirty day option clause is to compel franchisees, or at least first-time franchisees, to purchase their equipment from defendant. Defendant maintains that this is not so for two reasons. First, it says the thirty day period is not the period in which franchisees must purchase their equipment from other sources, or arrange for its purchase or even decide what vendors they want to use. It is, defendant contends, simply the period in which they must decide whether they are going to buy any part of it from Dunkin Donuts. Thus, the practical economic effect of this clause, from the point of view of defendant, is to give Dunkin Donuts the time, if the franchisee decides to buy from it, to order the equipment, arrange for its delivery and installation, prepare the necessary documentation, arrange the necessary financing and make the appropriate U.C.C. filings. Moreover, argues defendant, extracts from the testimony of individual plaintiffs elicited a variety of responses as to the effectiveness of the thirty day option. For example, whereas plaintiffs quote Mr. Hegazi for the proposition that the 30 day option clause is "totally unrealistic" and does not afford the franchisee enough time to make a real choice, defendant cites the deposition testimony of Mr. Thomae who stated that 30 days would have been sufficient time to assemble the equipment package on his own with the help of others, which was readily available. (Thomae dep. at 71–72). The effect of such varying testimony, defendant again asserts, is to create individual questions which cannot easily or properly be dealt with in a class action.

Secondly, defendant maintains that there is simply no indication on the record of any general policy or practice countervailing the individual choice expressly confirmed in the form agreements. To buttress this contention, it points to portions of the deposition tes-

---

61. Defendant may not be successful in franchising a shop before it is ready to open or before the franchisee has completed his training and, in such circumstance, may open and operate the shop itself before a franchisee assumes possession. Moreover, there are two other ways in which franchisees commonly acquire their outlets other than as a new store. One occurs when a franchisee determines to sell his franchise; in this circumstance the purchaser will typically enter into a franchise agreement with defendant, enter into a purchase and sale agreement with the existing franchisee for the equip-ment, signs, inventory, etc., and either assume the seller's lease or enter into a new lease or sublease with defendant. Dunkin Donuts does not participate in the sale of equipment, signs and inventory at all. The other manner in which a franchisee may acquire a "used" store occurs when one franchisee cedes his store to Dunkin Donuts, which then refranchises it to a new franchisee. In this type of transaction, the documentation also typically consists of a franchise agreement, a purchase and sale agreement and a lease or sublease.

timony, for example that of Albert T. Vermeire, Dunkin Donuts' Director of Franchise Sales. When asked whether he could recall on approximately how many occasions a franchisee asked him whether he could purchase his equipment elsewhere than from Dunkin Donuts, Mr. Vermeire testified that perhaps one out of every four or five franchisees inquired as to the feasibility of so doing. Furthermore, Mr. Vermeire testified that on those occasions where a franchisee did not ask whether he could purchase his equipment elsewhere, he did not specifically tell him that he had to buy his equipment from Dunkin Donuts. (Vermeire dep. at 150–51). Defendant also refers to the deposition testimony of Messrs. Wainrober, Swahn and Giannuzzi wherein each admitted that he was not compelled to purchase all his equipment from defendant. (Wainrober dep. at 37; Swahn dep. at 58–59; Giannuzzi dep. at 34–40). In point of fact, Mr. Giannuzzi, when asked whether he was "after" the package deal, testified that this was so.

The defendant concedes, see discussion *infra*, that the great majority of franchisees purchased their equipment from defendant. It contends, however, that the record also shows that there are significant reasons of convenience and attractiveness that would tend to account

for these purchases. Moreover, defendant maintains that while it is theoretically possible that coercion, rather than convenience, accounted for some or many franchisees' purchases both before and after November 1, 1970, this conclusion cannot be based on an inference from that portion of record data which plaintiffs cite. Nor, defendant continues, since the experience was substantially the same under both agreement forms, can it be based on any post hoc reasoning from the language of one of those forms. Finally, Dunkin Donuts asserts that it is at least as likely that both pre and post-November 1970 franchisees purchased as a result of lawful considerations, as that they purchased as a result of unlawful considerations, concluding that this can properly be determined only on an individual basis.

Plaintiffs view the class action discovery from a very different vantage. With respect to the practice of Dunkin Donuts prior to the November 1, 1970 change in the form franchise agreement, plaintiffs point to other portions of the deposition testimony of Mr. Vermeire wherein he admitted that prior to November 1, 1970, it was the policy of Dunkin Donuts to require new franchise operators to purchase the Equipment Package from Dunkin Donuts.[62] Plaintiffs also maintain that there is docu-

---

62. In a memorandum prepared by Vermeire to provide answers to policy questions most frequently asked by franchisees, the following question and answer appear:

Q. Can the franchisee buy a portion or all of his equipment elsewhere to start his franchise? How about after he has opened?

A. No—must purchase all original equipment on equipment list from us. . . . He can, however, purchase a vitality orange juice dispenser and approved soft drink machines. All other additional equipment must have written permission by Dunkin Donuts of America, Vice-President.

(Plaintiffs' Exhibit 2 to Vermeire deposition.) Vermeire testified during the deposition that the answer contained in this quotation was the Dunkin Donuts policy (Vermeire dep. at 36, 70); that this policy was

given him by a senior vice-president and other high officers of Dunkin Donuts (Vermeire dep. at 63); and that this policy had been the consistent policy and practice of Dunkin Donuts until November 1, 1970 (Vermeire dep. at 56–59, 62–63, 68–70, 72, 55–58). Vermeire testified during the deposition as follows:

Q. My question is: If he asks, you tell him that it is a part of the package, the whole package, and he says: "Well, I want to be a Dunkin Donut franchisee but I want to buy the equipment from another source."

You said this occasionally has come up. What do you tell him? Can he become a Dunkin Donut franchisee and yet buy the equipment from another source?

A. He cannot, for the reasons I mentioned, prior to June 1970.

mentary corroboration for this testimony in that the advertisements by Dunkin Donuts clearly imply that the equipment is part of the whole package deal. For instance, plaintiffs point out, the prospectus issued by Dunkin Donuts on February 6, 1968, states:

> Prospective Dunkin' Donuts franchise owners enter into a franchise agreement and an equipment agreement with the company . . . . Prospective franchise owners also execute an equipment agreement under which the company furnishes equipment necessary to operate a Dunkin' Donuts shop. . . .

More significantly, however, plaintiffs point to evidence from the class action discovery that, prior to November 1, 1970, 405 of approximately 406 franchisees purchased the equipment package from Dunkin Donuts, that only 7 or 9 of the 405 franchisees purchasing from Dunkin Donuts made *any* deletions from the equipment package, and that the persons making the abovementioned deletions were either multiple franchisees or former employees of Dunkin Donuts. It is plaintiffs' contention that these figures, combined with the fact that those franchisees who purchased the equipment from Dunkin Donuts paid between $7,000 and $22,000 more for the equipment than they would have had to pay if they were free to purchase the equipment in a competitive market, effectively foreclose any argument by defendant that the equipment clause was not vigorously enforced.

With respect to the post November 1, 1970 equipment contract, plaintiffs take the position that the option provision, hedged about by the unreasonable time strictures within which the franchisee must make the choice, imposes no less of a tie than its predecessor. Moreover, according to plaintiffs, those franchisees that inquired about the thirty day option were subtly pressured by Dunkin Donuts not to pursue purchasing the equipment on their own. In this regard, plaintiffs point to the deposition testimony of plaintiff Cerajewski, taken on October 23, 1973, at pages 37–38. There Mr. Cerajewski testified that Dunkin Donuts "persuaded" him to purchase the equipment items from Dunkin Donuts by informing him that the franchisee-franchisor relationship was like a "marriage" in which the parties "have to trust one another." Plaintiffs contend that this approach was made to virtually every new franchisee. They further contend that, by virtue of the imbalance in experience, financial strength and bargaining power, Dunkin Donuts was in a position of dominance over the franchisee, and that this kind of persuasion was thus effective in inducing the franchisees to comply with Dunkin Donuts' suggestions. As further evidence of this pressure, plaintiffs point to evidence in the class action discovery that despite the uneconomic nature of purchasing the equipment from Dunkin Donuts, only 17 franchisees out of approximately 364 units added or deleted items from the equipment package after November 1970. Furthermore, the additions and/or deletions were minor in a large majority of the cases. There were only two or three franchisees who added and/or deleted more than $5,000 worth of equipment. The large majority of the remaining franchisees made minor additions and/or deletions which average out to approximately $500.

Defendant objects to plaintiffs' utilization of Mr. Vermeire's testimony to establish proof of the existence of a uniform policy on the part of Dunkin Donuts to coerce the franchisees into buying their equipment from Dunkin Donuts. Rather, defendant contends that Mr. Vermeire's testimony reflects an effort on the part of Dunkin Donuts only to formulate a uniform policy. Defendant states that Mr. Vermeire was assigned certain questions for which he proposed answers to be discussed at the Franchise Review Session. His replies, according to defendant, were suggestions only and, in fact, were never adopted.

The plaintiffs have thus developed statistical data and other evidence sufficiently impressive to counter defendant's claims as to conclusive absence of an effective company policy and to make out a *prima facie* claim that there, in fact, was a company policy to influence franchisees to purchase their equipment from Dunkin Donuts. The significance of this state of affairs will be described in our class action discussion below.

## C. *The Supplier Tie-In Claim*

Dunkin Donuts' Franchise Agreement provides that franchisees can purchase materials from "non-approved vendors" only so long as these vendors can meet Dunkin Donuts' specifications and thereby become approved vendors.[63] Defendant first contends that this provision simply requires that the franchisees purchase certain categories of ingredients and supplies from any manufacturer who has demonstrated an ability to meet Dunkin Donuts' standards and specifications as a means of protecting its trademark through quality control. To the extent that these requirements prevent franchisees from dealing with vendors who have not been approved or who have been rejected in the approval process, defendant concedes that they restrain trade. However, viewed from the perspective of the defendant, such restraints do not violate the antitrust laws since they are reasonable efforts to protect both itself and its franchisees who depend on the high regard of the public towards the Dunkin Donuts logo to attract customers.

A more reliable forecast of illegality under the antitrust laws, defendant concedes, would be provided by the argument, advanced by plaintiffs, that defendant has been guilty of "footdragging" or furnishing "useless" specifications to proposed suppliers in order to maintain the exclusivity of those already approved suppliers from whom defendant receives "kickbacks" and "grand opening contributions." Defendant argues that such is not the case and presents both deposition and documentary evidence to buttress this assertion.[64] Dunkin Donuts first points to the affidavit of Andre Bolaffi, the Director of Research and Development at Dunkin Donuts, who stated therein that it was his conclusion that defendant's specifications were "good." In Mr. Bolaffi's affidavit and accompanying exhibits he described the quality control function at Dunkin Donuts, including the constant evaluation and upgrading of specifications, the testing of new suppliers for approval, and the monitoring of performance of existing approved suppliers.

As of late 1973, there were five approved suppliers of flour and cake mixes, two approved suppliers of shortening,

---

63. Defendant notes an exception to the extent that some franchisees have been permitted to buy supplies from any source. Plaintiff Daratony, for example, testified that while he generally uses only approved supplies, he has used unapproved shortening because of its lower price (Daratony dep. at 120). He continued to use the unapproved shortening until it was no longer available. According to defendant, the deposition testimony of Daratony shows that at no time during his use of the unapproved shortening did anyone from Dunkin Donuts ever object to its use or tell Daratony that he was not permitted to use it. (Daratony dep. at 121). Also, plaintiff Hudock testified that he often used non-printed (non-approved) paper goods in his shop, even when printed goods were available, because non-printed items cost less. (Hudock dep. at 112). According to defendant, Hudock continues to use four non-printed items and has not received any threats of disenfranchisement (Hudock dep. at 113–114). In addition, Hudock has consistently used unapproved shortening for the last five years, and has received no threats or criticisms from Dunkin Donuts (Hudock dep. at 128–129). Finally, according to defendant, plaintiff Hegazi is now permitted to purchase unapproved shortening (Hegazi dep. at 95).

64. Defendant points out that while 13 suppliers made new shop opening contributions, 19 did not.

five approved suppliers of fillings and toppings, seven approved suppliers of coffee and twenty-two approved suppliers of paper goods.[65] In addition, as of November 1973, there were seven coffee companies, seven shortening companies, four mix companies and thirteen fillings and toppings companies in the process of approval or ready for testing. As of November 1973, defendant is said to have given its specifications for various products and ingredients to numerous potential suppliers and franchisees.[66] Defendant maintains that while most of these suppliers and potential suppliers had been sought out by Dunkin Donuts, many were approved or inquired into as a result of franchisee initiative.[67] Dunkin Donuts states that some manufacturers sponsored by franchisees have not met its standards,[68] but that in any event the franchisees are free to promote new sources for approval, although many franchisees have allegedly made no effort to do so.[69] Consequently, defendant maintains that trial of this claim promises to involve individual inquiry into each manufacturer proposed by any franchisee whose request was denied and would result, at best, in a random liability finding as to a few franchisees.

The plaintiffs, on the other hand, assert that Dunkin Donuts' quality control procedures do not represent the least restrictive available method for protection of the trademark and that they are, therefore, violative of the antitrust laws. Plaintiffs list various other methods which they assert can be used to achieve quality control. One method would be to permit independent purchasing by the franchisee of products conforming to the franchisor's specifications, with the franchisor insuring quality control through inspection of the franchisees. Another method, according to the plaintiffs, would be to allow discretionary purchases by the franchisee on the condition that the franchisor could terminate franchisees who purchased products which did not meet the specifications of Dunkin Donuts.

In any event, plaintiffs contend that Dunkin Donuts' quality control procedures result in the imposition of an illegal tie because of defendant's arbitrary

65. Answer to Interrogatory 3 of the Rader class action interrogatories at 12–15. The list of Dunkin Donuts approved suppliers includes some industry giants like Pillsbury and General Foods as well as some lesser known companies such as Victor Coffee Co., Orchard Products and Sheri Cup Co.

66. See Rader Answer to Interrogatory 6, at 23–30c, listing 95 manufacturers and 19 franchisees owning 41 franchises to whom specifications had been sent.

67. For example, Rader is one of the franchisees who claims to have attempted to secure approval for new suppliers (Rader dep. at 98–101). Halper Brothers, upon Rader's application, was approved as a supplier of paper goods. Burwell, another named plaintiff franchisee, sought to have a new supplier approved. Defendant points to the fact that Michigan Fast Foods, upon Burwell's application, became an approved supplier for paper goods, jellies, flour and shortening in 1961. Finally, Hudock, along with several other plaintiffs in this action, was successful in obtaining approval for an additional paper supplier, Michigan Popcorn.

68. Cerajewski is another one of the franchisees who has been very active in attempting to secure approval for two new suppliers —the Karp Company and the Conrad Kern Company. At the time of this writing, neither company has become an approved supply vendor. Rader is another franchisee who attempted to secure approval for a new supplier, Globe, which was met with refusal. Finally, Hudock forwarded jelly samples to Dunkin Donuts for approval in 1969. To Hudock's knowledge, the jelly manufacturer never attempted to contact Dunkin Donuts directly, and Hudock never received either approval or disapproval for those jellies. (Hudock dep. at 107–108).

69. For example, defendant states that during their years as Dunkin Donuts franchisees, Pallantios, Daratony, Hegazi and Wainrober never sought approval for a new supplier. (Pallantios Answer to Interrogatory 19; Daratony Answer to Interrogatory 19; Hegazi dep. at 103; Wainrober dep. at 101).

enforcement. In their briefs and exhibits they quote extensively from the deposition testimony and documentary evidence to advance their arguments: (1) that defendant maintained a system of rebates and contributions from approved suppliers that was financially beneficial to Dunkin Donuts at the expense of its franchisees; and (2) that defendant, when confronted with an application by a franchisee to approve a new supplier, employed dilatory and obfuscatory methods so as to avoid approval, and foster and maintain its "kickback" system.

With regard to the system of exacting rebates and a grand opening contribution from approved suppliers, plaintiffs contend that this was uniform conduct by the defendant, typified by correspondence which clearly indicates the tie-in with the various suppliers and its effect upon the franchisees. They point, *inter alia,* to letters dated August 22, 1968. (Exhibit "T") and September 18, 1969 (Exhibit "U") between Dunkin Donuts and Pillsbury Company which are said to show a kick-back for $10,000 from Pillsbury to Dunkin Donuts. The inference plaintiffs draw from this and similar letters is that any approved supplier wishing to continue in that status was required to "kick-in" the rebates.[70]

In support of their allegations that defendant employed dilatory and obfuscatory tactics in rejecting suppliers suggested by the franchisees, plaintiffs first allude to the deposition testimony of plaintiff Cerajewski, who has been attempting to secure approval for two new suppliers—the Karp Company and the Conrad Kern Company. With regard to Karp, Cerajewski's knowledge on October 23, 1973, the time of his deposition, was that Karp's samples were still in the testing process and that they had been neither approved nor disapproved, although the original application for approval was submitted to Dunkin Donuts 2½ years earlier—in February 1971.[71] With regard to Kern, Mr. Cerajewski testified that in 1971 the association of Dunkin Donuts franchisees, of which he was a member, caused their attorney to write to Dunkin Donuts requesting spec-

70. Plaintiffs also rely upon: (a) a letter dated April 16, 1970, from Popsicle Industries to Robert Rosenberg, President of Dunkin Donuts, in which Dunkin Donuts is collecting $7,286.61 in rebates as a result of opening sales to the franchisees (Exhibit "Q"); (b) inter-office correspondence dated November 24, 1970, from Thomas R. Schwarz, an employee of Dunkin Donuts, in which he discusses the defendant's policy of selecting suppliers and determining the amount of contribution (Exhibit "V"); (c) a schedule of supplier contributions along with a form letter sent to all suppliers from Al Bennet, Director of Marketing for Dunkin Donuts. (Plaintiffs infer from this communication that if the suppliers desire to continue supplying the franchisees, they must accede to the demands of Dunkin Donuts in the form of a grand opening contribution); and (d) confidential interoffice correspondence, dated January 13, 1971, from Thomas Schwarz in which he estimates that suppliers will contribute $75,000 in 1971. See also plaintiffs' Exhibit "DD," comprised of inter-office correspondence dated November 4, 1971, from Len Geller in reference to Middleby Co., a supplier who would not pay their $250 per store contribution until they did $2500 in sales from each franchise operation in which they gave the $250 contribution. With the attached letter, dated October 28, 1971, is a dunning statement which was sent to Middleby in the amount of $3000 for grand opening contributions, notwithstanding defendant's alleged new policy of not trying to force suppliers to contribute if this would increase the cost to the franchisee.

71. Defendant refutes Cerajewski's testimony and states that the time lapse involved in Karp's request for approval as a mix supplier was, in fact, only seven months—from February 1971 to September 1971. Dunkin Donuts avers that the request for approval was received in February; Karp's first samples were tested in March; further samples were received in May; these were tested again in August, and results available in September indicated the presence of salmonella and pseudomonas in Karp's product. Disapproval was promptly communicated to Karp who continued to make subsequent efforts to gain Dunkin Donuts' approval.

ifications to be delivered to the Conrad Kern Company. Finally, in October 1973, the Kern Company received the specifications from Dunkin Donuts (Cerajewski dep. at 111–115).[72] As a result of these two experiences, plaintiff Cerajewski concludes that although he has tried to get new suppliers approved, "when you try to go through [Dunkin Donuts'] channels, it is impossible to get . . . [T]here is so much work involved in getting another supplier approved that it almost takes a heroic effort to accomplish. There are too many obstacles." (Cerajewski dep. at 111–15).[73]

Another method which defendant is alleged to employ to prevent approval of new suppliers suggested by the franchisees is the furnishing of "useless" specifications that cannot fairly be met by a new applicant. As evidence of this fact, plaintiffs point to a report by Dr. Andre Bolaffi, Director of Research and Development for defendant since 1971 (Plaintiffs' Exhibit "FF"). This report, entitled "Research and Development at Dunkin' Donuts of America, Inc.," was prepared by Dr. Bolaffi in April 1972 for defendant's use. Plaintiffs quote the relevant parts in their brief, with strong emphasis on the following language:

> Previously established draft specifications for coffee, shortening, mixes and fillings were, for the most part, not realistic. . They did not reflect meaningful and factual data and were incomplete. As such, these specifications were useless, since they could not be used as a standard to measure and/or monitor product quality. Hence, correct and meaningful specifications had to be developed in conjunction with field operations, suppliers, and in some cases the consumer.[74]

In sum, plaintiffs contend that the record presents a common question for trial with respect to the existence *vel non* of a policy or practice on the part of Dunkin Donuts to tie to the grant and maintenance of the franchise the obligation to purchase the supplies of an arbitrarily limited group of vendors from whom defendant receives secret "contributions." As will be seen *infra*, we agree that such a viable trial issue exists.

### D. *The Sign Tie-In Claim*

Defendant's response to the sign tie-in claim asserted by the plaintiffs is similar to its response to the equipment

---

**72.** With regard to the Conrad Kern Company, defendant asserts that a request for approval was first communicated to Dunkin Donuts in November 1972. It is Dunkin Donuts' assertion, based on communications in its files, that the delay in sending specifications was due, in great part, to Kern's actions and a mixup in the U. S. Postal Service.

Furthermore, defendant contends that the record of Dunkin Donuts' experience with the Karp Company and the Conrad Kern Company is obviously not dispositive as to *its relations with all franchisees and manufacturers who ever sought approval.*

**73.** Two other named plaintiffs have expressed similar viewpoints. Burwell recites one discussion he had with his district sales manager as constituting a *request for specifications.* Burwell, at one time, was using a product that was not approved in his store and, in response to a statement by his district sales manager that he should remove the product, Burwell asked, "I can try to get it approved, who do I go to?" In response, the district sales manager is claimed to have stated, "[b]elieve me, we tried it and you are not going to get it approved— forget it." (Burwell dep. at 153). Hudock, another franchisee, was successful in obtaining approval for an additional paper goods supplier. As Hudock described the approval process, "finally, after many meetings and arguments and fighting, Dunkin finally agreed to let Michigan Popcorn handle the paper goods." (Hudock dep. at 109).

**74.** Defendant decries plaintiffs' use of this report "in a vacuum." It contends that Dr. Bolaffi's deposition testimony qualifies and explains the language cited from the report.

sales claim, *i. e.*, that these purchases were voluntary and non-coercive.[75] Moreover, as an example of the allegedly outcome determinative variations in the experiences of the class members that are likely to be brought to light at trial, defendant presents detailed histories of the named plaintiffs. For example, Dunkin Donuts points out that Wainrober never expressed an interest in shopping for his own signs and, in fact, took it for granted that Dunkin Donuts would arrange their purchase for him. (Wainrober dep. at 37).[76] Conversely, Rader purchased signs for his Elizabeth, N. J. store from one of Dunkin Donuts' recommended suppliers, but not without some discussion of the matter. According to Rader's testimony, he inquired of a Dunkin Donuts representative whether he could buy the signs from a supplier other than the one recommended by Dunkin Donuts. In response to the explanation that Dunkin Donuts desired all its signs to be uniform and the "strong suggestion" that Rader not use a different supplier, Rader dropped the subject completely. (Rader dep. at 27–28, Answer to Interrogatory 4).

Despite defendant's protestations to the contrary, plaintiffs contend that, in reality, Dunkin Donuts has a policy of pressuring its franchisees, through thinly veiled threats or strong paternal advice, to purchase their signs either from Dunkin Donuts or from a company from which the defendant receives substantial and secret "kickbacks." As evidence of Dunkin Donuts' practices to this effect, plaintiffs allude to the depositions and answers to interrogatories of many of the franchisees. For instance, Mr. Burwell testified that he asked a Dunkin Donuts representative whether he could buy the signs from someone other than Dunkin Donuts and was told "no, it had to be bought through them." (Burwell dep. at 14–17). Likewise, Mr. Pallantios claims that he was subjected to pressure from Dunkin Donuts to purchase signs from the company for his fourth store. The examples of pressure cited by Pallantios are found in his Answers to Interrogatories 4 and 12 wherein he contends that both attempts to influence him occurred at meetings attended by Dunkin Donuts franchisees and Dunkin Donuts employees. At a June 1966 meeting of the Purchasing Committee, Pallantios claims that he asked whether he could purchase signs for his North Olden Avenue store from a local company. Dunkin Donuts replied that the local company could not possibly give Pallantios a lower price, and Pallantios received a "strong recommendation" that he purchase the signs from Dunkin Donuts because the opening could be delayed if the signs were not delivered promptly. The other instance of pressure occurred at an Advisory Council meeting,[77] when Pallantios told a Dunkin Donuts employee that he had received a much lower quote for signs from the "State Sign people." The response, according to Pallantios, was that he was being "low-balled" and that when the company got the job, he would end up paying more. In addition, Pallantios was told that delivery dates were important and that if the shop could not open on time because signs were not there,

75. Defendant also asserts a quality control justification for this alleged tie-in practice.

76. Defendant cites other instances in which franchisees either raised no questions regarding sign purchases or indicated that the system of purchase recommended by Dunkin Donuts was attractive to them. For instance, Pallantios, until he negotiated for his fourth Dunkin Donuts shop, was seemingly happy to purchase the signs from or through Dunkin Donuts. Also, it was Gian-

nuzzi's wish that Dunkin Donuts put together the entire package for him, including the signs. (Giannuzzi dep. at 34).

77. The Advisory Council is a group of elected franchisees and company representatives in each area of the country which meets regularly to discuss grievances, exchange ideas and provide a channel for communication by franchisees directly to the executive level of the franchisor.

Pallantios would be held responsible for the late opening. (Pallantios dep. at 13, 25–26).[78]

Plaintiffs contend that there is substantial evidence on the record from which the court could conclude that the defendant is receiving large sums of money from the sign vendors as a result of the illegal tie-in of the signs. They point to certain correspondence to buttress this contention, e. g. letters from Cummings and Co. to William Bebe of Dunkin Donuts [79] and inter-office memoranda of the defendant.[80] With regard to the secret nature of these kickbacks, plaintiffs recite the testimony of Albert Vermeire, Director of Franchising for Dunkin Donuts, taken in the *Ungar* case. Mr. Vermeire testified that, to his knowledge, the bills for signs that were sent to the franchisees by the approved sign vendors showed a total price. Thus, the commission payable to Dunkin

Donuts by the vendor, although constituting part of the total charge, was not designated as such on the bill to the franchisee (Vermeire dep. at 83–85).[81]

▋ As will in due course appear, we believe, with respect to the question of signs as well as equipment, that in terms of ultimate trial a common issue of Dunkin Donuts' company policy exists and predominates.

### E. *The Real Estate Tie-In Claim*

In a number of ways, defendant counters plaintiffs' assertions that it imposes a tie with respect to the real estate where the Dunkin Donuts franchise is conducted. First, defendant points to the franchise agreement forms which it has utilized over the years and which posit that the franchisee may be holding his property or erecting his building pursuant to his own independent arrangements.[82] Second, in support of

---

78. Plaintiffs cite other instances in which Dunkin Donuts brought subtle pressure to bear upon a franchisee in order to "convince" him to order his signs from or through Dunkin Donuts. For instance, although Hegazi had a friend in the sign business and wanted to purchase from him, he accepted Dunkin Donuts' explanation that Dunkin Donuts had a manufacturer who made signs especially for it. (Hegazi dep. at 29). Also, Mr. Swahn testified that he had a relative in the sign business and mentioned getting a price from him to Dunkin Donuts. According to Swahn, defendant's response was that it had a sign company who had the molds and it couldn't possibly be done cheaper than what they could do it for. (Swahn dep. at 57–58).

79. According to the plaintiffs, this letter shows that the franchisee signs a security agreement as a result of his purchasing the signs from Cummings for $6,3050.00, which also includes Dunkin Donuts' "commission" of $1,850.00.

80. Plaintiffs particularly emphasize an inter-office memorandum, dated April 5, 1968, from Robert Rosenberg, President of Dunkin Donuts (Exhibit "II"). This memorandum shows that the signs were transferred to the equipment package because the sign companies did not want to include in their financing agreement with the franchisee the

$1800 rebate to Dunkin Donuts. Also, Rosenberg reiterates the defendant's policy of charging a fixed mark-up on the signs regardless of the number of signs a franchisee purchased. According to plaintiffs, this memorandum clearly shows that the defendant would only deal with those sign companies who would give Dunkin Donuts the $1800 kickback.

81. Defendant claims that Vermeire's testimony, as cited by the plaintiffs regarding the alleged sign tie-in, is misleading. Read as a whole, Dunkin Donuts argues, Vermeire's deposition supports its contention that the franchisees were free to purchase signs after 1966 from any sign company they wished. Moreover, Vermeire testified that Dunkin Donuts no longer engaged in the practice of receiving commissions from sign vendors after September 1969 (Vermeire dep. at 75–78).

82. For example, the current form of agreement (Exhibit 1–13 to Rader Answer to Interrogatory 1) states:
 2. DUNKIN' DONUTS agrees:
 A. To select the location for the DUNKIN' DONUTS SHOP; or, in the event the FRANCHISEE makes his own selection, to approve the location if it meets the standards employed by DUNKIN' DONUTS in selecting other locations at the time;

its assertion that the company policy is to encourage franchisees to make their own real estate arrangements, defendant points to the "Dunkin' Donuts Rental Policy" booklet which is given to new and existing franchisees,[83] the affidavit of Dunkin Donuts' President Robert Rosenberg,[84] and a document entitled "Questions and Answers about Dunkin' Donuts" which is allegedly given to prospective franchisees and states that franchisees can have their own real estate.

Defendant also asserts that the class action discovery shows that many of the named plaintiffs had no interest in buying their own property or dealing directly with the prime lessor. For instance, Rader testified that he did not recall having any discussions with Dunkin Donuts about developing his own site for any Dunkin Donuts shop; nor had he ever tried to get a franchise for a location which he owned or leased directly other than from or through Dunkin Donuts (Rader dep. at 127). Likewise, Pallantios testified that he did not recall raising any questions regarding the ownership of the property on which any of his shops are presently located. Rather, the "turnkey" nature of the Dunkin Donuts operation was attractive to him in that he could devote energies elsewhere (Pallantios dep. at 29–31, 54). Moreover, Giannuzzi testified that from the very beginning of his discussions with Dunkin Donuts, he had intended that Dunkin Donuts be the owner of the real estate and the building constructed thereon so that it could then rent the property to him for the purpose of running the shop.[85] He allegedly desired to be a lessee rather than an owner not because of anything Dunkin Donuts told

B. At the FRANCHISEE's request, to develop and lease the DUNKIN' DONUTS SHOP, through a subsidiary, to the FRANCHISEE; or, in the event the DUNKIN' DONUTS SHOP is under development on the date this Agreement is executed, to lease the DUNKIN' DONUTS SHOP, through a subsidiary, to the FRANCHISEE;
C. To provide, in the event the FRANCHISEE elects to develop the DUNKIN' DONUTS SHOP, the plans and specifications and the benefit of DUNKIN' DONUTS' experience in the design and construction of DUNKIN' DONUTS SHOPS.

83. On page 1 of the booklet is the following statement:
It may come as a surprise to many that the Company views its real estate involvement as a poor financial venture and only utilizes leasing or real estate ownership as a necessary means to open additional shops and enable Dunkin' Donuts to grow. Our policy has been to avoid real estate involvement where possible and, in fact, because of limited funds in a restrictive money market, we encourage all new and existing owners who want additional shops to find and finance their own realty. This would ease the financial burden on the Company and would also enable the franchise owner to save the rent mark-up and percentage override for himself.

(Exhibit "J" to Def. First Class Action Brief and Def. Post-Argument Brief, at 31).

84. Rosenberg stated that "[i]t has never been the policy or practice of Dunkin' Donuts to require franchisees to lease or sublease premises from Dunkin' Donuts." (Rosenberg Affidavit, ¶ 14, 15).

85. Defendant also points out that with regard to a second piece of property on Forest Avenue, Dunkin Donuts, after unsuccessfully attempting to negotiate with the landlord, told Giannuzzi that if he desired he should negotiate on his own. Giannuzzi obtained an option on the land, but the landlord refused to lease the property to Giannuzzi unless Dunkin Donuts was also on the lease. Before Giannuzzi could arrange the deal, his option expired. Giannuzzi is allegedly working on a location in another area at present. He plans to put his second shop in a building that is presently being used as a bowling alley in a shopping center. According to Giannuzzi, Dunkin Donuts' only desire with regard to that location is that it be given an option to take over the Dunkin Donuts shop in the event that Giannuzzi ever determines to abandon the business he establishes there. Although he is making all of his own arrangements for the shop, Giannuzzi testified at his deposition that he has received neither threats nor harassment from Dunkin Donuts (Giannuzzi dep. at 63–72).

him, but rather because his net worth was so modest that he could not afford the prospect of ownership (Giannuzzi dep. at 21–22.[86]

In sum, defendant argues that even if some of the franchisees were misled or intimidated by an overzealous franchise salesman into taking a lease from Dunkin Donuts, the record does not show that defendant had a uniform policy of requiring that they do so. Defendant submits that the large number of franchisees who chose to lease their premises from defendant did so because they desired that type of arrangement for reasons of convenience or inability to gather the necessary funds to purchase the land on their own. Thus, Dunkin Donuts contends that class certification is inappropriate because proof of liability would entail that sort of individual inquiry that is proscribed by Rule 23.

Plaintiffs' rejoinder is that, despite the absence of a contractual requirement on the lease issue, realistically the franchisees had to agree to common practices of lease-back used by the defendant in order to utilize the Dunkin Donuts logo. As the plaintiffs view it, in actuality the franchisees could not bargain with other prospective lessors who could have lowered their rental costs, but were forced to acquiesce to the resolutely enforced policy of the defendant if they wanted the franchise. As the best evidence of this policy on the part of defendant, plaintiffs point to the fact that, despite the uneconomic nature of the leasing provisions, only 55 or so locations out of approximately 700 as of 1972 (about eight per cent) were held by franchisees free of any interest on the part of Dunkin Donuts. Moreover, according to the plaintiffs, Dunkin Donuts' statement in its "Rental Policy" booklet that it is not interested in the real estate business is not credible since, in fact, the largest producer of gross income for the company is rentals from franchisees. Plaintiffs cite the *Standard and Poors Reports* on Dunkin Donuts dated October 10, 1973. The report provides in part:

In fiscal 1972, the company derived 39% of gross income from rentals of properties to franchisees; 24% from commissions, 20% from sales by company operated units; 12% from equipment sales and related service to new units; and 5% from other sources.

Plaintiffs further argue that it is clear from the deposition testimony of some of the named plaintiffs that although many would have liked to have made other arrangements with regard to their interest in the site of the store, they were precluded from doing so by the defendant. For instance, in 1971, Mr. Pallantios, who already owned other Dunkin Donuts stores, negotiated with Dunkin Donuts for a franchise to be located in Lawrenceville, New Jersey. Pallantios planned to own the land upon which the store was to be erected. The negotiations were allowed to proceed, according to Pallantios, until ". . . the deal was just about consummated. And then Bobby Rosenberg came down and said that I wasn't qualified to open —to have another franchise." (Pallantios dep. at 62). The given reason for Pallantios' non-qualification was the lack of quality in his product. However, Mr. Pallantios testified that such reason was a ruse in order to prevent Pallantios from owning his own land.

Testimony was also adduced from other franchisees to the effect that they were unsatisfied with the lease, construction and override aspects of the contract but were told by defendant that these were a required and advantageous part of the deal. For example, plaintiffs Swahn, Thomae, Hudock, Burwell and Olivieri testified that they asked

---

**86.** Similarly, according to defendant, Daratony was interested in being a lessee rather than an owner because being an owner would be too costly for him (Daratony dep. at 21).

whether they could purchase the land and building themselves or enter into a lease with the prime lessor, rather than a sublease with Dunkin Donuts. In each case, they testified, the response of Dunkin Donuts was an emphatic "no" (Swahn dep. at 47–48; Thomae dep. at 29; Hudock dep. at 13; Burwell dep. at 35; Olivieri dep. at 38–40).

■ We believe (see discussion *infra*) that there is enough evidence of a Dunkin Donuts' company policy to enforce a lease tie-in to frame a common issue for trial.

VIII. *The Class Action Discussion*

A. *Formal Requisites of Rule 23;
 The Applicability of Rule 23(b)
 (3) Rather than Rule 23(b)(2)*

■ Before a class action may be maintained under F.R.Civ.P. 23, there must be a showing that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

F.R.Civ.P. 23(a). In addition, the class proponent must satisfy one of the three conditions of rule 23(b). Plaintiffs have asked for class certification under both §§ 23(b)(2) and 23(b)(3). The burden is on the plaintiffs to show that the case is proper for class treatment and that they are appropriate representatives of the class.

Section 23(b)(2) certification is appropriate if the prerequisites of § 23(a) are satisfied and if, in addition, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." (F.R. Civ.P. 23(b)(2)). The Notes of the Advisory Committee to the 1966 amendments to rule 23, 39 F.R.D. 69, 102 (1966), state that "[t]his subdivision [23(b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Moreover, Professor Moore expresses the view that where a plea for injunctive relief is appended as a "very secondary" consideration, the action should be classed within (b)(3), but where injunctive relief and damages would be equally appropriate remedies, and both may be obtained, the court should divide the suit into subclasses handled under the separate subdivisions of subsection (b). He also believes that in most private antitrust suits, even where the request for an injunction is sincere, the prospect of damages is so important that injunctive relief would usually not be "predominant." He concludes that "[i]n almost all such situations, the suit should be 'treated under (b)(3)." 3B Moore, Federal Practice ¶ 23.45 at 23–708.09 n. 43 (2d ed. 1974) [hereinafter cited as Moore]. In a similar vein, in Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973), Judge VanArtsdalen refused to certify a (b)(2) class on the ground that money damages were, at the very least, a substantial element of plaintiffs' claim.

■■ We agree with Judge VanArtsdalen and Professor Moore. While there are very significant claims for declaratory and injunctive relief involved in the present case, we believe that the damage aspect is so important that (b)(2) certification would be inappropriate. Declaratory and injunctive relief can be awarded in a (b)(3) action which also carries with it greater safeguards. Accordingly, we will confine our discussion hereinafter to whether plaintiffs have met the test of Rule 23(b)(3).

In order to certify a class under rule 23(b)(3), we must find that the requisites of 23(a) have been satisfied and,

in addition, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." (F.R.Civ.P. 23(b)(3)). We will address the requisites of Rule 23(b)(3) in the order stated in the rule, but will discuss the matter of common questions in conjunction with the issue of predominance.

### B. *Numerosity*

According to the class action papers, there are presently in excess of 400 Dunkin Donuts franchisees and approximately 200 former franchisees. We find that the class is so numerous that joinder of all members is impracticable. Defendant does not appear to contest this point.

### C. *Typicality of Claims*

■ Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Advisory Committee did not elaborate on the meaning of this requirement so that the extent to which this requirement differs, if at all, from the other requirements of Rule 23(a) is unclear. Indeed, Professor Moore has concluded that "there is no need for this clause, since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23." 3B Moore, *supra* ¶ 23.06–2, at 23–325.[87]

The typicality requirement has been equated, *inter alia*, with the Rule 23(a)(2) requirement that the representative party adequately represent the class. See cases cited at 3B Moore, *supra* ¶ 23.06–2, at 23–325 n. 2–4. Profes-

sor Moore at one point quotes the typicality and adequacy provisions together. 3B Moore, *supra* ¶ 23.07[2], at 23–371. Judge Teitlebaum in Herrmann v. Atlantic Richfield Co., 1975 Trade Cas. ¶ 60,115 (W.D.Pa.1975), discusses typicality together with commonality and predominance. In the case at bar the claims of each plaintiff virtually track those of every other plaintiff. As will be seen below, the adequacy, commonality and predominance requisites are met. It follows that the typicality requirement is met; hence, we need not dwell upon it further.

### D. *Adequacy of Representation*

In its recent opinion in Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239 (3d Cir., 1975), our court of appeals (per Rosenn, J.) explained that the adequacy of representation requirement of Rule 23(b)(3) depends on two factors:

(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.

508 F.2d at 247 (footnotes omitted).

■ With regard to the first factor noted by the court in *Wetzel*, Mr. Berger is an acknowledged leader in the field of class action antitrust and securities litigation. Mr. Brown is an expert on the law of franchising, having written several volumes in the field. Mr. German and Mr. Manta have had experience not only in prosecuting, but also in defending class actions in the antitrust and securities fields and, in addition, have fine credentials in the field of general litigation. In sum, we believe that plaintiffs' attorneys are well qualified to conduct the proposed litigation.[88]

---

87. Professor Kaplan, on the other hand, believes that the basis for the typicality requirement is the notion that the representative ought to be squarely aligned in interest with the represented group. Kaplan, Continuing Work of the Civil Committee: 1966

Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356 (1967).

88. In addition, we believe that the adequacy inquiry requires a finding that the representative party and his attorney can be ex-

In this case, the important issue on adequate representation involves the second factor delineated by Judge Rosenn. Defendant alleges that there exist within the putative class several permutations or combinations of antagonism or conflict which militate against class certification. Defendant asserts: (1) that the interests of present franchisees differ from those of former franchisees; (2) that the interests of those who became franchisees before the standard franchise agreement was changed, on November 1, 1970, may differ from those who became franchisees after that date; and (3) that the interests of multiple franchisees differ from those of the putative class members who own a single franchise.

The latter two points raised by the defendant give us no difficulty. We see no disparity between the interests of the pre and post-November 1, 1970 franchisees. There may be some differences in proof of their tying claims, but their interests are precisely the same. Indeed, there are a number of multiple franchisees who took some franchises before and some after November 1, 1970. Neither do we see any significant conflict of interest between the single and multiple franchisees. The latter may have greater damages, but damage issues would in any event be separately tried. Moreover, on the issue of liability, the single and multiple franchisees have precisely the same interest in establishing illegal ties and restrictive cov-

enants so as to give rise to declaratory, injunctive and damage relief.

There is authority, which defendant cites, to the effect that the potentially conflicting interests of present and former franchisees are a sufficient basis upon which to deny class certification (or at least one factor militating against it). *See* Bogosian v. Gulf Oil Corp., 62 F.R.D. 124 (E.D.Pa.1973); Seligson v. Plum Tree, Inc., 61 F.R.D. 343, 346 (E. D.Pa.1973); Van Allen v. Circle K Corp., 58 F.R.D. 562 (C.D.Cal.1972); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.1972).[89] On the other hand, in McMackin v. Schwinn Bicycle Co., 354 F.Supp. 1154 (N.D.Ill.1972), vacated on other grounds, 1974 Trade Cas. ¶ 75,047 (N. D.Ill.1974), where Judge McLaren reversed his earlier holding that a hardware store owner whose Schwinn Bicycle franchise had been terminated could represent a class that included more than 6,000 specialized bicycle dealers who were current franchisees, he made it clear that a former franchisee *could* represent a class including present franchisees:

> It should be emphasized that the Court does not adopt the notion that a former franchisee may never represent a class that includes present franchisees. Such a *per se* rule would be counter to the standards and purpose of Rule 23. If, for example, a franchise were terminated on a ground

pected to prosecute the action vigorously. As Judge Gurfein noted in Wolfson v. Solomon, 54 F.R.D. 584 (S.D.N.Y.1972), in many cases such as this the possibility of recovering attorney's fees will provide the sole stimulus for the enforcement of the class rights. *See also* Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965). We believe that in this case the possibility of recovering attorney's fees is sufficient stimulus for the enforcement of class rights.

89. In *Free World*, Judge Weinfeld found the interests of present and former franchisees

to be adverse because of the concern of present dealers that Alfa Romeo remain in business to assure their source of supply as opposed to the sole interest of the plaintiff in that case, a former franchisee, in recovering damages. Judge Weinfeld found the threat to the defendant's survival in the face of the class action suit to be real. Whether or not there is any threat to the survival of Dunkin Donuts here is not known; but in this case the suit is led by *present* franchisees who are active in the Dunkin Donuts franchisee association.

that would violate the antitrust laws and other present franchisees were threatened with similar action, the terminated franchisee could represent the others. Antagonism between the class members would be far less likely under these circumstances.

1974 Trade Cas. at 96,690.

Other cases support the proposition that there is no necessary conflict between present and former franchisees. In Herrmann v. Atlantic Richfield Co., 65 F.R.D. 585 (W.D.Pa.1975), Judge Teitlebaum found no conflict between present and former ARCO lessee dealers in connection with claims of price fixing, price discrimination and tying of TBA, and permitted the matter to proceed as a single class. And, in In re Clark Oil & Refining Corp., 1974–1 Trade Cas. ¶ 74,880 (E.D.Wis.1974), Judge Reynolds found no conflict between present and former franchisees, certifying a class comprised of both.[90]

It is true that the present Dunkin Donuts franchisees may have more interest in injunctive relief than the past franchisees in that a favorable decree could require prospective contract changes, conferring relief from company policies which impose burdensome ties, and perhaps modifying the restrictive covenant.

(The former franchisees might be concerned with relief from the post-term restrictive covenant.) However, we do not perceive significant differences in the nature of the proof, for the evidence which advances the tying claims of the former franchisees is no different from that which advances the tying claims of the present franchisees. The principal object of both present and former franchisees is to secure damages. Our overview detects no antagonism between the interests of the present and former franchisees at this time.[91]

Accordingly, we find that the named plaintiffs will fairly and adequately represent the interests of the class.[92] However, should conflicts between former and present franchisees arise, we could declare subclasses of present and former franchisees, designating Ungar and Miller, who already have separate counsel (and perhaps the Olivieris), as representatives of the former franchisees and the remaining plaintiffs as representatives of the present franchisees. The trial would, in any event, proceed as a single entity with counsel advancing the interests of their respective class clients, but the form of relief, if subclasses were declared, would be molded to accommodate the subclass determination.

---

90. *Cf.* Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239 (3d Cir., 1975) (where a former employee, assumedly not entitled to reinstatement, was held to be an adequate representative of a class of past and present employees alleging discriminatory employment practices); Mersay v. First Republic Corp., 43 F.R.D. 465 (S.D.N.Y.1968) (where a plaintiff was permitted to serve as the class representative in a securities act suit even though it is possible that he was personally barred from recovery as an insider).

91. Possible conflicts may arise if there is selective enforcement of restrictive covenants or adverseness between franchises who have highly successful stores and marginal operators to whom the presence of a new coffee and doughnut shop in proximity to their franchised outlet may be damaging. These are but possibilities as of now. However, we will be alert to them as the case

develops, having in mind the great flexibility to modify and mold afforded by Rule 23.

92. So that we might adequately assess the potential representative status of the named plaintiffs, we have reviewed their status as franchisees. It appears that all are present franchisees with the following exceptions. Rader is a former franchisee with respect to the Elizabeth, N.J. store, one of his several Dunkin Donuts shops. Similarly, Pallantios, who still has several operating Dunkin Donuts franchises, is a former franchisee with respect to one shop in Hamilton, N.J. The Olivieris are former franchisees with respect to two of their three shops, in Penn Hills and Versailles, Pa. Finally, Ungar and Miller, while "present" franchisees when their suit was instituted on January 12, 1972, became former franchisees after termination of their franchise agreement in September 1974.

E. *Predominance of Common Questions of Fact and Law over Individual Questions*

1. *Introduction; The Matters of Damages and the Statute of Limitations*

 Certification of any class under Rule 23 requires a finding that there are questions of law or fact common to the class. Certification of a § 23(b)(3) class requires the additional finding that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. By way of explication of this provision, Professor Moore has observed:

A basic function of the predominance element is to place the questions in the pragmatic context of the new rule, in order to evaluate the contribution which class treatment would make to efficient settlement of the multiparty controversy. To retain this perspective, it has been suggested that the court should ascertain "whether a class action will splinter into individual trials. If this appears likely, common questions do not predominate, and a class action is inappropriate." . . .

3B Moore, *supra,* ¶ 23.45[2], at 23–755 (footnotes omitted).

What the courts generally look to in evaluating predominance questions is the existence of a "common nucleus of operative facts." *See, e. g.,* Siegel I, 271 F. Supp. 722 (N.D.Cal.1967), modified sub nom. Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969); Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968); Entin v. Barg, 60 F.R.D. 108 (E.D.Pa.1973).

What we now must do, drawing upon and collating our discussions of the law of tying and of the class action discovery, is to: (1) assess the existence (or non-existence) of common questions of law and fact; and (2) decide whether common questions of law or fact predominate over individual questions. Since the predominance finding, according to the court in Katz v. Carte Blanche Corp., 496 F.2d 747, 756 (3d Cir. 1974), requires "the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate," we must make these determinations with respect to each issue. Before commencing this review, however, we must dispose of two contentions which cut across all the issues.

 First, defendant claims that, because the damages of each class member will inevitably vary from every other and necessitate individual damage trials, individual issues predominate and militate against certification of a class. Some courts have adopted that view. However, we reject it and believe that the better rule is that summarized by Professor Moore:

The most frequently recurrent types of suits brought under (b)(3) are private treble-damage antitrust suits, and actions based on various types of securities frauds. In both series of cases, courts as a rule approach the problem of predominance from the point of view of the severability of the issues of liability and damages—whether the asserted statutory violations can be effectively adjudicated in a class proceeding independent from the proceeding in which individual damages would be assessed.

3B Moore, *supra* ¶ 23.45[2], at 23–758 (footnotes omitted). *Accord,* Green v. Occidental Petroleum Corp., Fed.Sec.L. Rep. ¶ 94,397 (C.D.Cal.1974); In re Memorex Security Cases, 61 F.R.D. 88, 103 (N.D.Cal.1973); City of New York v. General Motors Corp., 60 F.R.D. 393, 395 (S.D.N.Y.1973), appeal dismissed, 501 F.2d 639 (2d Cir. 1974). If there is a verdict for the class on liability, we

will exercise the option for separate damage proceedings at that time.[93]

Defendant's second contention which cuts across the various issues is that individual questions must predominate since the statute of limitations variously affects the named plaintiffs and, *a fortiori,* the other members of the class. Defendant's attack is essentially threefold. First, to the extent that any franchisee's claim arose more than four years before the commencement of the action, an additional issue is said to be injected as to his claim as compared with more recent franchisees. Second, to the extent that plaintiffs rely on fraudulent concealment to toll the statute, individual issues are said to be necessarily injected as to what each franchisee was told, what he knew and what he could have discovered with due diligence. Third, with respect to the pendent state law claims which may be afflicted with statute of limitations problems, disparate legal issues are said to be involved because of the variety of state statutes of limitations governing the various types of claims.

■■■■■ Putative class members whose claims are irretrievably time barred must in due course be excluded from the class, Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239 (3d Cir., 1975), and denied relief. However, under the doctrine of American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the filing of a timely class action complaint commences the action for all members of the class as subsequently determined.

A survey of the class action discovery record suggests that the claims of most plaintiffs are not tinged by a statute of limitations problem. There are some claims of some plaintiffs which may be barred, although in such instances the plaintiffs assert tolling by virtue of the fraudulent concealment doctrine. We agree with Professor Moore who has likened the statute of limitations problem to the damage problem and has pointed out that in private treble damage actions brought under Rule 23(b)(3), courts have "routinely" made provision for separate trials or determinations of damages "in which individual claims and *defenses on statutes of limitation,* reliance, knowledge, etc., can be adjudicated." 3B Moore, *supra* ¶ 23.45[1], at 27–703 n. 13.

■■■■■ Accordingly, we conclude that class action determination is not undermined on predominance grounds by problems that some plaintiffs may have with the statute of limitations. Those problems can be determined in due course in the separate trials on damages, should the case reach that stage.[94]

2. *The Antitrust Tying Claims*

■■■■■ It has been plain from the outset of this opinion that its outcome depends mainly on the determination of whether there are common and predominating questions of fact and law pervading plaintiffs' antitrust tying claims. In the ordinary course, this would have to be the most extensive section of this opinion. However, by reason of our extended discussion of the law of tying and

---

93. The damage issues can be tried through the vehicle of separate damage proceedings, LoCicero v. Humble Oil & Refining Co., 52 F.R.D. 28, 30–31 (E.D.La.1971). Additionally, the separation procedure may be further conducted by using a master to calculate damages of individual class members. Brennan v. Midwestern United Life Ins. Co., 286 F.Supp. 702, 729–30 (N.D.Ind.1968); Connecticut Importing Co. v. Frankfort Distilleries, Inc., 42 F.Supp. 225, 226–27 (D. Conn.1940).

94. In Hawkins v. Holiday Inns, Inc., C.A. No. C–72–217 (W.D.Tenn., Feb. 3, 1975), Judge McRae, in declaring a class of Holiday Inns franchisees in a suit alleging violations of the Sherman Act and breaches of fiduciary duty, found it inappropriate even to examine the statute of limitations issue in connection with class action determination on the grounds that it was an affirmative defense on which the defendant had the burden of proof.

our comprehensive review of plaintiffs' claims and the class action discovery, it may be very brief. With the exceptions hereinafter noted, we find that common questions of fact and law exist and predominate in the area of plaintiffs' equipment, sign, real estate and supplier tying claims.[95] This conclusion is premised mainly upon the emergence from the class action discovery of sufficient evidence of Dunkin Donuts' company policy in these areas to provide a *prima facie* substitute for the *Siegel II* express contractual tie. Needless to say, had we accepted rather than rejected the individual coercion doctrine, we could not have made this finding, for individual questions would clearly have predominated. In the absence of the individual coercion doctrine, we find that the principal issues for trial are issues which involve evidence common to the entire putative class. It is important to add that where a company policy emerges, matters of individual exception (and there may be such matters here) will not alter the result. What follows is a summary of the issues for trial with brief comment on the predominance considerations as to each.

### a. *The Formal Requisites of a Tie*

The first group of issues are those involving proof of the formal requisites of a tie. These are plainly common issues. The first two requisites—proof of separate tying and tied products, and proof of the requisite economic power in the tying product, *i. e.*, the Dunkin Donuts trademark, logo and franchise system—may be established by a minimum of proof followed by legal argument common to the class.[96] The third requisite —proof that a not insubstantial amount

of commerce has been restrained—may be established by proof of facts common to all the franchisees.

### b. *Proof of Use of Economic Power*
### (1) *General Conclusions*

We have outlined the ways in which the plaintiffs may prove use of economic power. The first and principal method at issue here is proof of company policy to influence the franchisees to acquire the tied items only from or through Dunkin Donuts. That presents a common issue, both prior to November 1, 1970 (for which period proof is rendered easier by the express equipment tie provision in the contract) and thereafter. Dunkin Donuts has argued forcefully in its brief that the notion of a resolutely enforced company policy is a phantom. Plaintiffs have argued equally forcefully to the contrary. At this juncture (more detailed comment follows), rather than recapitulate the extended class action discovery survey, we note only our conclusion that there is sufficient evidence of company policy to create a *bona fide* issue for trial with respect to the equipment, sign, real estate and supply tie-in claims. We underscore that we are *not* deciding here the existence or non-existence of such a policy. What we do decide on the basis of our survey is that there is a viable company policy issue for trial and that on that point common questions predominate.

The other means of proving use of economic power, *i. e.*, proof that large numbers of franchisees have accepted a burdensome or uneconomic tie, likewise involves a predominance of common questions. It is a corollary to this conclusion that common questions predominate on the issue of whether Dunkin Do-

---

95. As will be seen, we do not certify the "used store" claims as defined more precisely below.

96. Even if the decision in Capital Temporaries, Inc. v. The Olsten Corp., 365 F.Supp. 888 (D.Conn.1973), aff'd, 506 F.2d 658 (2d Cir. 1974), see note 24 *supra*, is correct in

its assumption that a trademark does not enable the court to presume the requisite economic power in the tying product, the issue of the extent of economic power inhering in the Dunkin Donuts trademark, logo and franchise system would still constitute a common question for trial.

nuts conditioned the availability of the franchise on purchase of the tied products.

### (2) *The Equipment and Sign Ties*

With respect to the equipment and sign ties, we add to the foregoing discussion only that while Dunkin Donuts has indeed established that there were some exceptions to the general practice whereby the franchisees purchased the entire equipment package (and the necessary signs) ·from Dunkin Donuts, the amount of deviation is not impressive enough to negate the viability of the issue of company policy for trial. As we have already noted, where company policy is established, occasional exceptions will not alter the result. Therefore, we will certify a class on the issue of whether Dunkin Donuts illegally tied its franchise to the sale of new equipment and signs to its franchisees. We will not, however, certify the equipment tie and sign tie claims in those instances where franchisees purchased used and equipped stores from either former franchisees or from Dunkin Donuts.

A more difficult question is posed in the situation where a franchisee purchases a new shop which is already equipped at the time of purchase. The plaintiffs suggest the possibility that a franchisor might establish equipped shops with the conscious purpose of circumventing the law of tying.[97] Were there evidence of such a practice, we would be inclined to certify such a claim. At oral argument, however, the plaintiffs conceded that they had no evidence that this had ever occurred; hence we will make no distinction for new equipped shops in this case, and will not include them within the scope of our class action certification.

### (3) *The Real Estate Tie*

The threshold question with respect to the plaintiffs' real estate claims is whether they can constitute a tie. We believe that the plaintiffs' contentions that the conditioning of the grant of the franchise upon the franchisee's agreement to lease or sublease from Dunkin Donuts the premises upon which the doughnut shop is to be operated constitute a cognizable tying claim within the traditional framework of § 1 of the Sherman Act.[98] Defendant does not contend otherwise.

Defendant's opposition to class certification here springs principally from its reliance upon the individual coercion doctrine. It buttresses its contentions with the statistics reviewed above regarding the number of franchisees who have used their own land for the operation of the franchise store. Plaintiffs argue that, just as with the equipment package, the number of franchisees making their own realty arrangements is small. In view of the evidence thus far discovered and discussed above regarding plaintiffs' claims as to company policy in this area, we believe that common questions exist and predominate. Accordingly, subject to satisfaction of the other Rule 23(b)(3) requirements, we will certify the real estate tie claim.[99]

---

97. They rely in this regard upon a passage in Beefy Trail, Inc. v. Beefy King International, Inc., 348 F.Supp. 799 (M.D.Fla.1972), wherein Judge Young indicated that there might be liability:

> . . . under the circumstances where the franchisor by an intentional course of conduct seeks to circumvent the antitrust laws concerning tying arrangements by requiring a franchisee to purchase a restaurant and its equipment previously established with the conscious purpose of avoiding the rationale of *Chicken Delight*.

98. *See, e. g.*, Halverson v. Convenient Food Mart, Inc., No. 70C499 (N.D.Ill., Oct. 31, 1974); Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974); Abercrombie v. Lum's Inc., 345 F.Supp. 387 (S.D.Fla. 1972). These cases, although supportive of the individual coercion doctrine, do seem to assume the viability of a leasing arrangement as constituting a cognizable tied product under the antitrust laws.

99. We do not separately certify the plaintiffs' claims with respect to the construction costs markup and the lease override. Dun-

**(4)** *The Supplier Tie-In Claim—The Quality Control Defense*

In our survey of the class action discovery, we described the conflicting positions of the parties with respect to the alleged supplier tie-in and its countervailing force, the quality control defense. Plaintiffs have asserted that the specifications and standards established by Dunkin Donuts are not only useless, but also a coverup for the receipt of kickbacks from suppliers and a device to limit the suppliers from whom the franchisee may buy. The defendant, citing Dr. Bolaffi's affidavit and other evidence, has argued that its approved supplier procedure is a valid quality control or marketing identity device which constitutes a defense to a tying claim. In addition, however, defendant has asserted that plaintiffs may proceed on their supplier tie-in claim only on an individualized basis; *i. e.*, that no plaintiff may press the claim unless he can establish that he attempted to purchase from a non-approved vendor and then failed in having the vendor approved as a supplier because of an arbitrary position taken by Dunkin Donuts.

We disagree, we believe that here, as elsewhere, proof of a resolute anticompetitive company policy can carry the day for the plaintiffs. We do not here decide that they have proved such a policy to date; moreover, the quality control defense may indeed prove to be a strong one. However, our survey of the discovery record persuades us that there is a common question for trial which predominates over individual questions in this area. Hence, subject to satisfaction of the other requisites of Rule 23(b)(3), we will certify the supplier tie-in claims (and concomitantly the quality control defense) for class treatment.

**3.** *The Advertising Tying Claims*

■ The claims of the plaintiffs with respect to the advertising fund are essentially twofold in nature. First, plaintiffs allege that the express contractual requirement that the franchisee pay 2% of gross sales into an advertising fund constitutes a tie-in to the sale of the franchise. However, such a claim fails to satisfy the requisite of separate tying and tied products since advertising is inextricably intertwined with the trademark, franchise system and logo as the major vehicle for promoting them. Hence, we will not certify the advertising tie claim as we find that, in the context of this case, advertising is not a separate tied product. *Accord*, Kugler v. AAMCO Automatic Transmissions, Inc., 460 F.2d 1214 (8th Cir. 1972).

Plaintiffs' second claim with respect to the advertising fund lies essentially in alleged breaches by Dunkin Donuts of its agreement with the franchisees with respect to the management of the fund. According to the plaintiffs, Dunkin Donuts, in violation of its implied contractual duty to manage the fund to enhance the franchisees' sales, has used the fund for its own benefit.[100] This claim presents questions which are common to the class. Moreover, it appears to present only common factual questions, for what is at issue is how the fund was handled at the Dunkin Donuts' headquarters in Randolph, Mass.

**4.** *The Real Estate Tax Escrow Claim*

As we have seen in our discussion of plaintiffs' class action claims, their real estate tax escrow allegations are princi-

---

kin Donuts' alleged overreaching with respect to the construction costs markup may well provide the plaintiffs with an additional item of damage if they succeed on liability. So perhaps may the lease override, although defendant will doubtless argue that that sum is really an additional franchise fee and, therefore, a set off against any tying dam-

ages. We need not resolve those issues here.

100. The manner of alleged misuse is described in detail above. We believe the claim is properly characterized as one for breach of contract rather than breach of fiduciary duty.

pally that Dunkin Donuts has breached a fiduciary duty to maintain the escrow funds in an interest-bearing account for the benefit of each franchisee.[101] Defendant counters that it does not stand in the position of a fiduciary to its franchisees. Alternatively, it asserts that the question of whether or not a fiduciary relationship exists is one involving uncommon questions of fact and law.

The question of whether or not a fiduciary relationship exists between a franchisor and a franchisee is not a simple one. Some courts have held that a franchisor does not stand in a fiduciary relationship to its franchisees. *See, e. g.,* E. B. E., Inc. v. Dunkin' Donuts of America, Inc., 64 F.R.D. 140 (E.D.Mich., 1974); Pollack v. International Industries, C.A. No. 72–1513–EC (C.D.Cal., Feb. 8, 1973); Jirna, Ltd. v. Mister Donut of Canada, Ltd., 22 D.L.R. (3d) 639 (Ont. Ct.App.1971). Other courts, given different facts, have held that a fiduciary relationship exists. *See, e. g.,* Mobil Oil Corp. v. Rubenfeld, 72 Misc.2d 392, 339 N.Y.S.2d 623 (1972). Moreover, the question of whether a franchisor, even if it is a fiduciary, has a duty to maintain escrow funds in an interest bearing account for the benefit of each franchisee is also difficult.

■ As we see it, the determination of whether a fiduciary relationship exists and of whether that relationship, once proven, would require the payment of interest on real estate tax escrow funds will require reference to the law of the 34 jurisdictions in which the alleged relationship arose. Accordingly, individual, not common, questions predominate, and class certification of plaintiffs' real estate tax escrow claims must be denied.

### 5. *The Common Law Fraud Claims*

■ The alleged misrepresentations by Dunkin Donuts about the financial aspects of the business which constitute plaintiffs' common law fraud claims have been detailed in our discussion of plaintiffs' class action claims. It is generally the law of the several states that the elements of a tort cause of action for misrepresentation are the following:

(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury.

37 C.J.S. Fraud § 3 (1943 & Supplement) (footnote omitted). *See also* W. Prosser, Law of Torts 685 (4th ed. 1971).

■ A review of these elements and of the limited record on this point makes it apparent that the common law fraud count raises numerous issues which are personal to each separate plaintiff and are, therefore, uncommon to the class as a whole. *First,* during the years in which Dunkin Donuts has sold franchises, its written promotional materials have varied substantially from time to time and from geographical area to area. Thus, the written representations upon which plaintiffs base their claim have been subject to constant revision due to variations in time and locale. *Second,* variations in oral representations that may have constituted the fraud alleged by plaintiffs add further to individual questions relating to each franchisee. (As averred in the Rosenberg Affidavit, ¶¶ 19, 20, oral representations have varied materially from one salesman to another, and, for each salesman, from prospective franchisee to prospective franchisee). *Third,* we are dealing here with the common law, not the antitrust law of tying with respect to which we have rejected the individual

---

101. There was relatively little discovery on this issue.

coercion doctrine; the common law of fraud requires proof of individual reliance. In sum, because individual, not common issues, predominate with respect to the plaintiffs' common law fraud claims, we will not certify those claims for class determination.

### 6. *The Restrictive Covenant Claims*

The plaintiffs have asserted claims for relief from in-term and post-term restrictive covenants on both antitrust and common law theories.[102] In the discussion which follows we will first consider the predominance questions with respect to the in-term antitrust claims, using as our matrix the analysis of Judge Garth in American Motor Inns, Inc. v. Holiday Inns, Inc., 365 F.Supp 1073 (D.N.J.1973).[103] We will then deal with the plaintiffs' other restrictive covenant claims. It will be recalled that Judge Garth's first approach to the problem was a traditional Sherman Act § 1 "rule of reason" inquiry into the business justifications for the restraint, the practices generally obtaining in the industry, the precise harm flowing from the restraint and the other considerations summarized by Mr. Jus-

tice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Such an undertaking may well be major in scope, but it is one which will involve the trial of questions predominantly common to the class.

Judge Garth's alternative approach was to examine the effect of the non-Holiday Inn clause in an exclusive dealing context AMI had contended that the non-Holiday Inn clause was an exclusive dealing arrangement which was justified *prima facie* unless it resulted in anticompetitive effects more substantial than those disclosed by the traditional rule of reason analysis. For purposes of this class certification motion, we must also consider that approach under which plaintiffs must point out the alleged markets (both geographic and product) in which these restraints are unreasonable. According to the defendant, although the complaint alleges a national market in the sale of coffee and doughnut outlets, it cannot be assumed that all class members, or even all plaintiffs, agree with these allegations. For example, the complaint in *Ungar*, defendant

102. The relief sought with respect to the restrictive covenants arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1959). One of the purposes behind declaratory judgments is to avoid multiplicity and circuity of actions. Smith v. Transit Cas. Co., 281 F.Supp. 661 (E.D.Tex.1968), aff'd, 410 F.2d 210 (5th Cir. 1969); Savini v. Sheriff of Nassau County, 209 F.Supp. 946 (E.D.N. Y.1962); Stout v. Grain Dealers Mut. Ins. Co., 201 F.Supp. 647 (M.D.N.C.1962), aff'd, 307 F.2d 521 (4th Cir. 1962). The granting of declaratory relief is proper where the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, or when it will terminate and afford relief from uncertainty, insecurity and controversy giving rise to the proceedings. Maryland Cas. Co. v. Rosen, 445 F.2d 1012 (2d Cir. 1971). Furthermore, declaratory judgments contemplate a pragmatic approach to determination of legal relations in controversy between interested parties. St. Paul Fire & Marine Ins. Co. v. Aetna Cas. & Sur. Co., 357 F.2d 315 (10th Cir. 1966); Brunswick Corp. v. Outboard Marine Corp., 297 F.

Supp. 373 (E.D.Wis.1969). We are not certain as to whether the defendant wishes to interpose objection to the propriety of declaratory relief. We note at this juncture only that we do *not* resolve that matter, which has not been sufficiently briefed, herein.

103. Plaintiffs also argue that the restrictive covenants are *per se* violations of the Sherman Act under the analysis of United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), due to the existence of Dunkin Donuts' owned "company stores." Thus, they allege that horizontal territoriality is rampant. *Topco*, however, is not applicable here since there is no evidence in the record that the "company stores" are anything more than a temporary device employed by Dunkin Donuts until the location is sold to a new franchisee. Hence, the type of restrictions imposed by Dunkin Donuts in the restrictive covenants are vertical in nature and cannot constitute a *per se* violation of the antitrust laws.

states, alleges a separate market exists in each metropolitan area in which defendant does business. Similarly, Dunkin Donuts argues, while some of the plaintiffs would appear to agree that the relevant product market is doughnut shop outlets, others believe that the defendant competes for the sale of its franchises with several other types of franchisors, including other types of fast food outlets, convenience food stores, hardware stores, etc. This uncommonness or conflict in the plaintiffs' claims, defendant argues, is a subject for consideration at trial, making class certification inappropriate.

Defendant does not rest its argument here, but goes on to argue for the nonapplicability of a national geographic market. As defendant reasons, there will be significant variation in the amount of foreclosure of a specific geographic market depending on the part of the country being examined. For example, defendant notes that it has many franchised outlets in the Boston area and almost none around Los Angeles or San Francisco; thus defendant's market share is much greater in Boston. Its restrictive covenants could be found dangerous to competition there, yet acceptable in Los Angeles. Finally, defendant suggests that an examination of the record indicates that it is not at all likely that any individual or multi-unit franchisee would be desirous of establishing a similar business too far away from his home territory. Rather, as a practical matter, defendant asserts, any one franchisee is likely to open new coffee and doughnut shops only in the area surrounding his home base.

■ In resolving the issue, it must first be noted that in *AMI* Judge Garth posited a nationwide market even though AMI did not have any hotels in the Far West and, as far as the record shows, was not desirous of opening any.

Rather, nationwide firms were vying for AMI's business. (Because of the late assertion of the restrictive covenant claim on a class basis here, these matters were not fleshed out in class action discovery.) Applying the teachings of *AMI* and the arguments of the parties to the facts at bar, we are inclined to believe that if the evidence developed by discovery or at a pretrial hearing or at trial shows the market to be nationwide, a common issue will be created. In view of the possibility that the actual market will be determined to be doughnut shop franchises, we cannot rule out the possibility that the Dunkin Donuts franchisees bound by the restriction will have a considerable market share that would be subject to foreclosure and, therefore, illegally restrictive of competition under the standards enunciated in Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Neither can we prematurely reject the assertion, also relevant, that multiple franchisees like Rader and Pallantios would be willing to expand far beyond the geographical area in which they now operate.

■ We shall not at this time make a determination, binding for trial, as to whether the exclusive dealing approach is required by the facts. As noted, that determination must abide further discovery and briefing and perhaps a pretrial hearing. Plainly, if the exclusive dealing analogy is applicable and the relevant market is determined to be a series of regional markets, individual questions (analysis of the market for each franchised location) will predominate and class certification will have to be re-evaluated as to the in-term antitrust restrictive covenant issue.[104]

■ The other aspects of the restrictive covenant claims may be briefly disposed of. The post-term clause does

---

104. While there is some variation in the terms of the various form agreements used by defendant, the in-term covenants do not vary sufficiently to affect our findings on the certifiability of the antitrust claim.

not rise to antitrust proportions. Unlike the in-term restraint which is framed in sharp focus by its very breadth, the post-term restraints vary markedly in their impact from franchise site to franchise site, depending upon the character of the area. Trial of the issue would thus necessitate an examination of each franchised location, hence individual questions would predominate.

 Viewing the claims, both in-term and post-term, from a common law aspect, they must perforce be judged by state law. The parties have not briefed the choice of law question; however, it appears likely that the question of reasonableness, *vel non,* of a restraint which will operate upon a citizen of a given state and within its borders will be of sufficient importance to the state in question to require that validity of the covenant be measured by that state's laws, notwithstanding the plaintiffs' contention that the law of Massachusetts governs all contractual relationships among the parties. There are about 34 jurisdictions whose laws on restrictive covenants would thus become the standards for judging the validity of the covenants at issue. Notwithstanding the noble efforts of the drafters of the Restatement of Contracts, § 515 (1932), this area of the law is one in which the states have varied widely. As evidence of this fact, defendant points to two recent cases. *Compare* Purcell v. Joyner, 200 S.E.2d 363, (Ga.Sup.Ct.1973) *with* Kenco Chemical & Manufacturing Co., Inc. v. Railey, 286 So.2d 272 (Fla.D.Ct. App.1973). The *Purcell* court refused to enforce a restrictive covenant that prevented competition in designated counties of Georgia, while the court in *Kenco*

enforced a restrictive covenant that was without geographical limitation. We cannot embark upon an analysis of the laws of 34 states in this action. Therefore, because individual questions of law as well as fact (*i. e.,* the impact of each covenant given its particular locale) predominate, we cannot certify plaintiffs' common law restrictive covenant claims.

We feel again constrained to note that we have not prejudged the substantive issue (here, restrictive covenants). Defendant asserts that the covenants are valid at common law and under the antitrust laws because they are reasonable and properly tailored to protect legitimate interests of the franchisor and franchisees. What we do here is merely to decide the motion for class determination.

### F. *Superiority*

The final requisite for 23(b)(3) class determination is a finding "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The second sentence of Rule 23(b)(3) goes on to state a number of considerations relevant to the required finding: [105]

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability of or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.[106]

---

105. Actually, the subject considerations are stated to be relevant to predominance as well as superiority, but in the context of this case we believe them to· be more germane to superiority. Hence, we discuss them only here.

106. Professor Moore comments that the second sentence of (b)(3) does not purport to

set up a series of factors on which findings must themselves be made:

> Analysis of these various items should not lead to an exaggerated impression of their materiality. None of the suggested factors should be determinative of the grant or denial of class status; they are simply pertinent details to be checked, the pres-

We do not find the factors mentioned in (A) or (C) to be particularly helpful in resolving the superiority question, but we will deal with (B) and (D), along with other relevant considerations.

In Katz v. Carte Blanche Corporation, 496 F.2d 747 (3d Cir. 1974), the court set forth further guidelines to be followed in deciding the superiority question:

> The superiority finding requires at a minimum (1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method. . . . [A]ll Rule 23(b) (3) superiority determinations [must] take into account several different interests. Superiority must be looked at from the point of view of (1) the judicial system, (2) the potential class members, (3) the present plaintiff, (4) the attorneys for the litigants, (5) the public at large and (6) the defendant. The listing is not necessarily in order of importance of their respective interests. Superiority must also be looked at from the point of view of the issues.

496 F.2d at 757, 760. It is fundamental that a class action enables a large group of claimants to have their disputes adjudicated in a single lawsuit. This is an especially important privilege where the individual claimants lack the resources to pursue the claims on their own. While the class action thus encourages litigation and makes recourse to the courts convenient, the question remains as to whether this result is desirable. The superiority prerequisite thus requires us to determine whether a class suit would be the best or the fairest way of channeling and adjudicating those claims. In this case we believe that it is.

While the *Rader* suit has been brought on behalf of a large number of Dunkin Donuts franchisees, we cannot say that plaintiffs' counsel were disingenuous when they represented to us at the hearing that it was only the prospect of class determination that motivated them to bring the *Rader* suit. In view of the staggering costs of discovery and of ultimate trial, we believe it to be a fair conclusion that without the prospect of a class action, individual claimants would lack sufficient interest or resources to bring a suit such as has been brought here. Such a conclusion has been held sufficient to support a finding of superiority. *See* Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D. Minn.1968). Not inapposite is the language of the court in Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941):

> To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent.[107]

However, even the conclusion that the plaintiffs might proceed on their own in any event does not necessarily militate

---

ence or absence of which may reflect on the overall wisdom of allowing a class suit. . . .
3B Moore, *supra* ¶ 23.45[4.–0], at 23–851.

107. Some cases have held that the larger the individual class member's damages, the less need there is for class treatment, particularly in antitrust actions where the plaintiff can obtain an award of attorneys' fees. *See,*

*e. g.,* Caceres v. International Air Transport Association, 46 F.R.D. 89 (S.D.N.Y.1969), appeal dismissed, 422 F.2d 141 (2d Cir. 1970). While we cannot gainsay that the individual plaintiff's damage claims here may be substantial, so too is the scope of the litigation. When all of the factors here are placed on the balancing scale, it strongly tips towards a superiority finding.

against class certification. For, as Professor Moore notes, the historic function of the common question suit—to "achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated" —remains a predominant element in the rationale behind Rule 23(b)(3). 3B Moore, *supra* ¶ 23.45[3], at 23–811. Cognizance of these criteria helps produce the conclusion that a class action is superior.

It must be borne in mind that class determination, which imposes binding effect upon all members of the class who do not opt out, can be a great boon to the defendant. For, if the defendant is successful on some or all of the issues presented at trial, as it may well be, it is then significantly protected from repeated and costly litigation all over the country (which seems to have been a problem for it in recent years).[108] This is an important factor favoring class determination.

■ Addressing the question from still another aspect, we believe that class treatment is an eminently appropriate vehicle for determining whether a nationwide franchisor in the category of Dunkin Donuts is engaging in anticompetitive practices to the detriment of its franchisees and competitors. This case in class action form will be massive in scope. However, we do not believe it will be unmanageable. Indeed, in view of the preeminent role of company policy in the case for trial, it would seem that evidence of the manner in which Dunkin Donuts conducted its business with respect to any putative class member would be admissible in the case before us regardless of whether a class were certified or not. In other words, the evidence might well be the same on the common issues (which comprise the vast bulk of the lawsuit) no matter how many plaintiffs are in the case, rendering this suit in class form weightier than without a class, but not so much weightier as might otherwise be expected.

■ As we analyze the case in terms of the *Katz* criteria, the alternative methods of adjudication of each class issue are a multitude of duplicative, expensive and time consuming suits. Conversely, the class action approach represents a fair and efficient accommodation of the interests of the plaintiffs, the potential class members, as well as the defendant, which will have the multifar-

---

108. In addition to the present suits and E. B. E., Inc. v. Dunkin' Donuts of America, Inc., 64 F.R.D. 140 (E.D.Mich., filed July 24, 1974), we note the existence of four other franchise antitrust actions which have been filed against Dunkin Donuts: Greene v. Dunkin Donuts, Inc., C.A. No. 3–5820–D (N.D.Texas, filed April 26, 1972); North Carolina ex rel. Robert Morgan v. Dunkin Donuts, Inc., No. 73–CVS–2680 (General Court of Justice of Wake County, Superior Court Division, filed Mar. 19, 1973) [also known as *Zezulka*]; Workman v. Dunkin Donuts, Inc., No. 74–173 (E.D.Pa., filed Jan. 23, 1974); Pasquarello v. Dunkin Donuts, Inc., No. 72–1424 (E.D.Pa., filed July 19, 1972). *Greene* was a suit filed on behalf of all present and past franchisees in Texas charging, *inter alia*, monopolization and attempt to monopolize, tying and exclusive dealing, and pendent fraud claims. *Zezulka* was an action initiated by the Attorney General of North Carolina seeking injunctive relief under North Carolina's "Little Sherman Act," N.C.Gen.Stats. Ch. 75, for unfair methods of competition and unfair deceptive acts and practices in the conduct of trade. Nine franchisees (one of whom was Zezulka) intervened as a purported class of franchisees. In the action by the franchisees in *Zezulka*, as well as in *Greene*, the courts relied on the individual coercion doctrine to deny class treatment. *Pasquarello* was brought in this court by Messrs. German and Manta, counsel for plaintiff Ungar herein. That case has been dismissed. *Workman* was brought in this court on behalf of a New Jersey franchisee by counsel not connected in any way with the present litigation. The parties have agreed to leave *Workman* in abeyance, pending the outcome of this motion.

ious claims against it adjudicated in one lawsuit. While the litigation will be onerous to this Court and to counsel, the total burden on the judicial system will be less than in the case of a series of protracted suits against the defendant. Finally, we believe the public interest will be served by a class adjudication. As the court of appeals noted in Hackett v. General Host Corp., 455 F.2d 618, 623 (3d Cir. 1972):

> The chief policy argument in favor of a hospitable attitude toward such class actions is that they tend to reenforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement. Viewed in this light the revised Rule 23 may be seen as an extension by the Supreme Court, acquiesced in by Congress, of the deterrent policies of such statutes as § 4 of the Clayton Act.[109]

(footnote omitted). We find the class action form to be superior.

## IX. *Conclusion*

For the reasons set forth in the foregoing opinion, we will make a class action determination in favor of the plaintiffs and certify for class treatment the following issues: (1) the antitrust tying claims with respect to equipment, signs, real estate and supplies;[110] (2) the contractual claims with respect to the Advertising Fund; and (3) the antitrust claims with respect to the in-term restrictive covenant. Certification of all other claims is denied.

We are satisfied that the named plaintiffs may proceed as representative parties for the class. In accordance with the dictates of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), plaintiffs will bear the costs of the class action notices. We will order counsel for plaintiffs to prepare a proposed form of notice to the class and submit it to counsel for defendant for comment, with a view to submitting a jointly approved form of notice to the Court. We will hold a conference for the purpose of passing upon the form of notice on March 21, 1975, at 11:00 a. m. in chambers.

In accordance with the foregoing opinion, we enter the following Order.

## ORDER

And now, this 12th day of March 1975, after hearing and upon considera-

---

109. There is a suggestion in portions of defendant's briefs and in some of the recent franchise class action motion opinions, *e. g.*, Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D. Ohio 1970), p. 104 *supra*, that class action certification is generally inappropriate in antitrust cases. Defendant suggests in one of its briefs that, at the very least, class certification is inappropriate in any but horizontal restraint antitrust cases. We find no evidence to support that conclusion. The history of class action litigation is heavily laden with antitrust cases. *Siegel*, the benchmark in the franchise field, was a class action case. Although the recent weight of authority in franchise cases is to deny class certification, that is so because of the acceptance of the individual coercion doctrine. Professor Moore points out the appropriateness (and limitations) of class treatment in antitrust cases, 3B Moore, *supra* ¶ 23.45[2], at 23–759–762. The discussion comes under the heading of predominance, and Professor Moore notes that the question of predominance is "more formidable in the numerous (b)(3) suits based on fraudulent dealings in securities [than in antitrust cases]." *Id.* at 23–762. The recent flurry of class certifications in antitrust cases, cited throughout this opinion, confirms this view. The significant point is that class certification turns not upon whether we are faced with an antitrust case, a securities fraud case, or some other particular area of substantive law, but upon compliance with Rule 23(b)(3).

110. However, we do not certify the equipment and sign tie-in claims in those instances where franchisees purchased used and equipped stores from either former franchisees or from Dunkin Donuts. Neither do we certify equipment and sign tie claims with respect to stores already equipped when purchased from Dunkin Donuts.

tion of the foregoing opinion and the findings contained therein, it is ordered that:

1. Plaintiffs' prayers for class certification under F.R.Civ.P. 23(b)(3) are granted as to the following issues: (1) the antitrust tying claims concerning equipment, signs, real estate and supplies;[111] (2) the contractual claim with respect to the Advertising Fund; and (3) the antitrust claim with respect to the in-term restrictive covenant.

2. Plaintiffs' prayers for certification under F.R.Civ.P. 23(b)(2) and for all other claims under F.R.Civ.P. 23(b)(3) are denied.

3. The plaintiffs in these actions shall be the representative plaintiffs in the herein certified class action which is to be maintained for a class comprised of all present and former Dunkin' Donuts franchisees.

4. For purposes of identifying the members of the class, defendant within 20 days from this date shall furnish the Court (with a copy to plaintiffs' counsel) a list of names and last known addresses of all those who are either present or former Dunkin' Donuts franchisees as of the date of this Order.

5. Notices shall be sent to each member of the class by first class mail. The expense of preparing, mailing and reproducing such notices to the class members shall be borne by plaintiffs. Plaintiffs shall prepare a proposed form of notice to the class and submit it to counsel for defendant, with a view to submitting a jointly approved form of notice to the Court. A conference will be held in chambers on March 21, 1975, at 11:00 a. m., for the purpose of passing upon the form of notice.

111. However, we do not certify the equipment and sign tie-in claims in those instances where franchisees purchased used and equipped stores from either former franchisees or from Dunkin' Donuts. Neither do we certify equipment and sign tie claims with respect to stores already equipped when purchased from Dunkin Donuts.